**Nos. 25-2092, 26-1093**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

IN RE: ADMINISTRATIVE SUBPOENA NO. 25-1431-019

THE CHILDREN'S HOSPITAL CORPORATION, d/b/a Boston Children's Hospital,

Petitioner-Appellee,

v.

UNITED STATES DEPARTMENT OF JUSTICE,

Respondent-Appellant.

On Appeal from the United States District Court
for the District of Massachusetts

## BRIEF FOR APPELLANT

BRETT A. SHUMATE
  *Assistant Attorney General*

BRAD HINSHELWOOD
BRANTLEY MAYERS
  *Attorneys, Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 890-9874*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .......................................................................................................1

STATEMENT OF JURISDICTION ..........................................................................4

STATEMENT OF THE ISSUE...................................................................................4

STATEMENT OF THE CASE...................................................................................5

      A.      Statutory Background.................................................................................5

            1.      The Federal Food, Drug, and Cosmetic Act ....................................5

            2.      The Health Insurance Portability & Accountability Act of 1996 and HIPAA Subpoenas ...................................................................9

      B.      Factual Background.................................................................................10

            1.      Off-Label Provision of Puberty Blockers and Cross-Sex Hormones to Treat Gender Dysphoria...........................................10

            2.      The Department's FDCA Investigation...........................................12

            3.      The Subpoena to BCH.......................................................................14

      C.      Prior Proceedings....................................................................................16

SUMMARY OF ARGUMENT.................................................................................. 17

STANDARD OF REVIEW ....................................................................................... 18

ARGUMENT ............................................................................................................. 19

I.      The BCH subpoena is valid and was properly issued........................................... 19

      A.      The subpoena satisfies the essential requisites for a valid administrative subpoena .............................................................................20

      B.      The district court erred in quashing the subpoena based on its evaluation of the Department's purpose......................................................24

1.  The district court misunderstood the "congressionally authorized purpose" inquiry...............................................25

2.  The district court erred in concluding that improper purpose justified quashal....................................................29

    a.  The district court erred in finding improper purpose because of the administration's policy preferences..............32

    b.  The district court also erred in finding improper purpose based on a lack of inculpatory evidence, the subpoena's breadth, and Massachusetts law ............................................38

II.  At minimum, the district court should have given the government an opportunity to satisfy its new, heightened standard...............................................45

CONCLUSION ........................................................................................48

CERTIFICATE OF COMPLIANCE

ADDENDUM

**TABLE OF AUTHORITIES**

**Cases:**                                                             **Page(s)**

*Community for Creative Non-Violence v. Pierce,*
   786 F.2d 1199 (D.C. Cir. 1986) ................................................................. 35

*Cooter & Gell v. Hartmarx Corp.,*
   496 U.S. 384 (1990) ................................................................................... 19

*Department of Com. v. New York,*
   588 U.S. 752 (2019) ................................................................................... 33

*Doe v. Dynamic Physical Therapy, LLC,*
   607 U.S. 11 (2025) ..................................................................................... 44

*Donaldson v. United States,*
   400 U.S. 517 (1971) ................................................................................... 30

*Dow Chem. Co. v. Allen,*
   672 F.2d 1262 (7th Cir. 1982) ................................................................... 20

*Endicott Johnson Corp. v. Perkins,*
   317 U.S. 501 (1943) ................................................................................... 19

*Fidelity/Micron Sec. Litig., In re,*
   167 F.3d 735 (1st Cir. 1999) ..................................................................... 46

*FTC v. Swanson,*
   560 F.2d 1 (1st Cir. 1977) ................................................................... 20, 28

*FTC v. Texaco, Inc.,*
   555 F.2d 862 (D.C. Cir. 1977) ........................................................... 20, 41

*Grand Jury Matters, In re,*
   751 F.2d 13 (1st Cir. 1984) .................................................................. 23-24

*Grand Jury Subpoenas Duces Tecum Dated January 30, 1986, In re,*
   638 F. Supp. 794 (D. Me. 1986) ............................................................... 23

*Kordel v. United States*,
335 U.S. 345 (1948) ....................................................................................7

*Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Tr. Corp.*,
5 F.3d 1508 (D.C. Cir. 1993) ...................................................................40

*Lynn v. Biderman*,
536 F.2d 820 (9th Cir. 1976) ...................................................................30

*McLane Co. v. EEOC*,
581 U.S. 72 (2017) ...................................................................................18

*McPhaul v. United States*,
364 U.S. 372 (1960) .................................................................................23

*Nyer v. Winterthur Int'l*,
290 F.3d 456 (1st Cir. 2002) ...............................................................18-19

*Sealed Case (Admin. Subpoena), In re*,
42 F.3d 1412 (D.C. Cir. 1994) ................................................................40

*Securities & Exch. Comm'n v. McGoff*,
647 F.2d 185 (D.C. Cir. 1981) ................................................................23

*Subpoena Duces Tecum, In re*,
228 F.3d 341 (4th Cir. 2000) ........................................................ 23, 39-40

*Sugarloaf Funding, LLC v. U.S. Dep't of the Treasury*,
584 F.3d 340 (1st Cir. 2009) ........................................................23, 28, 31

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .................................................................................35

*Trump v. Hawaii*,
585 U.S. 667 (2018) .................................................................................33

*Trump v. United States*,
603 U.S. 593 (2024) .................................................................................35

*U.S. Dep't of Just. v. Ricco Jonas*,
24 F.4th 718 (1st Cir. 2022) .........................................................20, 25, 27

*United States v. Arthur Andersen & Co.,*
623 F.2d 725 (1st Cir. 1980) ...................................................................30

*United States v. Bacto-Unidisk,*
394 U.S. 784 (1969)..................................................................................5

*United States v. Clarke,*
573 U.S. 248 (2014)................................................................................46

*United States v. Comley,*
890 F.2d 539 (1st Cir. 1989) ...............................................1, 27, 28, 30, 31

*United States v. Dotterweich,*
320 U.S. 277 (1943)..................................................................................5

*United States v. 47 Bottles, More or Less, Etc.,*
320 F.2d 564 (3d Cir. 1963).......................................................................7

*United States v. Gertner,*
65 F.3d 963 (1st Cir. 1995) ...............................................................30, 37

*United States v. LaSalle Nat'l Bank,*
437 U.S. 298 (1978).................................................................................30

*United States v. Markwood,*
48 F.3d 969 (6th Cir. 1995)......................................................................31

*United States v. Marschall,*
82 F.4th 774 (9th Cir. 2023) ...................................................................7-8

*United States v. Morton Salt Co.,*
338 U.S. 632 (1950) ............................................................... 1, 19, 20, 40

*United States v. Norwood,*
420 F.3d 888 (8th Cir. 2005) ...................................................................41

*United States v. Park,*
421 U.S. 658 (1975)...............................................................................5, 7

*United States v. Powell,*
379 U.S. 48 (1964)...............................................1, 19, 24-25, 26, 29, 39

*United States v. Skrmetti*,
605 U.S. 495 (2025)........................................................ 1, 2, 4, 10, 11, 32, 45

*United States v. Sturm, Ruger & Co.*,
84 F.3d 1 (1st Cir. 1996).............................1, 17, 19-20, 23, 24, 25, 26, 27, 28

*United States v. Texas*,
599 U.S. 670 (2023)..............................................................................35

*United States v. Trustees of Bos. Coll.*,
718 F.3d 13 (1st Cir. 2013) ..................................................................20

*United States v. Urbuteit*,
335 U.S. 355 (1948)................................................................................7

*United States v. Whispering Oaks Residential Care Facility, LLC*,
673 F.3d 813 (8th Cir. 2012) ...............................................................31

*United States v. Wiesenfeld Warehouse Co.*,
376 U.S. 86 (1964)..................................................................................7

*Usery v. Whitin Mach. Works, Inc.*,
554 F.2d 498 (1st Cir. 1977) ................................................................41

*Vahlsing v. Commercial Union Ins. Co.*,
928 F.2d 486 (1st Cir. 1991)............................................................30-31

*Wayte v. United States*,
470 U.S. 598 (1985)..............................................................................35

**Statutes:**

18 U.S.C. § 24(a) .................................................................................14

18 U.S.C. § 24(a)(2) ...............................................................................9

18 U.S.C. § 24(b).................................................................................9-10

18 U.S.C. § 3486 ............................................................................... 4, 21

18 U.S.C. § 3486(a)(1)(A)(i)(I) ...................................................................9, 21, 26

18 U.S.C. § 3486(a)(3) ...................................................................................24

21 U.S.C. § 321(m) ........................................................................................7

21 U.S.C. § 331................................................................................................ 7, 9

21 U.S.C. § 331(a)-(c) ..................................................................................... 6, 7

21 U.S.C. § 331(d) ...........................................................................................5

21 U.S.C. § 331(k) ........................................................................................... 6, 7

21 U.S.C. § 333(a)(1) .......................................................................................7

21 U.S.C. § 333(a)(2) ....................................................................................... 7, 22

21 U.S.C. § 352.................................................................................................6

21 U.S.C. § 352(a) ............................................................................................6

21 U.S.C. § 352(f) .............................................................................................5

21 U.S.C. § 352(f)(1)......................................................................................... 6, 7

21 U.S.C. § 355.................................................................................................6

21 U.S.C. § 355(a) ............................................................................................5

21 U.S.C. § 355(d) ............................................................................................6

28 U.S.C. § 1291 ..............................................................................................4

**Regulatory Materials:**

21 C.F.R. § 1.3(a) .............................................................................................7

21 C.F.R. § 201.5 .............................................................................................. 5, 6

21 C.F.R. §§ 201.55-201.57 ...................................................................................6

21 C.F.R. § 201.100 ..............................................................................................6

21 C.F.R. § 201.128 ......................................................................................... 6, 8

Exec. Order No. 14,168,
§ 2, 90 Fed. Reg. 8615 (Jan. 30, 2025)...............................................................11

Exec. Order No. 14,187,
§ 1, 90 Fed. Reg. 8771 (Feb. 3, 2025)................................................................11

**Rules:**

Fed. R. App. P. 4(a)(1)(B) .....................................................................................4

Fed. R. App. P. 10(a)(1).......................................................................................17

**Other Authorities:**

Admiral Brian Christine, Assistant Sec'y for Health, U.S. HHS,
*Evidence-Based Care for Children and Adolescents with Gender Dysphoria*
(Dec. 18, 2025), https://perma.cc/ZH22-R5GH .............................................13-14, 33

Dep't of Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria:*
*Review of Evidence and Best Practices* (Nov. 19, 2025),
https://perma.cc/MUB7-2ETU ..........................................................................33

Judgment, *United States v. Cephalon, Inc.*, No. 2:08-cr-598
(E.D. Pa. Oct. 10, 2008), Dkt. 11 .......................................................................8

Robert F. Kennedy Jr., Sec'y, U.S. HHS, *Declaration of the Secretary*
*of the Department of Health and Human Services: Safety, Effectiveness,*
*and Professional Standards of Care for Sex-Rejecting Procedures on Children*
*and Adolescents* (Dec. 18, 2025), https://perma.cc/P6NZ-V66S ........................ 14, 33

Memorandum from the Att'y Gen., Off. of the Att'y Gen.,
to Select Component Heads (Apr. 22, 2025),
https://perma.cc/N345-R8QL............................................................................ 12, 37

Press Release, The White House, *President Trump Is Delivering on His Commitment to Protect Our Kids* (Feb. 3, 2025), https://perma.cc/K7DT-J428 ...................................................................11-12

Press Release, The White House, *President Trump Promised to End Child Sexual Mutilation — and He Delivered* (July 25, 2025), https://perma.cc/ML5V-PVVK .......................................................................12

Press Release, U.S. Dep't of Just., *Eli Lilly and Company to Pay U.S. $36 Million Relating to Off-Label Promotion* (Dec. 21, 2005), https://perma.cc/2Y64-FUK5.................................................................... 8-9

Press Release, U.S. Dep't of Just., *Genzyme Corporation to Pay $32.5 Million to Resolve Criminal Liability Relating to Seprafilm* (Sep. 3, 2015), https://perma.cc/P7AT-MUVT ...............................................9

Press Release, U.S. Dep't of Just., *Wyeth Pharmaceutical Agrees to Pay $490.9 Million for Marketing the Prescription Drug Rapamune for Unapproved Uses* (July 30, 2013), https://archives.fbi.gov/ archives/oklahomacity/press-releases/2013/wyeth-pharmaceutical- agrees-to-pay-490.9-million-for-marketing-the-prescription-drug- rapamune-for-unapproved-uses.........................................................................9

Restatement (Second) of Torts § 682 cmt. b (A.L.I. 1977), Westlaw (database updated Sep. 2025) ........................................................30

Brett A. Shumate, Assistant Att'y Gen., U.S. Dep't of Just., to Civ. Div. Emps. (June 11, 2025), https://perma.cc/AMR2-U7W3.........................................................12-13, 37

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Oral argument is necessary in this case. The district court quashed a facially valid administrative subpoena based on an evaluation of the government's subjective purpose. Given the extraordinary relief the district court concluded was required by this Court's precedent, both the litigants in this case and the First Circuit would benefit from a thorough vetting of the issues at oral argument.

**INTRODUCTION**

Congress routinely authorizes federal agencies to issue subpoenas to investigate potential violations of federal law. An agency "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950). With broad agency discretion comes limited judicial intervention. Judicial review of a subpoena is "summary in nature," *United States v. Comley*, 890 F.2d 539, 541 (1st Cir. 1989), and an agency need only satisfy "modest requirements" related to relevance, scope, and procedure, *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 4 (1st Cir. 1996). A probable cause showing is not one of these requirements. *See United States v. Powell*, 379 U.S. 48, 57 (1964).

Every administration is also free to set enforcement priorities. Under this administration, the Department of Justice (Department) has made it a priority to investigate potential violations of the Federal Food, Drug, and Cosmetic Act (FDCA) and other federal health care offenses in connection with pediatric gender medicine. The Department has a substantial basis to believe that various actors in the industry, from hospitals to pharmaceutical companies, have violated federal law. Given that the practices at issue are "associated with harmful—and sometimes irreversible—risks," *United States v. Skrmetti*, 605 U.S. 495, 517 (2025), the Department has made ensuring compliance with federal law in this area a particular focus.

As part of this investigation, the Department issued an administrative subpoena to Boston Children's Hospital (BCH), "home to the first pediatric and adolescent transgender health program in the United States." Add.2. The Department suspects that BCH has in its possession records relevant to potential federal offenses and therefore issued a subpoena like those it ordinarily issues in the health care space. Yet the district court quashed the subpoena in full, denouncing the entire investigation as pretextual and effectively shielding the entire industry from federal due diligence.

The district court's order disregards basic principles governing review of administrative subpoenas. At bottom, the court's various errors rested on the fact that the President and other officials in his administration have expressed opposition to the administration of puberty blockers and cross-sex hormones to minors with gender dysphoria, and from this fact concluded that any subpoena issued to investigate the provision of puberty blockers and cross-sex hormones to minors is an attempt to "end" such interventions. That simply does not follow. To be sure, the President has serious moral and policy objections to the practice of subjecting minors to these interventions with "sometimes irreversible" consequences, *Skrmetti*, 605 U.S. at 503; *id.* at 534-35 (Thomas, J., concurring), but the current investigation seeks only to discover any violations of existing federal statutes. That is plainly permissible. Just as an administration skeptical of cryptocurrency could prioritize investigations into the use of cryptocurrency in money laundering schemes, or an administration opposed to sports gambling could choose to prioritize investigations into whether gambling

operations are complying with all regulatory requirements, an administration that is dubious of making permanent changes to children's bodies under the guise of "medical care" is entitled to prioritize investigations into whether industry actors are violating existing federal law. That does not amount to bad faith or pretext. To hold otherwise would immunize any industry or practice that an administration opposes as a policy matter, even if criminal activity is underway. That sweeping logic is unprecedented and unsustainable.

The district court's reliance on other aspects of the subpoena as demonstrating improper purpose is likewise mistaken. The court faulted the Department for not offering evidence that BCH violated federal law, but administrative subpoenas are permissible even at the earliest stages of an investigation, and the government need not provide evidence to justify an administrative subpoena to gather evidence, especially when BCH may simply be a witness to misconduct. The court also questioned the breadth of some of the subpoena's requests for information, but each of the subpoena's requests sought documents relevant to the ongoing investigation and fell well within the permissible scope of a subpoena. And even if the court had concerns about the breadth of the subpoena, it should have considered whether to narrow it, not quashed it entirely on grounds that would appear to foreclose the Department from issuing *any* subpoena. Similarly, the court's assertion that Massachusetts law allows the administration of these interventions to minors is a non

sequitur; Massachusetts law cannot authorize violations of federal law in the healthcare industry.

The safety and propriety of gender-related interventions for minors is a topic of "fierce scientific and policy debates," one that the President and his administration have not hesitated to address. *Skrmetti*, 605 U.S. at 525. But that political backdrop does not excuse participants in this industry from complying with the same federal health care laws as everyone else. And it certainly should not shield them from ordinary criminal investigations or duly authorized subpoenas. This Court should reverse the order below.

## STATEMENT OF JURISDICTION

The district court granted BCH's motion to quash on September 9, 2025. The government filed a timely notice of appeal on November 7, 2025. *See* Fed. R. App. P. 4(a)(1)(B). The district court denied the Department of Justice's motion to alter the judgment on November 24, 2025, and the government filed a timely notice of appeal on January 23, 2026. *See id.* This Court subsequently consolidated the appeals. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court erred in quashing a subpoena to BCH expressly authorized by 18 U.S.C. § 3486 on the basis that the Department failed to show a proper purpose and issued the subpoena for an improper purpose.

# STATEMENT OF THE CASE

## A. Statutory Background

### 1. The Federal Food, Drug, and Cosmetic Act

In 1938, Congress passed, and President Franklin D. Roosevelt signed into law, the FDCA. The FDCA's "overriding purpose [is] to protect the public health." *United States v. Bacto-Unidisk,* 394 U.S. 784, 798 (1969). Because the FDCA's purpose should "infuse construction of the" FDCA, *United States v. Dotterweich*, 320 U.S. 277, 280 (1943), courts give the FDCA a "liberal construction" that furthers protection of the public health, including criminal enforcement, *Bacto-Unidisk*, 394 U.S. at 798; *see also United States v. Park*, 421 U.S. 658, 672 (1975) (explaining the FDCA imposes a "positive duty to seek out and remedy violations when they occur").

The FDCA regulates the development, manufacturing, and distribution of drugs in the United States. Before any "new drug" may enter interstate commerce, the manufacturer must demonstrate to the United States Food and Drug Administration (FDA) that the drug is both safe and effective for each of its intended uses. 21 U.S.C. §§ 331(d), 355(a). The introduction of an unapproved new drug into interstate commerce violates the FDCA. *Id.* § 331(d).

A drug manufacturer obtains FDA approval for a new drug through a new drug application (NDA) that demonstrates its drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a). When FDA approves a drug, it approves it as safe and effective for particular use(s) in the NDA. *See id.* § 352(f); 21 C.F.R. § 201.5. In

addition, for prescription drugs, FDA must also approve elements of the drug's labeling, such as the prescribing information, which specifies, among other things, the essential scientific information needed for the safe and effective use of the drug for its FDA-approved uses and adequate directions for those uses. 21 U.S.C. §§ 352(f)(1), 355; *see* 21 C.F.R. §§ 201.5, 201.55-201.57, 201.100. Because a drug that is safe and effective for one use may be neither safe nor effective for others, FDA approval extends only to the uses specified in a drug's approved application and labeling. 21 U.S.C. § 355(d).

The FDCA generally prohibits "misbranding" a drug. *See* 21 U.S.C. § 352; *id.* § 331(a)-(c), (k). A drug may be misbranded if, among other things, its labeling is false or misleading, *id.* § 352(a), or if its labeling does not bear adequate directions for its intended use, *id.* § 352(f)(1). "Intended use" means the "objective intent of the persons legally responsible for the labeling of an article (or their representatives)." 21 C.F.R. § 201.128. Such intent "may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives." *Id.* And the "intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer." *Id.* If, for example, a seller "intends an article for different uses than those intended by the person from whom he or she received the article," then the "seller is required to supply adequate labeling in accordance with the new intended uses." *Id.*

6

Under the FDCA, drug labeling is broadly defined to include any "written, printed, or graphic matter . . . accompanying" the drug. 21 U.S.C. § 321(m). The term "accompanying" includes materials that are separate from but related to the drug and any material that supplements, explains, or is designed for use with the drug. *See id.* § 321(m); 21 C.F.R. § 1.3(a); *Kordel v. United States*, 335 U.S. 345, 349-50 (1948); *United States v. Urbuteit*, 335 U.S. 355, 357 (1948); *United States v. 47 Bottles, More or Less, Etc.*, 320 F.2d 564, 569 (3d Cir. 1963). Labeling can include promotional materials, advertisements, brochures, flyers, instruction sheets, posters, and similar materials.

Given the FDCA's protective purpose, misdemeanor violations of the FDCA are punishable on a strict liability basis, without any proof of criminal intent. *See* 21 U.S.C. §§ 331, 333(a)(1); *Park*, 421 U.S. at 672-73; *United States v. Wiesenfeld Warehouse Co.*, 376 U.S. 86, 91 (1964). For example, if a drug manufacturer or other person causes the distribution of an approved drug for an unapproved use, the manufacturer or other person could be charged with misbranding the drug or distributing a drug with labeling that lacks adequate directions for its intended uses. 21 U.S.C. §§ 331(a)-(c), (k), 352(f)(1). Where a violator has an intent to defraud or mislead, an FDCA violation may be punishable as a felony. *Id.* § 333(a)(2).

Misbranding, via false or misleading "written, printed, or graphic matter" on a drug, container, or wrapper or that supplements, explains, or is designed for use with a drug, is a classic FDCA violation. *See, e.g.*, *United States v. Marschall*, 82 F.4th 774, 779 (9th Cir. 2023) (quotation omitted) (upholding misbranding conviction of the

defendant who shipped drugs with false informational sheets). Drug manufacturers and distributors also can be convicted of FDCA violations, for example, for shipping drugs in interstate commerce intending that they be used off-label, with that intent frequently shown through evidence of promoting the drugs for such uses. *See* 21 C.F.R. § 201.128 (intent may "be shown by labeling claims, advertising matter," "oral or written statements," and "circumstances in which the [drug] is, with the knowledge of" certain persons, "offered or used for a purpose for which it is neither labeled nor advertised"); *see, e.g.*, Judgment, *United States v. Cephalon, Inc.*, No. 2:08-cr-598 (E.D. Pa. Oct. 10, 2008), Dkt. 11 (conviction of manufacturer for promoting three drugs for off-label uses). Thus, in such prosecutions, the government may rely on evidence of communications between pharmaceutical sales representatives and prescribing physicians and recommendations to doctors of diagnostic codes to mask off-label prescriptions to ensure payment for unapproved uses. *See, e.g.*, Information at 4-5, ¶¶ 12-18, *United States v. Cephalon, Inc.*, No. 2:08-cr-598 (E.D. Pa. Sep. 29, 2008), Dkt. No. 1; Press Release, U.S. Dep't of Just., *Eli Lilly and Company to Pay U.S. $36 Million Relating to Off-Label Promotion* (Dec. 21, 2005), https://perma.cc/2Y64-FUK5 (announcing guilty plea of drug manufacturer involving illegal off-label promotion and highlighting evidence that the defendant "[e]ncourag[ed] sales representatives . . .

to send unsolicited medical letters to promote the drug for an unapproved use to doctors"). [1]

### 2. The Health Insurance Portability and Accountability Act of 1996 and HIPAA Subpoenas

In 1996, Congress passed, and President Clinton signed into law, the Health Insurance Portability and Accountability Act (HIPAA). As relevant here, the statute permits the Attorney General to issue a subpoena—often referred to as a "HIPAA subpoena"—to investigate federal health care offenses. 18 U.S.C. § 3486(a)(1)(A)(i)(I). A federal health care offense includes a "violation of, or a criminal conspiracy to violate" 21 U.S.C. § 331, "if the violation or conspiracy relates to a health care benefit program," 18 U.S.C. § 24(a)(2). And a "health care benefit program" is "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is

---

[1] There are many similar examples. *See, e.g.*, Press Release, U.S. Dep't of Just., *Genzyme Corporation to Pay $32.5 Million to Resolve Criminal Liability Relating to Seprafilm* (Sep. 3, 2015), https://perma.cc/P7AT-MUVT (highlighting evidence that manufacturer encouraged off-label uses by distributing promotional materials citing a misleading scientific study); *United States v. Endo Pharms., Inc.*, No. 1:14-CR-66 (N.D.N.Y. Feb. 21, 2014), Dkt. 2 (deferred prosecution agreement regarding drug manufacturer's off-label promotion of drug, highlighting evidence that manufacturer distributed a misleading scientific study and promoted off-label uses at educational presentations for physicians); Press Release, U.S. Dep't of Just., *Wyeth Pharmaceutical Agrees to Pay $490.9 Million for Marketing the Prescription Drug Rapamune for Unapproved Uses* (July 30, 2013), https://archives.fbi.gov/archives/oklahomacity/press-releases/2013/wyeth-pharmaceutical-agrees-to-pay-490.9-million-for-marketing-the-prescription-drug-rapamune-for-unapproved-uses (highlighting evidence that manufacturer paid bonuses to incentivize off-label sales).

providing a medical benefit, item, or service for which payment may be made under the plan or contract." *Id.* § 24(b). The Department is therefore expressly empowered to use a HIPAA subpoena to investigate violations of the FDCA and related conspiracies, if the violation or conspiracy relates to products or services that might ultimately be paid for by a private or public health insurance program.

### B.  Factual Background

#### 1.  Off-Label Provision of Puberty Blockers and Cross-Sex Hormones to Treat Gender Dysphoria

This case involves a HIPAA subpoena that the Department issued in connection with an investigation into the provision of certain prescription drugs to minors with gender dysphoria. *See* App.17-44. These include prescription drugs that suppress the production of sex hormones to delay puberty (commonly referred to as "puberty blockers") and cross-sex hormones meant to induce physical changes to alter the child's secondary sexual characteristics to resemble those typically seen in the opposite sex and less like the individual's biological sex. *See United States v. Skrmetti*, 605 U.S. 495, 503-04 (2025) (describing use of these drugs). Although these drugs are approved by FDA for some uses, FDA has not determined that any of these drugs are safe or effective for the treatment of gender dysphoria, nor has FDA approved any of these prescription drugs for the treatment of gender dysphoria or any other psychiatric disorder.

The use of these drugs in the treatment of gender dysphoria in minors is highly controversial—the subject of "fierce scientific and policy debates." *Skrmetti*, 605 U.S. at 525. As the Supreme Court recently explained, "health authorities in a number of European countries have raised significant concerns regarding the potential harms associated with using puberty blockers and hormones to treat transgender minors," and "more than 20 States have enacted laws banning the provision of sex transition treatments to minors." *Id.* at 504-05; *see also id.* at 533-35 (Thomas, J., concurring).

Shortly after entering office, President Trump issued several Executive Orders weighing in on these and related issues. Executive Order 14168 establishes a policy "to recognize two sexes, male and female," and states that a contrary "gender ideology" is harmful and that the two "sexes are not changeable and are grounded in fundamental and incontrovertible reality." Exec. Order No. 14,168, § 2, 90 Fed. Reg. 8615, 8615 (Jan. 30, 2025). Executive Order 14187 establishes a federal policy not to "fund, sponsor, promote, assist, or support the so called 'transition' of a child from one sex to another." Exec. Order No. 14,187, § 1, 90 Fed. Reg. 8771, 8771 (Feb. 3, 2025).

Since issuing those orders, the White House has praised certain hospitals' decisions to "downsize or eliminate their so-called 'gender-affirming care' programs," explaining that the latter executive order was "already having its intended effect — preventing children from being maimed and sterilized by adults perpetuating a radical, false claim that they can somehow change a child's sex." Press Release, The White

11

House, *President Trump Is Delivering on His Commitment to Protect Our Kids* (Feb. 3, 2025), https://perma.cc/K7DT-J428; *see* Press Release, The White House, *President Trump Promised to End Child Sexual Mutilation — and He Delivered* (July 25, 2025), https://perma.cc/ML5V-PVVK (similar).

### 2. The Department's FDCA Investigation

The Department has taken steps to investigate potential violations of the FDCA in connection with the provision of puberty blockers and cross-sex hormones to minors. In April, Attorney General Bondi directed the Department "to investigate and hold accountable medical providers and pharmaceutical companies that mislead the public about the long-term side effects of chemical and surgical mutilations." Memorandum from the Att'y Gen., Off. of the Att'y Gen., to Select Component Heads 4 (Apr. 22, 2025), https://perma.cc/N345-R8QL (Bondi Memo); *see* Add.3. Attorney General Bondi did not purport to declare any conduct unlawful, or to change the laws that apply to this industry. Rather, the Bondi Memo directed the Department to "undertake appropriate investigations of any violations of the [FDCA] by manufacturers and distributors engaged in misbranding by making" purported "false claims about the on- or off-label use of puberty blockers, sex hormones," and similar drugs. Bondi Memo 4.

In June, Assistant Attorney General for the Civil Division Brett Shumate issued a memorandum stating that "[t]he Civil Division will use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other

appropriate entities . . . [including] possible violations of the [FDCA] and other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs." Memorandum from Brett A. Shumate, Assistant Att'y Gen., U.S. Dep't of Just., to Civ. Div. Emps. 2-3 (June 11, 2025), https://perma.cc/AMR2-U7W3 (Shumate Memo); *see* Add.3-4. This memo too simply expressed an intention to investigate potential violations of existing federal statutes.

Based on information from whistleblowers and experts, there may be violations of federal law associated with gender-related treatments for minors. For example, the marketing or promotion of puberty blockers and cross-sex hormones (the drugs at the center of the investigation) for treating gender dysphoria in minors—an unapproved use—could constitute illegal misbranding under the FDCA. Misleading or deceiving minors and their parents about the risks of gender-related treatments could similarly violate the FDCA.

These are not mere technical violations. Bypassing the drug approval process carries real health consequences for children. After surveying the evidence, the United States Department of Health and Human Services (HHS) has identified harms associated with these drugs—including infertility and sterility, impaired bone density development, cardiovascular and metabolic disease, psychiatric conditions, and others—and determined that "[a]vailable evidence cannot support determinations regarding the effectiveness of these medical interventions for improving mental health

or alleviating gender dysphoria symptoms in children and adolescents." Admiral Brian Christine, Assistant Sec'y for Health, U.S. HHS, *Evidence-Based Care for Children and Adolescents with Gender Dysphoria* 1 (Dec. 18, 2025), https://perma.cc/ZH22-R5GH (HHS Statement). And the HHS Secretary, after conducting a comprehensive evidence review, concluded that "[s]ex-rejecting procedures for children and adolescents are neither safe nor effective as a treatment modality for gender dysphoria, gender incongruence, or other related disorders in minors, and therefore, fail to meet professional recognized standards of health care." Robert F. Kennedy Jr., Sec'y, U.S. HHS, *Declaration of the Secretary of the Department of Health and Human Services: Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents* 9 (Dec. 18, 2025), https://perma.cc/P6NZ-V66S (HHS Secretary Declaration).

### 3. The Subpoena to BCH

BCH describes itself as "home to the first pediatric and adolescent transgender health program in the United States." Dkt. 4 at 4. Through this program, BCH states that it provides interventions for minors with gender dysphoria including "puberty suppression" and "hormone therapy," *id.* at 5—in other words, the provision of puberty blockers and cross-sex hormones for unapproved uses.

The Civil Division issued a HIPAA subpoena to BCH in June 2025 seeking information relevant to its investigation into potential violations of the FDCA in connection with the provision of puberty blockers and cross-sex hormones to minors.

14

App.17-44. The subpoena explained that it seeks information to investigate "Federal health care offenses as defined in 18 U.S.C. § 24(a)," *id.* at 18, and included 15 different requests for documents. The subpoena seeks documents and data relating to BCH's provision of gender-related medical treatment, including medical records for patients prescribed puberty blockers or hormone therapy and documents relating to billing or coding practices, or insurance claims, for gender-related care. *Id.* at 24-26. It also seeks communications with pharmaceutical manufacturers regarding the use of puberty blockers or hormones in connection with gender affirming care for minor patients. *Id.* at 25.

At a minimum, given BCH's self-described history of prescribing the drugs at the center of the Department's investigation, BCH could be a witness to federal misconduct by other actors in the distribution chain, like pharmaceutical companies. And in a supplemental declaration from a Department attorney that the district court declined to consider, App.99-114 (Hsiao Declaration), the Department also outlined information specific to BCH's transgender health program that raised concerns related to the investigation. For example, between 2015 and 2024, BCH provided a first diagnosis of central precocious puberty to over 500 minors age 10 or older, including numerous teenagers aged 14 to 18—much older than children who are typically diagnosed with precocious puberty. App.110. This data raises, at the least, a question as to the legitimacy of BCH's billing practices and the presence of fraudulent intent. Statements from BCH clinicians—which indicate that prescriptions for

15

puberty blockers and hormones are written without the necessary evaluation of a child's mental state or parental consent—raise similar questions. *Id.* at 111. And statements previously found on a BCH website but since removed—which claimed puberty blockers are "temporary," "fully reversible" and "do not cause any permanent changes," *id.*—may be false or misleading, *see, e.g.*, HHS Statement 3 (identifying "substantial risks associated with irreversible medical interventions"), and could render such drugs misbranded.

### C. Prior Proceedings

On July 8, 2025, BCH moved to quash the subpoena. BCH argued that the Department did not issue the subpoena for a congressionally authorized purpose, the subpoena did not seek documents relevant to any authorized purpose, and the subpoena requests are overbroad and unduly burdensome. App.11.

The district court granted BCH's motion. Add.1-14. The court concluded that the Department "failed to show proper purpose" because the Department failed to "submit[] any affidavits or other evidence" and failed to "provide[] any support" that the subpoena was limited to potential healthcare offenses. *Id.* at 11. The court faulted the Department for not "offering an iota of suspicion that BCH is actually engaging in fraudulent billing practices or off-label promotion" and for issuing requests that "seek an astonishingly broad array of documents and information." *Id.* at 12. The court determined—based on statements from the President and administration officials— that the "true purpose of issuing the subpoena is to interfere with the Commonwealth

16

of Massachusetts' right to protect [gender-affirming care] within its borders, to harass and intimidate BCH to stop providing such care, and to dissuade patients from seeking such care." *Id.* at 14.

In the light of the district court's order, the Department moved to alter or amend the judgment and requested an opportunity to make an evidentiary showing to meet the district court's standard. App.96. Along with its motion, the Department attached the Hsiao Declaration, which explains the proper purpose behind the government's investigation and explains the relevance of each request. App.99-114.[2] Because the Department filed the motion at 10:30 p.m. rather than the 6:00 p.m. deadline in the District of Massachusetts's local rule, the court denied the motion. Add.16-18.

## SUMMARY OF ARGUMENT

This Court should reverse the district court's order quashing the subpoena. The Department has statutory authority to investigate potential FDCA violations; the sought-after records are relevant to the Department's FDCA investigation; the Department has adequately described the records it seeks; and the Department followed the procedural requirements. As a result, Department's subpoena is valid and properly issued. *See United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 4 (1st Cir. 1996).

---

[2] The declaration is part of the record on appeal. *See* Fed. R. App. P. 10(a)(1) (providing that the record on appeal includes "the original papers and exhibits filed in the district court").

The district court's contrary conclusion is built on interrelated errors. First, the court mistook the "congressionally authorized purpose" inquiry for a burden on the government to provide evidence supporting the subpoena's purpose. Second, the court erred in concluding that the government's opposition to certain medical interventions for minors with gender dysphoria renders pretextual and improper any investigation into those practices. Regardless, there is no indication that such an improper purpose is the sole reason for the subpoena, as this Court's cases require. Third, nothing about Massachusetts state law's allowance of "gender-affirming care," the scope of the subpoena, or the amount of inculpatory evidence in the record—the other reasons the court offered in favor of its "improper purpose" finding—supports quashal either. State law cannot immunize an actor from compliance with federal law. The subpoena is not overbroad, which would not support quashing it entirely in any event. And the government need not provide an evidentiary showing that an offense has likely been committed, whether a showing of probable cause or otherwise, before issuing a subpoena to investigate whether an offense has been committed.

Finally, at minimum, the district court erred by failing to give the Department a fair opportunity to meet the new, heightened standard that it created and imposed.

**STANDARD OF REVIEW**

An order quashing an administrative subpoena is reviewed for abuse of discretion. *McLane Co. v. EEOC*, 581 U.S. 72, 75 (2017). A district court abuses its discretion "if it based its ruling on an erroneous view of the law or on a clearly

erroneous assessment of the evidence." *Nyer v. Winterthur Int'l*, 290 F.3d 456, 461 (1st Cir. 2002) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

## ARGUMENT

## I.      The BCH subpoena is valid and was properly issued.

Congress has authorized the Department to investigate and prosecute federal healthcare offenses. Accordingly, the Department "may take steps to inform itself as to whether there is probable violation of the law." *United States v. Morton Salt*, 338 U.S. 632, 643 (1950). Indeed, the Department "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Id.* at 642-43. No showing of probable cause is necessary. *See United States v. Powell*, 379 U.S. 48, 57 (1964). And in its investigation, the Department is entitled to any evidence unless it is "plainly incompetent or irrelevant to any lawful purpose" of the Department in investigating federal healthcare offenses. *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943).

In accord with these principles, this Court has long provided that the "requirements for enforcement of an administrative subpoena are not onerous." *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 4 (1st Cir. 1996). The agency must show that "(1) the subpoena is issued for a congressionally authorized purpose, the information sought is (2) relevant to the authorized purpose and (3) adequately described, and (4) proper procedures have been employed in issuing the subpoena."

*Id.* The subpoena at issue meets these minimal requirements and the district court's contrary reasons do not withstand scrutiny.

### A. The subpoena satisfies the essential requisites for a valid administrative subpoena.

Each of the requirements this Court and the Supreme Court has identified are satisfied here. At the outset, the subpoena is plainly within the agency's congressionally-granted authority and seeks information relevant to that authorized investigation. An administrative subpoena meets these requirements if the agency's assertion of investigative "authority is not obviously apocryphal," *Sturm, Ruger & Co.*, 84 F.3d at 5; *accord U.S. Dep't of Just. v. Ricco Jonas*, 24 F.4th 718, 726 (1st Cir. 2022); *FTC v. Swanson*, 560 F.2d 1, 2 (1st Cir. 1977) (per curiam), and the information sought is "reasonably relevant," *Morton Salt,* 338 U.S. at 652, to the "general purposes of the agency's investigation," *Dow Chem. Co. v. Allen*, 672 F.2d 1262, 1268 (7th Cir. 1982) (alteration adopted and quotation omitted))); *see United States v. Trustees of Bos. Coll.*, 718 F.3d 13, 24 (1st Cir. 2013); *FTC v. Texaco, Inc.*, 555 F.2d 862, 874 (D.C. Cir. 1977) (en banc) ("[I]n the pre-complaint stage, . . . the relevance of the agency's subpoena requests may be measured only against the general purposes of its investigation."). And at the subpoena stage, courts do not resolve questions about the agency's "substantive authority to regulate," which are instead to be resolved in any future civil or criminal action that results from the investigation. *Sturm, Ruger & Co.*, 84 F.3d at 5; *accord Swanson*, 560 F.2d at 2.

Here, Congress has expressly authorized the Attorney General to issue subpoenas to investigate potential violations of "Federal health care offense[s]," including qualifying offenses in the FDCA. 18 U.S.C. § 3486(a)(1)(A)(i)(I). The subpoena in this case was issued for that very purpose. Attorney General Bondi ordered the Civil Division's Enforcement and Affirmative Litigation Branch "to undertake appropriate investigations of any violations of the [FDCA] by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'" Add.3 (alteration in original) (quotation omitted). In the Shumate Memo, the Assistant Attorney General stated that the Civil Division will use "all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with [the Bondi Memo's] directives," which would include investigations into "possible violations of the FDCA." Add.3-4 (quotation omitted).

The subpoena to BCH—which requests documents from BCH to assist the Department's efforts to "investigate Federal health care offenses," App.18—follows directly from the Bondi and Shumate memoranda's prioritization of investigations Congress authorized in 18 U.S.C. § 3486. The Bondi and Shumate memoranda directed the Civil Division to use its authority to investigate potential violations of the FDCA related to puberty blockers and cross-sex hormones. BCH houses a "pediatric and adolescent transgender health program" and prescribes the drugs at issue. Add.2.

21

The subpoena seeks information relevant to the Department's investigation in two different ways. First, the Department seeks records to determine whether BCH itself may have engaged in conduct that implicates the FDCA. Second, the Department seeks records from BCH to determine whether manufacturers and distributors of the drugs at issue may have violated the FDCA.

There are four groups of Requests, all of which extend from January 1, 2020, to the present. Request 1 seeks personnel files to identify who had authority to direct prescribing, billing, or marketing practices and to determine which actors may have liability. App.24. Requests 2 through 6—which seek documents related to billing, insurance claims, and diagnosis coding practices—are informative as to the existence of false billing and the presence of an "intent to defraud or mislead." 21 U.S.C. § 333(a)(2); *see* App.24-25. Requests 7 through 10 seek documents related to the relationship between BCH and drug manufacturers, which can provide evidence of misbranding and fraudulent intent. App.25. For example, communications between pharmaceutical sales representatives and prescribing physicians can provide evidence of off-label promotion, which would be relevant to an FDCA prosecution for misbranding drugs. *See, e.g.*, *supra* p. 8. Finally, Requests 11 through 15 seek patient records, which will allow the Department to assess the scope of the potential violations at issue, identify patterns of misbranding or false billing, and assess fraudulent intent. App.25-26.

These requests are also "adequately described." *Sturm, Ruger & Co.*, 84 F.3d at 4. There is no meaningful doubt about what records are sought. And to the extent the district court viewed the requests as broad, *see* Add.12, the breadth of the requests flows from the nature of the investigation itself: because the Department's "inquiry" is "a relatively broad one," "the permissible scope of materials that [can] reasonably be sought [is] necessarily equally broad." *McPhaul v. United States*, 364 U.S. 372, 382 (1960); *see Securities & Exch. Comm'n v. McGoff*, 647 F.2d 185, 192-93 (D.C. Cir. 1981) ("We agree that the demands are broad. But the nature of the inquiry precludes a trim list of requests." (footnote omitted)); *cf. Sugarloaf Funding, LLC v. U.S. Dep't of the Treasury*, 584 F.3d 340, 348 (1st Cir. 2009) ("[T]here are no cases that universally proscribe the use of 'all documents' language."). The Department's requests are not atypical in this area. *See, e.g.*, *In re Subpoena Duces Tecum*, 228 F.3d 341, 350 (4th Cir. 2000) ("[I]f Bailey had treated 15,000 patients over a period of seven years and all of them were reimbursed on claims he submitted, a suspicion of fraud on these claims would justify a review of Bailey's documentation of services to these patients, of the claims submitted on their behalf, and of the reimbursements collected."); *see also In re Grand Jury Subpoenas Duces Tecum Dated January 30, 1986*, 638 F. Supp. 794, 795-96 (D. Me. 1986) (concluding that grand jury subpoenas health-care fraud investigation were not overbroad despite necessity that psychiatrist review all 2,500 patient files). Further, the "subpoena commands production of materials covering only a reasonable

period of time," currently a little over six years. *In re Grand Jury Matters*, 751 F.2d 13, 18 (1st Cir. 1984).

Finally, there is no dispute that the "proper procedures have been employed in issuing the subpoena." *Sturm, Ruger & Co.*, 84 F.3d at 4. The subpoena was signed by the Assistant Attorney General, properly served on BCH, and calls for the production of nonprivileged documents relevant to the investigation within 500 miles of BCH. *See* App.17-44; 18 U.S.C. § 3486(a)(3).

### B. The district court erred in quashing the subpoena based on its evaluation of the Department's purpose.

As the foregoing illustrates, the subpoena here met all the basic requisites for a valid subpoena. The district court nevertheless quashed the subpoena based on its conclusion "that the Government has failed to show proper purpose and, even if it had, that BCH has demonstrated that the subpoena was issued for an improper purpose, motivated only by bad faith." Add.14. This is wrong twice over.

First, the district court did not apply the relevant standard this Court has articulated for the "proper purpose" requirement, and to the extent the district court intended that statement to provide a distinct ground for quashal, it was manifestly wrong.

Second, the district court erroneously found improper purpose. The Supreme Court has recognized that a facially valid subpoena may be quashed if a recipient meets the high burden of demonstrating that the subpoena was "issued for an

improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell*, 379 U.S. at 58. The district court here concluded that the subpoena was issued for an improper purpose because it was pursuing the "Administration's goal of ending [gender-affirming care]." Add.11. That determination was wrong in every respect. An administration's policy view that particular practices or industries should be regulated or even banned cannot immunize those practices or industries from investigations into their compliance with existing federal law. The court's conception of "improper purpose" erroneously conflated reasonable policy views with illicit animus, required the government to submit inculpatory evidence concerning the subpoena recipient, treated a run-of-the-mill breadth dispute as grounds for facially quashing an entire subpoena, and improperly relied on state law to limit a federal investigation.

1. **The district court misunderstood the "congressionally authorized purpose" inquiry.**

As discussed above, the first prerequisite for a valid subpoena is that the subpoena must be "issued for a congressionally authorized purpose." *Sturm, Ruger & Co.*, 84 F.3d at 4. "A challenge to a subpoena" on the ground that it fails to meet that element "will fail '[a]s long as the agency's assertion of authority is not obviously apocryphal.'" *Ricco Jonas*, 24 F.4th at 726 (alteration in the original) (quoting *Sturm, Ruger & Co.*, 84 F.3d at 5). Here, the Department explained that the subpoena sought

evidence relevant to its investigation of potential federal health care offenses, as authorized by 18 U.S.C. § 3486(a)(1)(A)(i)(I), and identified some of the health care offenses potentially under investigation, specifically offenses related to the potential misbranding of puberty blockers and cross-sex hormones. The district court also reviewed the Bondi and Shumate memoranda, Add.3-4, which serve to authorize and direct the FDCA investigation. Whatever else may be said of the Department's authority, its ability to investigate potential misbranding of drugs in violation of the FDCA cannot be described as "apocryphal."

In conducting its "improper purpose" analysis, the district court stated that the government had "failed to show proper purpose." Add.11; *id.* at 14 (same). To the extent the court intended that statement to suggest that the Department had failed to demonstrate that the subpoena was "issued for a congressionally authorized purpose," *Sturm, Ruger & Co.*, 84 F.3d at 4, that was plainly mistaken. The court acknowledged that the Department "is authorized by statute to issue a subpoena if it relates to a federal healthcare offense." Add.11. Moreover, the district court did not suggest that the Department's authority to investigate in this area is "apocryphal"—indeed, it did not even cite this Court's articulation of the governing standard.

The question of whether the Department has authority to issue a subpoena is conceptually distinct from the question of whether an otherwise-valid subpoena should be quashed because it was issued for an "improper purpose." *See Powell*, 379 U.S. at 58. The district court appears to have seized upon—and misinterpreted—

language from this Court describing the first element of the enforcement test as examining whether the subpoena "is for a proper purpose authorized by Congress." *United States v. Comley*, 890 F.2d 539, 541 (1st Cir. 1989). In the very same decision, the Court made clear that the inquiry into whether a subpoena is facially valid examines the agency's statutory authority, observing that a court "must enforce an administrative subpoena" if it is (*inter alia*) "within the agency's authority," and concluding that the government had satisfied that requirement by showing that "Congress has vested the [agency] with the authority to issue subpoenas in conjunction with investigations" within the agency's statutory authority and the agency had invoked an authorized purpose "as one of the purposes underlying its subpoena." *Id.* at 541-42 (quotation omitted). That is why this Court has subsequently cited *Comley* as confirming that an agency need only identify a "congressionally authorized purpose." *Sturm, Ruger & Co.*, 84 F.3d at 4 (citing *Comley*, 890 F.2d at 541); *see Ricco Jonas*, 24 F.4th at 726 (applying "not obviously apocryphal" standard).

For the same reasons, the district court's suggestion that the Department had failed to satisfy this element of the inquiry because it had not supplied "evidence," such as "affidavits," further outlining the nature of the investigation at issue, Add.11, was mistaken. It is entirely unclear what additional information an affidavit could provide that would address whether the subpoena was issued as part of an investigation into a federal healthcare offense, as authorized by statute. The Bondi and Shumate memoranda make clear that such an investigation is underway and the nature

27

of that investigation. *See also In Re: 2025 Subpoena to Children's National Hospital*, 1:25-cv-03780 (D. Md. Dec. 15, 2025), Dkt. 15-1 ¶¶ 34-35 (detailing investigative findings).

While the government sometimes submits declarations or affidavits in subpoena enforcement actions, *see, e.g.*, *Comley*, 890 F.2d at 541 ("[T]he affidavits of government officials have been accepted as sufficient to make out a prima facie showing that the[] requirements [for enforceability] are satisfied."), those suits commonly involve investigations as to which there is no public information about the existence or scope of the investigation. In such circumstances, a district court would be oblivious to the existence of an investigation or its statutory grounding without a declaration. But here, the Bondi and Shumate memoranda serve that purpose: they demonstrate that an investigation exists into potential FDCA violations, and no one disputes that the subpoena here was issued as part of that investigation. Given the context, nothing more is needed to show that, in issuing the subpoena here, the Department is not "wander[ing] unconscionably far afield" from its statutory authority. *Swanson*, 560 F.2d at 2.

The district court underscored its confusion by stating that applying the proper test would result in the government's "self-proclaimed say-so" being treated as "sufficient to defeat a motion to quash." Add.11. As discussed, the inquiry into whether there is a "congressionally authorized purpose" is not an extensive one. *Sturm, Ruger & Co.*, 84 F.3d at 4; *see Sugarloaf Funding*, 584 F.3d at 347 (observing that "even 'bareboned allegations' can suffice to support the prima facie showing"). But

the fact that the government has identified a source of statutory authority for the subpoena does not conclusively resolve the separate question of whether a subpoena recipient has shown an improper purpose that requires quashing the subpoena despite the authority Congress has granted. And on that question, the district court likewise erred.

### 2. The district court erred in concluding that improper purpose justified quashal.

The heart of the district court's analysis was its conclusion that the subpoena should be quashed because it was issued for an improper purpose. That was mistaken in multiple respects. At the outset, the court mistakenly concluded that an administration's policy positions and priorities could render otherwise lawful subpoenas improper. And even if such policy positions could potentially be treated as establishing an improper purpose, there is no indication that such an improper purpose is the sole purpose for the subpoena, as this Court's cases require.

The Supreme Court has explained that, when called upon to enforce an administrative subpoena, a district court has the ability to ensure that "its process" is not "abused." *Powell*, 379 U.S. at 58. "Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the [recipient] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Id.*

29

Given that the improper purpose inquiry asks whether an otherwise valid subpoena seeking evidence relevant to an investigation should nevertheless be quashed or denied enforcement, the Supreme Court has recognized that the subpoena recipient bears a "heavy" burden in proving the subpoena was issued pursuant to an improper purpose. *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316 (1978); *see United States v. Arthur Andersen & Co.*, 623 F.2d 725, 729 (1st Cir. 1980); *Comley*, 890 F.3d at 542-43 (showing of "firm evidence" required); *United States v. Gertner*, 65 F.3d 963, 967 (1st Cir. 1995) (showing of "specific allegations of bad faith" and "reasonably particularized evidence"). Quashal is only warranted when the "sole purpose" is an improper one. *Gertner*, 65 F.3d at 970; *see Donaldson v. United States*, 400 U.S. 517, 533 (1971) (inquiring whether "the sole objective of the investigation is to" impermissibly use a civil subpoena to "obtain evidence for use in a criminal prosecution"); *Lynn v. Biderman*, 536 F.2d 820, 826 (9th Cir. 1976) ("It is not . . . a ground to deny enforcement of a subpoena that it is being employed for a wrongful purpose if there is also a legitimate purpose for the subpoena."); *cf.* Restatement (Second) of Torts § 682 cmt. b (A.L.I. 1977), Westlaw (database updated Sep. 2025) (explaining that tort of abuse of process will not lie where there is both a legitimate motive and "an incidental motive of spite or an ulterior purpose of benefit to the defendant"); *Vahlsing v. Commercial Union Ins. Co.*, 928 F.2d 486, 490 (1st Cir. 1991) ("When process is employed for the purpose for which the law intends its use, no

30

abuse of process occurs even though the person using the process may have an improper motive in addition to his lawful intention.").

Given this heavy burden, it is no surprise that this Court and others have consistently rejected "improper purpose" claims. For example, in *Comley*, this Court rejected an "improper purpose" defense when the subpoena recipient made "forceful allegations about the bad faith of certain [Nuclear Regulatory Commission] officials" uninvolved in the investigation. 890 F.2d at 543. And in *Sugarloaf Funding*, this Court rejected an "improper purpose" argument based on, among other things, an alleged threat of "the imposition of severe penalties if [the subpoena recipients] did not settle" and an alleged threat to the recipients' counsel that the counsel could face a "disciplinary referral" if counsel did not provide complete responses to document requests in another case. 584 F.3d at 349-50; *see also United States v. Whispering Oaks Residential Care Facility, LLC*, 673 F.3d 813, 819 (8th Cir. 2012) (per curiam) (rejecting improper purpose argument where "no credible evidence on the record . . . demonstrate[d] the subpoenas were actually motivated by an improper purpose"); *United States v. Markwood*, 48 F.3d 969, 983-84 (6th Cir. 1995) (rejecting improper purpose argument and concluding that the movant's claimed "'evidence' of impropriety . . . [wa]s merely an assertion of impropriety, and d[id] not amount to a substantial demonstration that the government [wa]s abusing the court's process").

There is no basis for concluding that the subpoena here was motivated solely by an improper purpose—policy views do not negate investigatory authority;

31

administrative subpoenas are permissible even at the earliest stages of an investigation and the government need not provide evidence to justify an administrative subpoena to gather evidence; overbreadth is not evidence of improper purpose and, regardless, the subpoena is not overbroad; and state law does not prevent federal investigations.

### a. The district court erred in finding improper purpose because of the administration's policy preferences.

The purportedly "improper" purpose the district court identified is simply the Executive Branch's expression of policy preferences, and those preferences cannot immunize entire industries or practices from scrutiny to determine if they have complied with existing federal law. The district court here made no finding—and BCH presented no evidence—that the government issued the subpoena to harass BCH, pressure BCH to settle a collateral dispute, or for any other reason specific to BCH that may constitute an improper purpose under *Powell* or this Court's caselaw. Instead, the court concluded that the subpoena "was issued for an improper purpose" based largely on statements, executive orders, and memoranda expressing the administration's view on the propriety of "gender-affirming care." Add.11-14. But those statements—which rest on a "rational basis," *United States v. Skrmetti*, 605 U.S. 495, 523 (2025)—cannot establish an improper purpose.

There is no dispute that the President, Attorney General Bondi, and others in the administration have expressed strong moral, ethical, and policy opposition to the practice of irreversibly altering minors' bodies as a way to address diagnoses of gender

dysphoria. The administration believes these interventions are untested, unsafe, unnecessary, and unethical—concerns that are gaining traction within the medical community in the United States and abroad. *See* HHS Statement 1-3; HHS Secretary Declaration 1-9; Dep't of Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* (Nov. 19, 2025), https://perma.cc/MUB7-2ETU. At the same time, the executive orders, Bondi Memo, and Shumate Memo do not purport to declare those interventions categorically unlawful or to change federal law in any respect. They merely direct investigations (and, if appropriate, enforcement actions) designed to enforce existing federal health care laws against entities in this industry. There is nothing bad-faith or pretextual about that. The Department is simply prioritizing enforcement of federal law in an industry of special concern for policy reasons.

The district court's conflation of policy opposition with improper purpose is misguided. An administration's policy statements on a particular topic have never amounted to an improper reason to issue a subpoena or further an investigation into whether a particular federal law has been violated. *Cf. Department of Com. v. New York*, 588 U.S. 752, 781 (2019) ("[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities."); *Trump v. Hawaii*, 585 U.S. 667, 706-07 (2018). Such logic would immunize from investigation any industry or practice that an administration is opposed to as a policy matter. By the district court's logic, an

administration's "stated goal" on a particular policy question necessarily renders any investigation that touches on that policy as pretextual. Add.11. That logic would preclude government investigations into anything touching on gender-related treatment—from fraud on government insurance to drug adulteration—effectively immunizing illegal conduct in this space.

The district court's approach would also have startling consequences. Consider an administration that publicly advocated for a federal ban on sports gambling, while simultaneously seeking to ensure that the industry, where lawful, carried out its activities in a manner consistent with existing federal law. On the court's logic, tax or other investigatory subpoenas to sports gambling operations and related businesses could be quashed based on the administration's "stated goal" of seeking to "end[]" such gambling. Add.11. Similarly, an administration that pursued or supported new legislation that would ban or limit practices of large technology or social media companies could see subpoenas related to ensuring that those practices comply with existing law quashed on the same basis. Or consider an administration that advocates for new gun control measures, while also heightening its enforcement of existing regulations governing firearm dealers. Applying the district court's reasoning, subpoenas issued in those investigations would have to be quashed based on improper purpose.

The list could go on. But the central point is that the government's opposition to a particular industry or practice does not immunize that industry or practice from

scrutiny to ensure that it is being carried out in a lawful manner. Just as sports gambling companies would not be immunized from scrutiny if a future administration sought to ban them, actors engaged in the sorts of activities at issue here are not immunized from compliance with existing federal law—or from a response to an otherwise-lawful subpoena designed to ascertain if violations of existing federal law have occurred.

Indeed, at bottom, the district court's rationale is simply an attack on the core executive power to exercise enforcement discretion in prioritizing what misconduct to investigate. "The Executive Branch—not the Judiciary—makes arrests and prosecutes offenses on behalf of the United States." *United States v. Texas*, 599 U.S. 670, 678-79 (2023). Indeed, under Article II, the Executive Branch possesses the "exclusive authority and absolute discretion," *Trump v. United States*, 603 U.S. 593, 620 (2024) (quotation omitted), to decide "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021). "The power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws," *Community for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986), and "the Government's enforcement priorities" are a legitimate consideration in decisions about whether to prosecute, *Wayte v. United States*, 470 U.S. 598, 607 (1985).

Under those established principles, the Department is entitled to prioritize financial crimes, immigration offenses, or health care fraud—and it can also choose to

prioritize the investigation and enforcement of those offenses in particular sectors or in relation to particular activities (such as gambling operations, firearm dealers, or telemedicine clinics). It is axiomatic that government resources are limited, that different administrations have different priorities, and that administrations thus allocate resources differently to align with their policy priorities.

Here, at most, the district court's logic could support an inference that the Department is focusing on misconduct by drug companies, insurers, and medical clinics engaged in providing "gender-affirming care" to minors because of the administration's broader policy concerns with that activity. Even if so, that is entirely permissible, and certainly not an "improper purpose" sufficient to quash a subpoena. Nothing in *Powell* or this Court's cases suggests otherwise. There is simply no inconsistency between an administration's desire for a disfavored practice to end and an administration's desire to ensure that current federal law is enforced.

Finally, the district court's rationale makes no sense on its own terms, since the subpoenas do not and cannot "end[]" the interventions the administration opposes. The subpoenas merely seek information so the Department can investigate—and, if appropriate, prosecute—federal criminal offenses that nobody disputes may occur in connection with puberty blockers and cross-sex hormones. The Department does not contend that the act of writing a prescription for an off-label use would, in and of itself, give rise to FDCA liability. But it is beyond question that such drugs may be

36

misbranded in violation of federal law or that a hospital could engage in fraudulent billing practices related to such drugs.

Ensuring that such violations have not occurred with respect to those drugs is plainly a legitimate purpose, and that is precisely what the Bondi and Shumate memoranda direct: investigations into potential FDCA violations "by manufacturers and distributors engaged in misbranding by making" purported "false claims about the on- or off-label use of puberty blockers, sex hormones," and similar drugs, Bondi Memo 4, and investigations of "doctors, hospitals, pharmaceutical companies, and other appropriate entities . . . [including investigations into] possible violations of the [FDCA] and other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs," Shumate Memo 2-3.

At all events, even if an administration's policy views might be treated as an improper purpose, there is no basis for quashing the subpoena here. As discussed, this Court has recognized that an improper purpose must be the "sole purpose" of the subpoena for quashal to be proper, *Gertner*, 65 F.3d at 970, such that the subpoena cannot be quashed on the basis of purportedly mixed motives. For example, in the sole case of which the government is aware where this Court concluded that a subpoena should be quashed based on improper purpose, the subpoena recipient demonstrated that the Internal Revenue Service had issued a subpoena purportedly to investigate the recipient law firm's compliance with the tax laws but in fact was solely

interested in investigating the firm's clients, thereby circumventing statutory limits on IRS "John Doe" subpoenas. *Id.* at 965-66, 69.

Here, there is no serious doubt that the Department is in fact pursuing the investigation outlined in the Bondi and Shumate memoranda, and that such an investigation is within the Department's statutory authority. It is undisputed that BCH prescribes puberty-blockers and other drugs that have never been FDA-approved for treating gender dysphoria. And, as discussed further below, even if BCH has not itself violated federal law, BCH may have communicated with pharmaceutical companies who have. Indeed, BCH has never argued that it does not possess evidence relevant to the Department's investigation. That is enough to demonstrate that the agency has a permissible purpose for the subpoena. A holding that mixed motives are sufficient for quashal would mean that no investigation—no matter how compelling the facts or indications of wrongdoing—could proceed so long as a particular administration continued to hold policy views on the relevant topic.

> **b.** **The district court also erred in finding improper purpose based on a lack of inculpatory evidence, the subpoena's breadth, and Massachusetts law.**

The district court likewise erred in its treatment of other aspects of the subpoena as demonstrating or indicating an improper purpose, while disregarding entirely evidence of the subpoena's proper purpose. The court thought it was relevant to its improper-purpose holding that the government had not offered evidence "that BCH is actually engaging in fraudulent billing practices or off-label promotion,"

Add.12, and that the subpoena sought information "seemingly unrelated to investigating fraud or unlawful off-label promotion," *id.* at 14. That reasoning fundamentally misunderstands both the subpoena standard and how federal health care investigations work in practice. The district court also believed that Massachusetts law—which protects "gender-affirming care"—had relevance in the purpose inquiry. *Id.* at 13. But that fundamentally misunderstands federalism. None of this evidences an improper purpose.

There is no requirement that the government offer evidence that a subpoena recipient is engaged in unlawful conduct to properly issue a subpoena, and the fact that any such evidence is not disclosed in issuing a subpoena does not call into question the propriety of the subpoena. It is well settled that no probable cause or reasonable suspicion is required to issue or enforce a subpoena. *See Powell*, 379 U.S. at 57. And the Department is not required to articulate the particulars or details of its investigation strategy to issue a subpoena and collect information which may or may not result in the bringing of enforcement actions against BCH or anyone else.

Similarly, the mere fact that a subpoena seeks a broad swathe of information is not a basis to infer an improper purpose; it reflects instead a legitimate purpose to sweep broadly and avoid missing something important. Indeed, the breadth of the requests here reflects the breadth of the investigation; investigations of healthcare offenses by their nature may involve numerous documents, and making the sheer number of documents sought dispositive or relevant would improperly "require the

government to ascertain, before issuing a subpoena, the extent of any wrongdoing." *In re Subpoena Duces Tecum*, 228 F.3d at 351; *see id.* at 344 (enforcing subpoena seeking patients' "complete medical files, patient appointment books, patient billing records, office sign-in sheets, and telephone messages in any form"); *see In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1419 (D.C. Cir. 1994) (explaining that relevance is determined by reference to "the 'general purposes of the agency's investigation'" and that courts "defer to the agency's appraisal of relevancy" (quoting *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Tr. Corp.*, 5 F.3d 1508, 1516 (D.C. Cir. 1993))).

As discussed further above and below, the subpoena requests here were not overbroad. But even if they were in some respects overinclusive, treating that fact as indicative of improper purpose and a basis to quash the subpoena would be particularly remarkable. The district court did not identify any overbreadth concern with eight of the 15 requests in subpoena. Moreover, the Supreme Court has made clear that the appropriate first step before a court might narrow a subpoena would be for BCH to seek to negotiate to narrow the subpoena. *Morton Salt*, 338 U.S. at 653 (observing that "[b]efore the courts will hold an order seeking information reports to be arbitrarily excessive, they may expect the supplicant to have made reasonable efforts before the [agency] itself to obtain reasonable conditions"); *see In re Subpoena Duces Tecum*, 228 F.3d at 349. Although the Department has expressed willingness to negotiate about the breadth of production in response to the subpoena, BCH made

no effort to do so. And even where a subpoena is challenged on overbreadth grounds, this Court and others have specified that overbreadth in a subpoena is not a basis for quashal or refusing to enforce, but instead at most grounds to narrow the subpoena in enforcing it. *Usery v. Whitin Mach. Works, Inc.*, 554 F.2d 498, 503 (1st Cir. 1977); *see United States v. Norwood*, 420 F.3d 888, 896 (8th Cir. 2005); *Texaco,* 555 F.2d at 882. [3]

In any event, the district court's view that these requests were overbroad reflects its fundamental misunderstanding of the parameters of the Department's investigation. When the Department investigates a federal health care offense, it seeks information from each entity in the relevant system or supply chain to investigate and determine if federal offenses have been committed (and by whom). An investigation into potential misconduct by an insurance company, for example, will often require records from doctors or pharmacies, an investigation into drug companies may require records of communications between those companies and third parties, and so on. In an integrated industry, it is fanciful to believe that any serious investigation could be conducted without seeking information from entities beyond the target.

Here, BCH, as a prominent provider of these interventions to minors, is indisputably an entity with information relevant to the Department's investigation. Information from BCH's records may show whether certain drugs are being used for

---

[3] BCH advanced overbreadth as a ground to narrow or quash the subpoena, App.11, but the district court did not consider that argument on its own terms, and as noted, BCH made no effort to negotiate to narrow the subpoena prior to filing this action.

off-label purposes, and how those treatments are being described for purposes of insurance claims. Communications between BCH and drug companies may show whether drug companies are misbranding the drugs or are participating in a conspiracy to do so. The district court relegated the relevance of BCH as a witness to misconduct to a footnote, Add.12 n.9, without explaining why it would be improper to seek evidence from BCH to determine whether other entities with which BCH and its doctors interact have engaged in misconduct. The fact that BCH may not itself be a target of the investigation, or the subject of any eventual enforcement proceeding, does not immunize it from compliance with the subpoena.

The same errors undergirded the district court's treatment of the breadth of the subpoena. The court believed that seven of the subpoena's 15 separate requests were overbroad. As the court acknowledged, four of those requests (Nos. 7-10) seek "documents and communications with pharmaceutical manufacturers, sales representatives, marketing departments, and medical science liaisons regarding the treatment of gender dysphoria and the use of puberty blockers or hormones." Add.12; *see* App.25. That evidence is plainly relevant to an investigation into whether manufacturers or distributors of these drugs have engaged in misbranding, including statements that constitute misbranding or financial arrangements suggestive of a conspiracy to misbrand. And gathering all communications establishes a baseline and provides information to analyze the potential differences in behavior or operations

42

when the drugs are prescribed for their approved uses versus an off-label use—an important comparison point when trying to establish intent.

The other three requests seek personnel and patient records. Request 1 seeks personnel files to determine potential liability by determining who had authority to direct prescribing, billing, or marketing practices. App.24. These files can also provide evidence—such as training and financial incentives—relevant to knowledge and fraudulent intent. Requests eleven and twelve seek patient records. *Id.* at 25. These requests would provide information about the scale of potential FDCA violations. Linking each patient's clinical record to corresponding billing and insurance claims can demonstrate whether diagnoses were miscoded, which can prove fraudulent intent. Documentation of clinical justification, informed consent, and disclosure is important to assessing whether BCH (or potential co-conspirators) concealed or downplayed risks associated with the unapproved use of the drugs, which could establish an intent to mislead. Reviewing patient records may also reveal systematic use of the same masking codes, fraudulent informed consent documents, or other possible criminal conduct—enabling investigators to distinguish between mere errors and an institutionalized practice. Such records could also provide essential investigative leads. Parents could be witnesses about what disclosures were made and patients (depending on age and circumstances) could provide information about the informed consent process, side effects, or potentially false or misleading information about the drugs conveyed during treatment. Health benefit programs tied to identified

patients could provide additional evidence on potential illegal distribution of the drugs for unapproved uses. There is no overbreadth here.

Finally, the district court suggested that the Department's issuance of the subpoena was meant to interfere "with the Commonwealth of Massachusetts' right to protect [gender-affirming care] within its borders." Add.13-14. But state-law rights cannot immunize the manufacturers and distributors of puberty blockers or cross-sex hormones—or BCH itself—from compliance with federal law. If a manufacturer, distributor, or BCH committed a federal healthcare offense in the provision of puberty blockers or cross-sex hormones, Massachusetts law would provide no defense. *See Doe v. Dynamic Physical Therapy, LLC*, 607 U.S. 11, 11 (2025) (per curiam) ("[A] State has no power to confer immunity from federal causes of action." (emphasis omitted)). And that would be true no matter the industry or issue. Just as a casino operating in a state in which sports gambling is legal would not be exempt from compliance with existing federal law.

Nor does it matter that Massachusetts "does not ban" these interventions for minors. Add.13. BCH may not be engaged in "evad[ing]" a state ban through improper billing, *id.* (quotation omitted), but that is not the question in this investigation. As noted, BCH may have evidence relevant to misbranding by others in the healthcare industry. Moreover, legitimate billing codes may be misused to mislead insurance companies or others into covering puberty blockers for older children with gender dysphoria, so the mere existence of "a diagnosis code" for particular

44

interventions "for billing purposes" does not preclude investigation. Add.13; *see infra* pp. 46-47.

* * *

Quashing an administrative subpoena on its face due to "improper purpose" is an extraordinary step for a federal court to take. And it is a particularly unjustified step when the subpoena is unquestionably procedurally valid and seeks information that is clearly relevant to potential criminal wrongdoing. The district court's order has effectively immunized an entire class of actors from federal criminal liability simply because the President has voiced legitimate ethical and policy opposition to their conduct. That is not consistent with the law. If any actors are ultimately charged with violating existing law, they will have every opportunity to rebut the charges, consistent with due process and the presumption of innocence. But they cannot stop an investigation before it even begins, merely by invoking the "fierce scientific and policy debates" over their conduct. *Skrmetti*, 605 U.S. at 525.

## II. At minimum, the district court should have given the government an opportunity to satisfy its new, heightened standard.

For all the reasons set forth above, the district court legally erred by quashing the subpoena, and essentially imposed on the government a heightened standard that is contrary to established precedent. At minimum, however, if the court was going to adopt and apply what amounts to such a heightened standard, then it should have given the government an opportunity to satisfy that new standard through the

45

submission of additional factual materials. *Cf. In re Fidelity/Micron Sec. Litig.*, 167 F.3d 735, 737 n.1 (1st Cir. 1999) (disapproving "of district courts imposing rules of practice without some form of notice that would allow the parties and their counsel to conform their conduct accordingly"); *United States v. Clarke*, 573 U.S. 248, 254-55 (2014) (holding that in the context of tax subpoenas a taxpayer may be entitled to a limited evidentiary hearing on improper purpose allegations).

The Department moved the district court to alter or amend the judgment and attached to that motion the Hsiao Declaration, which details the Department's investigation. Despite recognizing its discretion in applying the District of Massachusetts's 6:00 p.m. filing deadline, the district court denied the Department's motion to alter or amend the judgment on timeliness grounds. Add.17-18

The district court erred in refusing to allow the Department some opportunity to respond to the novel burden and standard that the court articulated. By failing to afford that opportunity, the court has left the government in an untenable position. In theory, the Department could simply issue a new subpoena to BCH, and (if challenged) defend using new evidence showing the basis for the investigation and validity of the subpoena's purpose. But the court's sweeping reasoning appears to foreclose any subpoena and, indeed, perhaps any investigation at all.

If given the opportunity, the government could have substantiated its investigation with evidence concerning fraudulent billing and the failure to provide adequate labeling in general, as well as evidence concerning BCH specifically.

App.109-111. With respect to BCH, the government could have presented evidence of BCH clinicians "provid[ing] a first diagnosis of central precocious puberty to over 500 minors age 10 or older, including numerous teenagers aged 14 to 18—much older than children who are typically diagnosed with precocious puberty." App.110. The government also could have provided evidence of BCH clinicians describing the provision of puberty blockers and hormones to minors without informed consent and often with minimal evaluation. *Id.* at 111. And the government could have presented evidence of contradictory statements regarding the reversibility and permanence of changes caused by puberty blockers. *Id.* If necessary, the government would present all this evidence on remand, as well as additional evidence collected as the investigation has proceeded, if not barred by the district court's improper purpose rationale.

Accordingly, if this Court does not reverse the decision below outright and permit enforcement of the subpoena, it should at minimum vacate and remand with instructions to allow the government to supplement the record in an effort to meet the district court's new, heightened standard for subpoena enforcement. Alternatively, the Court could review the Hsiao Declaration in the first instance and conclude that it satisfies the applicable standards.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*


  */s/ Brantley Mayers*
BRAD HINSHELWOOD
BRANTLEY MAYERS
  *Attorneys, Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 890-9874*
  *brantley.t.mayers@usdoj.gov*

April 2026

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,590 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Brantley Mayers*
Brantley Mayers



**ADDENDUM**

# TABLE OF CONTENTS

District Court Order (Dkt. 33) (September 9, 2025) ...............................................Add.1

District Court Order of Dismissal (Dkt. 34) (September 9, 2025).........................Add.15

District Court Order (Dkt. 52) (November 24, 2025)............................................Add.16

18 U.S.C. § 24....................................................................................................Add.19

18 U.S.C. § 3486 ...............................................................................................Add.20

21 U.S.C. § 331..................................................................................................Add.21

21 U.S.C. § 333..................................................................................................Add.22

21 U.S.C. § 352..................................................................................................Add.23

21 U.S.C. § 355..................................................................................................Add.24

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| )<br>)<br>In Re: Administrative Subpoena )<br>)<br>No. 25-1431-019 )<br>)<br>) | No. 1:25-mc-91324-MJJ |

## MEMORANDUM OF DECISION

September 9, 2025

JOUN, D.J.

On June 11, 2025, the Department of Justice ("DOJ") served The Children's Hospital Corporation d/b/a Boston Children's Hospital ("BCH") with an administrative subpoena issued pursuant to 18 U.S.C. § 3486, which authorizes, in part, the issuance of an administrative subpoena "[i]n any investigation of . . . a Federal health care offense." 18 U.S.C. § 3486(a)(1)(A)(i)(I). The subpoena was issued to BCH, along with numerous other hospitals across the country, seeking the production of information and documents relating to the hospital's provision of gender-affirming care ("GAC"). The subpoena was purportedly issued to investigate whether BCH was engaged in unlawful off-label promotion of puberty blockers and cross-sex hormones in violation of the Food, Drug, and Cosmetic Act ("FDCA") and other false claims that may have been submitted to federal healthcare programs. The subpoena contains 15 separate requests for documents related to BCH's staff, patients, and provision of GAC. [*See* Doc. No. 4 at 17]. Before me is BCH's Motion to Quash the subpoena, [Doc. No. 3], as well as BCH's Motion to Seal the case, [Doc. No. 2].

Add.1

## I.    BACKGROUND

BCH is one of the largest leading pediatric hospitals in the nation. It is dedicated to improving and advancing the health and well-being of children through its work in clinical care, biomedical research, medical education, and community engagement. [Doc. No. 4 at 9]. BCH is also home to the first pediatric and adolescent transgender health program in the United States. [*Id.* at 10]. Major medical organizations in a variety of specialties recognize gender dysphoria as a medical condition in individuals who may experience a conflict between the sex they were assigned at birth and the gender with which they identify, which can cause extreme distress and can lead to severe depression, anxiety, and suicidal ideation. [*Id.*]. Doctors have described GAC as a medical necessity. [*Id.* at 10–11]. BCH offers GAC in the form of physical and psychological assessments, ongoing medical care, and therapy and support groups, and has also invested in research and training related to GAC. [*Id.* at 10]. In Massachusetts, "[a]ccess to … gender-affirming health care services is a right secured by the constitution and laws of the commonwealth. Interference with this right, whether or not under the color of law, is against the public policy of the commonwealth." Mass. Gen. Laws ch. 12, § 11I ½(b).

The Administration has taken a firm stance against GAC, making its disapproval of the transgender community well known and terminating GAC a priority. On his first day in office, President Donald J. Trump issued Executive Order 14168, titled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."[1] The Executive Order declares that gender identity is a "false" idea and that the United States only

---

[1] *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, The White House (January 20, 2025), https://tinyurl.com/227z34e3.

Add.2

recognizes "two sexes, male and female" which are "not changeable."[2] The Administration has issued several other executive orders prohibiting transgender individuals from serving in the military, eliminating federal funding from schools that support "gender ideology," and banning transgender women and girls from competing in sports aligned with their gender identity. [Doc. No. 4 at 13].

On January 28, 2025, President Trump issued Executive Order 14187, aimed at restricting access to medical care for transgender youth.[3] The goal of the Order is to end GAC. The Order accuses medical providers of GAC of "maiming and sterilizing" children or engaging in "mutilation," and states that "[t]his dangerous trend will be a stain on our Nation's history, and it must end."[4] On April 22, 2025, Attorney General Pamela Bondi issued a memorandum, titled "Preventing the Mutilation of American Children," directing the Civil Division of the DOJ to "act decisively to protect our children and hold accountable those who mutilate them under the guise of care" and "to undertake appropriate investigations of any violations of the [FDCA] by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'"[5]

On June 11, 2025, the Civil Division issued a memorandum (hereinafter, the "Civil Division memo") that stated that the Division will use "all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities

---

[2] *Id.*

[3] *Protecting Children from Chemical and Surgical Mutilation*, The White House (Jan. 28, 2025), https://tinyurl.com/mwadx9cw.

[4] *Id.*

[5] Memorandum from Attorney General, *Preventing the Mutilation of American Children*, Office of the Attorney General, at 3-4 (April 22, 2025), https://tinyurl.com/2b9kaja7.

Add.3

consistent with these directives," and "hold accountable those who mutilate [children] under the guise of care" and pursue investigations of "radical gender experimentation."[6] The Civil Division memo states expressly that these investigations include possible violations of the FDCA regarding drugs dispensed in connection with GAC, as well as possible violations of the False Claims Act against health care providers that bill the federal government for "impermissible services," which includes providers that attempt to "evade state bans on gender dysphoria treatments by knowingly submitting claims to Medicaid with false diagnosis codes."[7]

On June 11, 2025, the same day the Civil Division memo was issued, the DOJ served BCH with an administrative subpoena pursuant to 18 U.S.C. § 3486, seeking the production of documents related to BCH's staff and its provision of GAC. [Doc. No. 4 at 17; Doc. No. 5-1]. The 15 document requests include, but are not limited to, requests for any and all information regarding BCH's personnel, documents, and communications regarding the use of billing codes in connection with GAC for minor patients; communications with pharmaceutical manufacturers regarding the use of puberty blockers or hormones in connection with GAC for minor patients; and documents and medical records of patients, including patients' social security numbers and home addresses. [Doc. No. 4 at 17]. In addition to investigating billing fraud as outlined in the Civil Division memo, the Government claims that it is "conducting an investigation into, among other things, whether off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors violated federal law, including the Food, Drug, and Cosmetic Act ("FDCA")." [Doc. No. 21 at 1].

---

[6] Memorandum from Assistant Attorney General Brett A. Shumate, *Civil Division Enforcement Priorities,* Office of the Assistant Attorney General, at 2-3 (June 11, 2025), https://tinyurl.com/mr3bym4f.

[7] *Id.* at 3.

Add.4

II.    ANALYSIS

A.    <u>**Motion to Seal**</u>

"A case filed in federal court and the documents filed in the case are presumed to be public." *Morgan v. Middlesex Sheriff's Office*, No. 14-cv-10659, 2014 WL 4104173, at \*6 (D. Mass. Aug. 13, 2014). "Public access to judicial records and documents allows the citizenry to monitor the functioning of our courts, thereby insuring quality, honesty and respect for our legal system." *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987) (citation omitted). The public's interest in accessing court files "is accentuated in cases where the government is a party: in such circumstances, the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch." As such, "only the most compelling reasons can justify non-disclosure of judicial records." *Id.* at 410 (citation omitted).

Still, I acknowledge that "the right to inspect and copy judicial records is not absolute . . . and access has been denied where court files might have become a vehicle for improper purposes." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978) (describing the courts' "supervisory power" to ensure that records are not used for improper purposes such as to "gratify private spite or promote public scandal," promote libel, or publicize "business information that might harm a litigant's competitive standing"). However, in such circumstances, Rule 26(c) of the Federal Rules of Civil Procedure provides that parties seeking to file a document under seal must demonstrate that "good cause" exists to do so. *Dunkin Donuts Franchised Restaurants, LLC v. Agawam Donuts, Inc.*, No. 07-cv-11444, 2008 WL 427290 at \*1 (D. Mass. Feb. 13, 2008). Good cause exists where the moving party demonstrates "the harm that would be sustained if the court did not allow the filing under seal." *Id.*

5

Add.5

BCH argues that both the text of the statute and the principles of grand jury secrecy supply the bases for sealing here. I address each of these arguments in turn.

## 1. **18 U.S.C. § 3486**

BCH points to Section 3486 in support of sealing, which provides that the Government "may issue an ex parte order that no person or entity disclose to any other person or entity . . . the existence of" the subpoena upon a "showing that . . . there is reason to believe that such disclosure may result in" the "endangerment to the life or physical safety of any person" or "intimidation of potential witnesses." *See* 18 U.S.C. § 3486(a)(6)(A)-(B)(i) and (B)(iv). BCH argues that if the statute permits the Government to seek issuance of this non-disclosure order, the same reasoning should apply to the subpoenaed party in these unusual circumstances. [*See* Doc. No. 2 at 5]. BCH has not pointed to a case that holds that the statute permits the subpoenaed party to seek such an order. However, even assuming BCH's position is correct, sealing is not warranted.

BCH and its employees have experienced threats of physical violence for providing GAC. BCH proffers several incidents that are cause for serious concern, including bomb threats, threats of violence and harassment, and death threats, all targeted toward BCH employees through abusive telephone calls, emails, social media posts, mail, and even messages submitted through the hospital's online appointment registration system. BCH argues that these threats constitute good cause for sealing. I empathize with BCH's position. However, it is already public knowledge that BCH provides GAC services. Making this case public does not move the needle on this score. The Government has also made public its intent to investigate GAC. On this latter point, I agree with BCH that the Government should not benefit from its own role in letting the cat out of the bag—but the bag has, nevertheless, been opened. *United States v. ISS Marine*

Add.6

*Servs., Inc.*, 905 F. Supp. 2d 121, 141 (D.D.C. 2012) (unsealing allowed where the "Government's investigation . . . has been public knowledge for some time").

BCH makes an additional argument: that sealing the case is warranted because the public is only generally aware (by the Attorney General's public announcement) that the DOJ has issued these administrative subpoenas on numerous hospitals across the country but is not aware that a subpoena has been served on BCH specifically, and that such knowledge could exacerbate those existing threats. This is not an irrational fear. However, such speculative generalized fear cannot clear the high burden of sealing the entire docket for an unlimited period. Our courts cannot operate in secret. I find that the statute does not provide sufficient basis for sealing here.

### 2.   Secrecy Rules In The Grand-Jury Context

BCH further argues that because the subpoena involves the investigation of a criminal federal healthcare offense, the subpoena should be analogized to the secrecy rules in the grand-jury context. "Prior to an indictment, governmental authorities are under an obligation not to reveal the existence and nature of an investigation concerning individuals who are merely suspected of criminal activities." *Gonzalez-Bernal v. United States*, 907 F.2d 246, 250 (1st Cir. 1990); Fed. R. Crim. P. 6(e). The Supreme Court has recognized that the "grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. of California v. Petrol Stops Nw.*, 441 U.S. 211, 218–219 (1979).

There are similarities as well as differences between grand jury subpoenas and administrative subpoenas. See *Missouri Baptist Med. Ctr. v. U.S. Dep't of Just.*, No. 22-mc-871, 2023 WL 315021, at *2 (E.D. Mo. Jan. 19, 2023) (analogous "due to their functional similarity as an evidence-gathering tool"). Although the underlying investigation here may implicate a criminal fraud investigation, BCH has not pointed to any case holding that the secrecy principles

surrounding administrative subpoenas are as strong as they are for grand jury subpoenas. Further,

given that Section 3486 *does* provide a mechanism for non-disclosure, Congress could have

chosen to provide additional privacy protections when issuing administrative subpoenas to

investigate healthcare fraud but chose not to do so. *Connecticut Nat. Bank v. Germain*, 503 U.S.

249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means

and means in a statute what it says there."). I must respect that. What is more, this matter simply

aims to resolve the narrow question of whether the administrative subpoena seeking certain

documents and information is valid or invalid. For these reasons, keeping the docket sealed is not

warranted here.[8]

### B.    <u>Motion to Quash</u>

"Section 3486 authorizes the Attorney General, in any investigation relating to a federal

health-care offense, to issue an administrative subpoena requiring 'the production of any records

or other things relevant to the investigation' and 'testimony by the custodian of the things

required to be produced concerning the production and authenticity of those things.'" *In re*

*Amato*, No. 05-mc-29, 2005 WL 1429743, at *4 (D. Me. June 17, 2005) (cleaned up) (citing 18

U.S.C. § 3486(a)(1)(B)). "[T]he subject of an administrative subpoena has an opportunity to

challenge the subpoena before yielding the information." *United States v. Sturm, Ruger & Co.*,

84 F.3d 1, 3 (1st Cir. 1996).

---

[8] Nor can I allow what documents that has been filed to remain under seal. BCH has failed to "explain, on a document-by-document basis, why sealing is required and how their request satisfies the applicable legal standard." *Bradford & Bigelow, Inc. v. Richardson*, 109 F. Supp. 3d 445, 447 (D. Mass. 2015); *In re: Subpoena No. 25-1431-014*, No. 25-mc-00039 (E.D. Penn. July 25, 2025) (denying motion to seal the entirety of its motion to quash a similar administrative subpoena issued to a hospital where the hospital did not provide a line-by-line demonstration of the particularized harm allegedly at risk); *see also* District of Massachusetts Local Rule 7.2 (requiring litigants to file a motion for impoundment each time a specific document or group of documents is to be filed, and prohibiting the court from entering "blanket orders" of confidentiality any time a document is to be filed).

"The requirements for enforcement of an administrative subpoena are not onerous. In order to obtain judicial backing the agency must prove that (1) the subpoena is issued for a congressionally authorized purpose, the information sought is (2) relevant to the authorized purpose and (3) adequately described, and (4) proper procedures have been employed in issuing the subpoena." *Id.*; *United States v. Morton Salt Co.*, 338 U.S. 632, 652–53 (1950) (agency's request for documents should be approved by the judiciary so long as it "is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant"); *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 209 (1946) (the court must determine whether the investigation is "authorized by Congress, is for a purpose Congress can order, and the documents sought are relevant to the inquiry"). "The role of a court in a subpoena enforcement proceeding is strictly limited to inquiring whether the above requirements have been met. Such proceedings are designed to be summary in nature." *United States v. Comley*, 890 F.2d 539, 541 (1st Cir. 1989) (citation omitted).

### 1. Improper Purpose

While the parties agree that the above standards govern whether a court can enforce an administrative subpoena, they dispute whether there is a "bad faith" exception to the issuance of such a subpoena. BCH relies on the Supreme Court's ruling in *United States v. Powell*, 379 U.S. 48 (1964) to argue that the bad faith exception applies in this case. There, the Court held that the Internal Revenue Service—which was using its subpoena power to seek production of documents from the president of a corporation—need not meet any standard for probable cause. *Id.* at 57. However, the Court held that a court may not enforce an administrative summons if to do so would "permit its process to be abused." *Id.* at 58. The Court specified that "[s]uch an abuse would take place if the summons had been issued for an improper purpose, such as to

harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation. The burden of showing an abuse of the court's process is on the taxpayer." *Id.*

The Government argues that there is no freewheeling "bad faith" exception, citing cases that hold that a court need not make inquiries into the motives behind a lawful investigation. While that proposition is generally true, the Government's argument misses the mark. Evidence of bad faith is relevant to whether an investigation is being pursued for an improper purpose. For instance, in *United States v. Comley*, Comley challenged the enforcement of an administrative subpoena served upon him by the Nuclear Regulatory Commission. 890 F.2d 539. There, upon challenge, the First Circuit first assessed whether the Commission made a prima facie showing of proper purpose and then turned to Comley's argument that the Commission's issuance of the subpoena was "motivated only by bad faith in its investigation of the employee." *Id.* at 542. The First Circuit held that "[i]f Comley's assertions were supported by firm evidence, then we would have adequate justification to deny enforcement of the subpoena." *Id.* (citing *United States v. Westinghouse Elec. Corp.*, 788 F.2d 164, 166–67 (3d Cir. 1986) ("[I]f a subpoena is issued for an improper purpose, such as harassment, its enforcement constitutes an abuse of the court's process.")). In line with these principles, I first assess whether the Government has made its prima facie showing of proper purpose, and then whether BCH has shown that the subpoena was issued for an improper purpose.

The Government argues that the subpoena is valid and enforceable. First, the Government argues the statute authorizes the DOJ to issue a subpoena in connection with an investigation of federal healthcare offenses, 18 U.S.C. § 3486(a)(1)(A)(i)(I). Second, the Government argues that the subpoena is procedurally sound as it was signed by the Attorney General of the United

10

States, served on BCH, and calls for the production of documents relevant to an investigation within 500 miles of BCH. Third, the Government argues that its requests are relevant to the purpose of its investigations "[b]ecause BCH is an acknowledged provider of the type of health care services under investigation," and as such, "the individual requests— which seek records related to the provision of those services—are also valid under the statute." [Doc. No. 21 at 14]. I find that, while the Government has made a prima facie showing that it is authorized by statute to issue a subpoena if it relates to a federal healthcare offense, significantly, the Government has failed to show proper purpose. The Government has not submitted any affidavits or other evidence to show proper purpose. *See Comley*, 890 F.2d at 541 ("[T]he affidavits of government officials have been accepted as sufficient to make out a prima facie showing that these requirements are satisfied."). Instead, the Government simply points to the April 22, 2025 Memorandum of the Attorney General directing the Civil Division "to undertake appropriate investigations" to make the argument that since the Government would not have issued the subpoena unless it was for an "appropriate" investigation, the subpoena must have been issued for a proper purpose. This logic, if followed, would preclude any form of judicial review as the Government's self-proclaimed say-so would always be sufficient to defeat a motion to quash. This is no logic at all.

Numerous statements by the Administration, executive orders, and memorandums, detail the Administration's goal of ending GAC. While portions of these statements also refer to suspicions of improper billing practices and unlawful off-label promotion, the Government has not provided any support that the information sought by the subpoena is limited to these potential healthcare offenses, as opposed to the Government's stated goal of ending GAC. To be clear, the Government cannot broadly make inquiry into the provision of GAC generally—any such

11

Add.11

inquiry must be limited to the healthcare fraud that is authorized by the statute: fraudulent billing codes and unlawful off-label promotion. That is not the case here.

The requests seek an astonishingly broad array of documents and information that are virtually unlimited in scope. For example, Request Nos. 1, 11, and 12 seek the personnel files of nearly all 2,000 individuals who work for BCH in any capacity, not limited to their employment as it relates to GAC. They also seek all medical records and personal information of patients who have been provided with GAC, including their social security numbers and home addresses, despite the tenuous link these medical records (or their personal information) would have to potential fraudulent billing codes and unlawful off-label promotion. Requests Nos. 7-10 are similarly overbroad, seeking documents and communications with pharmaceutical manufacturers, sales representatives, marketing departments, and medical science liaisons regarding the treatment of gender dysphoria and the use of puberty blockers or hormones generally.

The Government seeks all this while not offering an iota of suspicion that BCH is actually engaging in fraudulent billing practices or off-label promotion in the first instance.[9] The Government may be correct that it need not provide probable cause for its investigations, but it cannot use its subpoena power to go on a fishing expedition. *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1418 (D.C. Cir. 1994) (quashing subpoena to the extent that the agency sought "unfettered authority to cast about for potential wrongdoing"). *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973) ("The Government cannot go on a "fishing

---

[9] Indeed, the Government acknowledges that it "has not made a decision as to whether BCH is a target . . . BCH *may* be simply a witness to, for example, pharmaceutical companies promoting puberty blockers for off-label use. Or it *may* be a witness to whom other people or entities directed false statements on the topic of pharmaceutical treatments in gender-related care for minors. Or BCH personnel *may* have committed federal health care offenses without the knowledge of BCH management." [Doc. No. 21 at 13 (emphasis added)].

12

Add.12

expedition" . . . and where it appears that the purpose of the summons is "a rambling exploration" of a third party's files, it will not be enforced") (citations omitted).

Context is important. For example, a statement made by a DOJ representative at the Federal Trade Commission recently claimed that the agency was "working on" getting GAC to "stop even in blue states."[10] After President Trump issued his Executive Order directing the Attorney General to prioritize investigations into GAC, the White House issued an article that boasted how several hospitals and healthcare systems have stopped providing GAC entirely.[11] These statements have no connection to the Government's asserted purpose of stopping alleged fraudulent billing practices or unlawful off-label promotion.

The Government's publicly stated goal of issuing these subpoenas is also in direct contradiction with the Massachusetts constitution, which provides for the right to GAC. *United States v. Skrmetti*, 145 S. Ct. 1816 (2025) ("We afford States wide discretion to pass legislation in areas where there is medical and scientific uncertainty.") (citation omitted). In its Civil Division memo, the Government noted that part of its investigation includes investigating whether providers are attempting to "evade state bans on gender dysphoria treatments by knowingly submitting claims to Medicaid with false diagnosis codes."[12] But Massachusetts does not ban GAC. And there exists a diagnosis code for GAC for billing purposes. It is thus difficult to understand what exactly the Government is trying to investigate BCH for.

---

[10] *See* FTC, *The Dangers of "Gender-Affirming Care" for Minors*, at 29 (July 9, 2025), https://tinyurl.com/mrap7e2f.

[11] *See President Trump Promised to End Child Sexual Mutilation — and He Delivered*, The White House (July 25, 2025), https://tinyurl.com/2dhcwjdd.

[12] The Civil Division Memo, at 3.

13

The Administration has been explicit about its disapproval of the transgender community and its aim to end GAC. The subpoena reflects those goals, comprising overbroad requests for documents and information seemingly unrelated to investigating fraud or unlawful off-label promotion. It is abundantly clear that the true purpose of issuing the subpoena is to interfere with the Commonwealth of Massachusetts' right to protect GAC within its borders, to harass and intimidate BCH to stop providing such care, and to dissuade patients from seeking such care. For the above reasons, I find that the Government has failed to show proper purpose and, even if it had, that BCH has demonstrated that the subpoena was issued for an improper purpose, motivated only by bad faith.

## III.    CONCLUSION

For the above reasons, BCH's Motion to Seal is <u>DENIED</u> and BCH's Motion to Quash is <u>GRANTED</u>.

SO ORDERED.

<u>/s/ Myong J. Joun</u>
United States District Judge

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____
                                        )
**The Children's Hospital Corporation** )
            Petitioner,                 )      **1:25-mc-91324-MJJ**
    **v.**                              )
                                        )
**United States Department Of Justice** )
            Respondent                  )
_____)

<u>**ORDER OF DISMISSAL**</u>

**JOUN, D.J.**

    **In accordance with this Court's memorandum of decision dated September 9, 2025, it is hereby ORDERED that the above-entitled action be and hereby is dismissed.**

September 9, 2025

```
                                /s/ Steve K. York
                                --------------------------
                                Deputy Clerk
```

Add.15

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:25−cv−91324−MJJ

In Re: Administrative Subpoena No. 25−1431−019       Date Filed: 07/08/2025
Assigned to: Judge Myong J. Joun                     Date Terminated: 09/09/2025
 Case in other court:  USCA − First Circuit, 25−02092
                       USCA − First Circuit, 26−01093
Cause: No cause code entered

**Petitioner**

**The Children's Hospital Corporation**          represented by  **Alan E. Schoenfeld**
*doing business as*                                              Wilmer Cutler Pickering Hale and Dorr LLP
Boston Children's Hospital                                       7 World Trade Center
                                                                 250 Greenwich Street
                                                                 New York, NY 10007
                                                                 212−937−7294
                                                                 Fax: 212−937−8888
                                                                 Email: alan.schoenfeld@wilmerhale.com
                                                                 *LEAD ATTORNEY*
                                                                 *PRO HAC VICE*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Amanda P. Strachan**
                                                                 WilmerHale LLP
                                                                 60 State Street
                                                                 Boston, MA 02109
                                                                 617−526−6000
                                                                 Email: amanda.masselamstrachan@wilmerhale.com
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Brian M Boynton**
                                                                 Wilmer Cutler Pickering Hale and Dorr LLP
                                                                 1875 Pennsylvania Ave. NW
                                                                 Washington, DC 20006
                                                                 202−663−6044
                                                                 Fax: 202−663−6363
                                                                 Email: brian.boynton@wilmerhale.com
                                                                 *LEAD ATTORNEY*
                                                                 *PRO HAC VICE*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Brian R. Blais**
                                                                 Ropes & Gray LLP − MA
                                                                 Prudential Tower
                                                                 800 Boylston Street
                                                                 Boston, MA 02199−3600
                                                                 212−596−9000
                                                                 Fax: 212−596−9090
                                                                 Email: brian.blais@ropesgray.com
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Douglas Hallward−Driemeier**
                                                                 Ropes & Gray LLP − DC
                                                                 2099 Pennsylvania Avenue, NW
                                                                 Washington, DC 20006
                                                                 202−508−4776
                                                                 Email: douglas.Hallward−Driemeier@ropesgray.com
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Joshua S. Levy**

Add.16

Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
617−951−7000
Email: joshua.levy@ropesgray.com
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

| | | |
|---|---|---|
| **United States Department Of Justice** | represented by | **Ross S. Goldstein** |

U.S. Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044
202−353−4218
Fax: 202−514−8742
Email: ross.goldstein@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick Runkle**
DOJ−Civ
Poc Agostinho, Jean
1100 L St., N.W.
8142
Washington, DC 20530
202−307−0340
Email: patrick.r.runkle@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **Commonwealth of Massachusetts** | represented by | **Adam M. Cambier** |

Massachusetts Attorney General's Office
One Ashburton Place
Boston, MA 02108
617−963−2278
Email: adam.cambier@mass.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/24/2025 | 52 | Judge Myong J. Joun: ELECTRONIC ORDER entered re 35 Motion to Alter Judgment. |

On September 9, 2025, I entered an order granting Boston Children Hospital&rsquo;s (&ldquo;BCH&rdquo;) Motion to Quash. [Doc. No. 33 ]. On October 7, 2025, the Department of Justice (&ldquo;DOJ&rdquo;) filed a Motion to Alter (the &ldquo;Motion&rdquo;). [Doc. No. 35 ]. On November 7, 2025, the DOJ filed a Notice of Appeal of my September 9 Order. [Doc. No. 46 ]. That appeal has been assigned USCA Case Number 25−2092. [Doc. No. 48 ]. The parties have completed briefing of the merits of the Motion, however, after DOJ filed its Notice of Appeal, BCH filed a Notice indicating that this court no longer has jurisdiction to decide the Motion. [*See* Doc. No. 50 ].

&ldquo;The filing of a notice of appeal is an event of jurisdictional significance&mdash;it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.&rdquo; *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). However, &ldquo;in order to prevent unnecessary appellate review, the district court

was given express authority to entertain a ***timely*** motion to alter or amend the judgment under Rule 59, even after a notice of appeal had been filed.&rdquo; *Id.* at 59 (emphasis added). As such, Rule 4(A)(iv) of the Federal Rules of Appellate Procedure provides that &ldquo;[i]f a party files in the district court&rdquo; a motion &ldquo;to alter or amend the judgment under Rule 59&rdquo; and &ldquo;does so within the time allowed by those rules––the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion.&rdquo; Fed. Rule App. Proc. 4(A)(iv). Rule 59(e) of the Federal Rules of Civil Procedure provides that &ldquo;[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment.&rdquo; Here, DOJ filed the Motion around 10:30 P.M. on October 7, 2025, or the 28th day following the entry of the judgment on September 9. However, an electronic filing made on the last day is timely if filed by midnight in the court&rsquo;s time zone, &ldquo;[u]nless a different time is set by a... local rule.&rdquo; Fed. R. Civ. P. 6(a)(4). Our district&rsquo;s local rules state that, &ldquo;[a]ll electronic transmissions of documents must be completed prior to 6:00 p.m. to be considered timely filed that day.&rdquo; L.R. 5.4(d). Accordingly, to have timely filed a Motion to Alter in this district, DOJ was required to file its Motion by 6:00 P.M. on October 7, 2025, but did not do so until about 10:30 P.M. [Doc. No. <u>44</u> at 4]. Contrary to DOJ&rsquo;s suggestion that our local rules may not apply to a &ldquo;miscellaneous proceeding to quash an administrative subpoena,&rdquo; [Doc. No. <u>44</u> at n.2], the local rules clarify that they &ldquo;apply to all proceedings in the United States District Court for the District of Massachusetts.&rdquo; L.R. 1.2(a). As such, the Motion is untimely. *See, e.g.*, *Sneade v. Rojas*, 11–cv–40061, 2014 WL 949635, at \*2 n.2 (D. Mass. Mar. 10, 2014) (&ldquo;[T]he motion to impound was filed after the 6:00 p.m. deadline and therefore, is deemed filed the next business day, *i.e.,* it was untimely&rdquo;); *Romero v. McCormick & Schmick Rest. Corp.*, No. 18–cv–10324, 2020 WL 1430530, at \*1 (D. Mass. Mar. 24, 2020) (&ldquo;Under the Local Rules, all electronic filings must be completed prior to 6 p.m. to be considered timely filed that day. L. R. 5.4(d). As reflected on the docket, Plaintiffs electronically filed their motion and memorandum in support at 7:45 p.m. and their statement of material facts at 8:01 p.m. on the date dispositive motions were due. Accordingly, the filing was late.&rdquo;).

&ldquo;District courts enjoy broad latitude in administering local rules.&rdquo; *Air Line Pilots Ass'n v. Precision Valley Aviation, Inc.*, 26 F.3d 220, 224 (1st Cir. 1994). DOJ asks that I exercise such discretion here to find that the four–hour delay be deemed timely because BCH does not identify any prejudice from the late filing, and other courts in this district have excused similar delays. *See, e.g.*, *Soo v. Bone Biologics Corp.*, No. 19–cv–11520, 2021 WL 1391458, at \*4 (D. Mass. Apr. 13, 2021) (excusing four–hour delay in filing an amended complaint and citing cases). However, DOJ has not pointed to any case finding such a motion timely where a subsequent notice of appeal has also been filed, divesting the court of its jurisdiction. &ldquo;To deviate from a local rule, the district court (1) must have a sound reason for doing so, and (2) must ensure that no party's substantial rights are unfairly jeopardized.&rdquo; *Belanger v. BNY Mellon Asset Mgmt., LLC*, No. 15–cv–10198, 2017 WL 1160570, at \*6 (D. Mass. Mar. 28, 2017) (cleaned up). DOJ has not provided any &ldquo;sound reason&rdquo; for its late filing or for deviating from the local rules. *Carpenter v. Rivera*, 10–cv–40233, 2014 WL 4928963, at \*2 n.2 (D. Mass. Sept. 30, 2014) (&ldquo;Accordingly, even if the Court had the power to extend the deadline, I would not find that Plaintiff has established cause for doing so.&rdquo;). Because the Motion was untimely and the notice of appeal has not been tolled, jurisdiction is now vested with the First Circuit Court of Appeals. As such, I do not have jurisdiction to rule on the merits of the Motion to Alter. *See Malek v. Feigenbaum*, 116 F.4th 118, 127&ndash;128 (2d Cir. 2024) (finding appeal untimely where Rule 59(e) motion was filed late and did not toll the deadline for appeal). The Motion to Alter, [Doc. No. <u>35</u> ], is thus ***DENIED***.

(SKY) (Entered: 11/24/2025)

Add.18

## 18 U.S.C. § 24 – Definitions relating to Federal health care offense

**(a)** As used in this title, the term "Federal health *care* offense" means a violation of, or a criminal conspiracy to violate—

> **(1)** section 669, 1035, 1347, or 1518 of this title or section 112813 of the Social Security Act (42 U.S.C. 1320a-7b); or

> **(2)** section 287, 371, 664, 666, 1001, 1027, 1341, 1343, 1349, or 1954 of this title section 301 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 331), or section 501 of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1131), or section 411, 518, or 511 of the Employee Retirement Income Security Act of 1974, [1] if the violation or conspiracy relates to a health care benefit program.

**(b)** As used in this tide, the term "health care benefit program" means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

## Health Insurance Portability & Accountability Act of 1996

**18 U.S.C. § 3486 - Administrative subpoenas**

  **(a) Authorization.—**

      **(1)**

            **(A)**    In any investigation of---

                **(i)**

**(I)** a Federal health care offense; or (II) a Federal offense involving the sexual exploitation or abuse of children, the Attorney General . . . may issue in writing and caused to be served a subpoena requiring the production and testimony described in subparagraph (B).

## Federal Food, Drug, and Cosmetic Act

## 21 U.S.C. § 331 – Prohibited Acts

The following acts and the causing thereof are prohibited:

**(a)** The introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded.

**(b)** The adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce.

**(c)** The receipt in interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise.

**(d)** The introduction or delivery for introduction into interstate commerce of any article in violation of section 344, 350d, 355,,[1] 360bbb-3, or 364c of this title.

**(e)** The refusal to permit access to or copying of any record as required by section 350a, 350c, 350f(j), 350e, 354, 360bbb-3, 364a, 373, 374(a), 379aa, or 379aa-1 of this title; or the failure to establish or maintain any record, or make any report, required under section 350a, 350c(b), 350f, 350e, 354, 355(i) or (k), 360b(a)(4)(C), 360b(j), (l) or (m), 360ccc-1(i), 360e(f), 360i, 360bbb-3, 364a, 364g, 379aa, 379aa-1, 387i, or 387t of this title or the refusal to permit access to or verification or copying of any such required record; or the violation of any recordkeeping requirement under section 2223 of this title (except when such violation is committed by a farm).

**(f)** The refusal to permit entry or inspection as authorized by section 374 of this title.

**(g)** The manufacture within any Territory of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded.

**(h)** The giving of a guaranty or undertaking referred to in section 333(c)(2) of this title, which guaranty or undertaking is false, except by a person who relied upon a guaranty or undertaking to the same effect signed by, and containing the name and address of, the person residing in the United States from whom he received in good faith the food, drug, device, tobacco product, or cosmetic; or the giving of a guaranty or undertaking referred to in section 333(c)(3) of this title, which guaranty or undertaking is false.

**(i)**

(1) Forging, counterfeiting, simulating, or falsely representing, or without proper authority using any mark, stamp, tag, label, or other identification device

authorized or required by regulations promulgated under the provisions of section 344 or 379e of this title.

(2) Making, selling, disposing of, or keeping in possession, control, or custody, or concealing any punch, die, plate, stone, or other thing designed to print, imprint, or reproduce the trademark, trade name, or other identifying mark, imprint, or device of another or any likeness of any of the foregoing upon any drug or container or labeling thereof so as to render such drug a counterfeit drug.

(3) The doing of any act which causes a drug to be a counterfeit drug, or the sale or dispensing, or the holding for sale or dispensing, of a counterfeit drug.

**(j)** The using by any person to his own advantage, or revealing, other than to the Secretary or officers or employees of the Department, or to the courts when relevant in any judicial proceeding under this chapter, any information acquired under authority of section 344, 348, 350a, 350c, 355, 360, 360b, 360c, 360d, 360e, 360f, 360h, 360i, 360j, 360ccc, 360ccc-1, 360ccc-2, 374, 379, 379e, 387d, 387e, 387f, 387g, 387h, 387i, or 387t(b) of this title concerning any method or process which as a trade secret is entitled to protection; or the violating of section 346a(i)(2) of this title or any regulation issued under that section..[1] This paragraph does not authorize the withholding of information from either House of Congress or from, to the extent of matter within its jurisdiction, any committee or subcommittee of such committee or any joint committee of Congress or any subcommittee of such joint committee.

**(k)** The alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, tobacco product, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded.

## 21 U.S.C. § 333 – Penalties

**(a)** Violation of section 331 of this title; second violation; intent to defraud or mislead

(1) Any person who violates a provision of section 331 of this title shall be imprisoned for not more than one year or fined not more than $1,000, or both.

(2) Notwithstanding the provisions of paragraph (1) of this section[1], if any person commits such a violation after a conviction of him under this section has become final, or commits such a violation with the intent

to defraud or mislead, such person shall be imprisoned for not more than three years or fined not more than $10,000, or both.

## 21 U.S.C. § 352 – Misbranded drugs and devices

### (a) FALSE OR MISLEADING LABEL

(1) If its labeling is false or misleading in any particular. Health care economic information provided to a payor, formulary committee, or other similar entity with knowledge and expertise in the area of health care economic analysis, carrying out its responsibilities for the selection of drugs or devices for coverage or reimbursement, shall not be considered to be false or misleading under this paragraph if the health care economic information relates to an indication approved under section 355, 360(k), 360c(f)(2), or 360e of this title or section 262 of Title 42 for such drug or device, is based on competent and reliable scientific evidence, and includes, where applicable, a conspicuous and prominent statement describing any material differences between the health care economic information and the labeling approved for the drug or device under section 355, 360(k), 360c(f)(2), or 360e of this title or section 262 of Title 42. The requirements set forth in section 355, 360(k), 360c(f)(2), or 360e of this title or section 262 of Title 42 shall not apply to health care economic information provided to such a payor, committee, or entity in accordance with this paragraph. Information that is relevant to the substantiation of the health care economic information presented pursuant to this paragraph shall be made available to the Secretary upon request.

. . .

### (f) DIRECTIONS FOR USE AND WARNINGS ON LABEL

Unless its labeling bears (1) adequate directions for use; and (2) such adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health, or against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users, except that where any requirement of clause (1) of this paragraph, as applied to any drug or device, is not necessary for the protection of the public health, the Secretary shall promulgate regulations exempting such drug or device from such requirement. Required labeling for prescription devices intended for use in health care facilities or by a health care professional and required labeling for in vitro diagnostic devices intended for use by health care professionals or in blood establishments may be made available solely by electronic means, provided that the labeling complies with all applicable requirements of law, and that the manufacturer affords such users the opportunity to request the labeling in paper

form, and after such request, promptly provides the requested information without additional cost.

## 21 U.S.C. § 355 – New Drugs

**(a) NECESSITY OF EFFECTIVE APPROVAL OF APPLICATION**

No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) is effective with respect to such drug.

. . .

**(d) GROUNDS FOR REFUSING APPLICATION; APPROVAL OF APPLICATION; "SUBSTANTIAL EVIDENCE" DEFINED**

If the Secretary finds, after due notice to the applicant in accordance with subsection (c) and giving him an opportunity for a hearing, in accordance with said subsection, that (1) the investigations, reports of which are required to be submitted to the Secretary pursuant to subsection (b), do not include adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof; (2) the results of such tests show that such drug is unsafe for use under such conditions or do not show that such drug is safe for use under such conditions; (3) the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to preserve its identity, strength, quality, and purity; (4) upon the basis of the information submitted to him as part of the application, or upon the basis of any other information before him with respect to such drug, he has insufficient information to determine whether such drug is safe for use under such conditions; or (5) evaluated on the basis of the information submitted to him as part of the application and any other information before him with respect to such drug, there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof; or (6) the application failed to contain the patent information prescribed by subsection (b); or (7) based on a fair evaluation of all material facts, such labeling is false or misleading in any particular; he shall issue an order refusing to approve the application. If, after such notice and opportunity for hearing, the Secretary finds that clauses (1) through (6) do not apply, he shall issue an order approving the application. As used in this subsection and subsection (e), the term "substantial evidence" means evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have

the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof. If the Secretary determines, based on relevant science, that data from one adequate and well-controlled clinical investigation and confirmatory evidence (obtained prior to or after such investigation) are sufficient to establish effectiveness, the Secretary may consider such data and evidence to constitute substantial evidence for purposes of the preceding sentence. The Secretary shall implement a structured risk-benefit assessment framework in the new drug approval process to facilitate the balanced consideration of benefits and risks, a consistent and systematic approach to the discussion and regulatory decisionmaking, and the communication of the benefits and risks of new drugs. Nothing in the preceding sentence shall alter the criteria for evaluating an application for marketing approval of a drug.