# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

IN RE: ADMINISTRATIVE SUBPOENA NO. 25-1431-019

THE CHILDREN'S HOSPITAL CORPORATION, d/b/a Boston Children's Hospital,

Petitioner-Appellee,

v.

UNITED STATES DEPARTMENT OF JUSTICE,

Respondent-Appellant.

On Appeal from the United States District Court
for the District of Massachusetts

## APPENDIX

BRETT A. SHUMATE
*Assistant Attorney General*

BRAD HINSHELWOOD
BRANTLEY MAYERS
*Attorneys, Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 890-9874*

# TABLE OF CONTENTS

District Court Docket Sheet .................................................................................App.1

Motion to Quash (Dkt. 3) (July 8, 2025) ..................................................App.10

Strachan Declaration (Dkt. 5) (July 8, 2025) ............................................App.15

Subpoena (Dkt. 5-1) (July 8, 2025).........................................................App.17

Transcript of Motion Hearing (Dkt. 30) (August 27, 2025)....................................App.45

Motion to Alter or Amend (Dkt. 35) (October 7, 2025).........................................App.96

Declaration of Lisa K. Hsiao (Dkt. 37) (October 7, 2025) ....................................App.99

Notice of Appeal (Dkt. 46) (November 7, 2025) ................................................. App.115

Notice of Appeal (Dkt. 54) (January 23, 2026).......................................... App.117

Query      Reports      Utilities      Help      Log Out

<span style="color:green">APPEAL</span>

## United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:25-cv-91324-MJJ

In Re: Administrative Subpoena No. 25-1431-019          Date Filed: 07/08/2025
Assigned to: Judge Myong J. Joun                        Date Terminated: 09/09/2025
Case in other court:  USCA - First Circuit, 25-02092
                            USCA - First Circuit, 26-01093
Cause: No cause code entered

**Petitioner**

**The Children's Hospital Corporation**                represented by   **Alan E. Schoenfeld**
*doing business as*                                                     Wilmer Cutler Pickering Hale and Dorr LLP
Boston Children's Hospital                                              7 World Trade Center
                                                                        250 Greenwich Street
                                                                        New York, NY 10007
                                                                        212-937-7294
                                                                        Fax: 212-937-8888
                                                                        Email: alan.schoenfeld@wilmerhale.com
                                                                        *LEAD ATTORNEY*
                                                                        *PRO HAC VICE*
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **Amanda P. Strachan**
                                                                        WilmerHale LLP
                                                                        60 State Street
                                                                        Boston, MA 02109
                                                                        617-526-6000
                                                                        Email:
                                                                        amanda.masselamstrachan@wilmerhale.com
                                                                        *LEAD ATTORNEY*
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **Brian M Boynton**
                                                                        Wilmer Cutler Pickering Hale and Dorr LLP
                                                                        1875 Pennsylvania Ave. NW
                                                                        Washington, DC 20006
                                                                        202-663-6044
                                                                        Fax: 202-663-6363
                                                                        Email: brian.boynton@wilmerhale.com
                                                                        *LEAD ATTORNEY*
                                                                        *PRO HAC VICE*
                                                                        *ATTORNEY TO BE NOTICED*

                                                                        **Brian R. Blais**
                                                                        Ropes & Gray LLP - MA
                                                                        Prudential Tower

App.1

800 Boylston Street
Boston, MA 02199-3600
212-596-9000
Fax: 212-596-9090
Email: brian.blais@ropesgray.com
*ATTORNEY TO BE NOTICED*

**Douglas Hallward-Driemeier**
Ropes & Gray LLP - DC
2099 Pennsylvania Avenue, NW
Washington, DC 20006
202-508-4776
Email: douglas.Hallward-
Driemeier@ropesgray.com
*ATTORNEY TO BE NOTICED*

**Joshua S. Levy**
Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
617-951-7000
Email: joshua.levy@ropesgray.com
*ATTORNEY TO BE NOTICED*

V.

**<u>Respondent</u>**

**United States Department Of Justice**            represented by   **Ross S. Goldstein**
U.S. Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044
202-353-4218
Fax: 202-514-8742
Email: ross.goldstein@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick Runkle**
DOJ-Civ
Poc Agostinho, Jean
1100 L St., N.W.
8142
Washington, DC 20530
202-307-0340
Email: patrick.r.runkle@usdoj.gov
*ATTORNEY TO BE NOTICED*

**<u>Amicus</u>**

**Commonwealth of Massachusetts**            represented by   **Adam M. Cambier**
Massachusetts Attorney General's Office
One Ashburton Place

App.2

Boston, MA 02108
617-963-2278
Email: adam.cambier@mass.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/08/2025 | 1 | ELECTRONIC NOTICE of Case Assignment. Judge Myong J. Joun assigned to case. (LB) (Entered: 07/08/2025) |
| 07/08/2025 | 2 | MOTION to Seal Case by The Children's Hospital Corporation.(LB) (Entered: 07/08/2025) |
| 07/08/2025 | 3 | MOTION to Quash by The Children's Hospital Corporation.(LB) (Entered: 07/08/2025) |
| 07/08/2025 | 4 | MEMORANDUM in Support re 3 MOTION to Quash filed by The Children's Hospital Corporation. (LB) (Entered: 07/08/2025) |
| 07/08/2025 | 5 | DECLARATION of Amanda Masselam Strachan by The Children's Hospital Corporation. (Attachments: # 1 Exhibit 1)(LB) (Entered: 07/08/2025) |
| 07/08/2025 | 6 | NOTICE of Appearance by Joshua S. Levy on behalf of The Children's Hospital Corporation. (LB) (Entered: 07/08/2025) |
| 07/08/2025 | 7 | NOTICE of Appearance by Douglas Hallward-Driemeier on behalf of The Children's Hospital Corporation. (LB) (Entered: 07/08/2025) |
| 07/08/2025 | 8 | NOTICE of Appearance by Brian R. Blais on behalf of The Children's Hospital Corporation. (LB) (Entered: 07/08/2025) |
| 07/08/2025 | 9 | NOTICE of Appearance by Amanda P. Strachan on behalf of The Children's Hospital Corporation. (LB) (Entered: 07/08/2025) |
| 07/08/2025 | 10 | MOTION for Leave to Appear Pro Hac Vice for admission of Brian Boynton by The Children's Hospital Corporation. (Attachments: # 1 Declaration of Brian Boynton) (LB) (Entered: 07/08/2025) |
| 07/08/2025 | 11 | MOTION for Leave to Appear Pro Hac Vice for admission of Boyd Johnson by The Children's Hospital Corporation. (Attachments: # 1 Declaration of Boyd Johnson)(LB) (Entered: 07/08/2025) |
| 07/08/2025 | 12 | MOTION for Leave to Appear Pro Hac Vice for admission of Alan Schoenfeld by The Children's Hospital Corporation. (Attachments: # 1 Declaration of Alan Schoenfeld) (LB) (Entered: 07/08/2025) |
| 07/10/2025 | 13 | Filing fee/payment processed: $52, receipt number 100012291 for Miscellaneous filing fee. (EZG) (Entered: 07/10/2025) |
| 07/10/2025 | 14 | Filing fee/payment processed: $125, receipt number 100012292 for 10 MOTION for Leave to Appear Pro Hac Vice for admission of Brian Boynton. (EZG) (Entered: 07/10/2025) |
| 07/10/2025 | 15 | Filing fee/payment processed: $125, receipt number 100012293 for 11 MOTION for Leave to Appear Pro Hac Vice for admission of Boyd Johnson. (EZG) (Entered: 07/10/2025) |
| 07/10/2025 | 16 | Filing fee/payment processed: $125, receipt number 100012294 for 12 MOTION for Leave to Appear Pro Hac Vice for admission of Alan Schoenfeld. (EZG) (Entered: 07/10/2025) |

App.3

| | | |
|---|---|---|
| 07/10/2025 | 17 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 10 Motion for Leave to Appear Pro Hac Vice Added Brian M. Boynton.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(EZG) (Entered: 07/10/2025) |
| 07/10/2025 | 18 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 11 Motion for Leave to Appear Pro Hac Vice Added Boyd Johnson.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(EZG) (Entered: 07/10/2025) |
| 07/10/2025 | 19 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 12 Motion for Leave to Appear Pro Hac Vice Added Alan Schoenfeld.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(EZG) (Entered: 07/10/2025) |
| 07/23/2025 | 20 | Opposition re 2 MOTION to Seal Case filed by United States Department Of Justice. (SP) (Entered: 07/23/2025) |
| 07/23/2025 | 21 | RESPONSE to Motion re 3 MOTION to Quash filed by United States Department Of Justice. (SP) (Entered: 07/23/2025) |
| 07/24/2025 | 22 | ELECTRONIC NOTICE Setting Hearing on Motion 2 Motion to Seal Case, 3 Motion to Quash :<br><br>**A Motion Hearing is set for 8/27/2025 at 11:00 a.m. in Courtroom 20 (In person only) before Judge Myong J. Joun.**<br><br>(SKY) (Entered: 07/24/2025) |
| 07/30/2025 | 23 | Motion for Leave to File Reply to the Government's Opposition to its Motion to Seal by The Children's Hospital Corporation. (Attachments: # 1 Reply in support of motion to seal) (SKY) (Entered: 07/30/2025) |

App.4

| 07/30/2025 | 24 | Motion for Leave to File Reply to the Government's Response to its Motion to Quash by The Children's Hospital Corporation. (Attachments: # 1 Reply in support of motion to quash)(SKY) (Entered: 07/30/2025) |
|---|---|---|
| 08/05/2025 | 25 | Judge Myong J. Joun: ORDER entered **GRANTING** 23 Motion for Leave to File Reply to the Government's Opposition to its Motion to Seal. (SKY) (Entered: 08/05/2025) |
| 08/05/2025 | 26 | Reply to 20 Opposition re 2 Motion to Seal Case filed by The Children's Hospital Corporation. (SKY) (Entered: 08/05/2025) |
| 08/05/2025 | 27 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 24 Motion for Leave to File Reply to the Government's Response to its Motion to Quash. (SKY) (Entered: 08/05/2025) |
| 08/05/2025 | 28 | Reply to 21 Response to 3 Motion to Quash filed by The Children's Hospital Corporation. (SKY) (Entered: 08/05/2025) |
| 08/27/2025 | 29 | Electronic Clerk's Notes for proceedings held before Judge Myong J. Joun: Motion Hearing held on 8/27/2025 re 2 Motion to Seal Case, 3 Motion to Quash filed.<br><br>The Court heard arguments from the parties as to the pending motions and took the matter under advisement. (Court Reporter: Jamie Halpin at jkhhalpin@gmail.com.)(Attorneys present: Levy & Strachan for the petitioner; Runkle & Goldstein for the respondent.)<br><br>(SKY) (Entered: 08/27/2025) |
| 09/01/2025 | 30 | Transcript of Motion Hearing held on August 27, 2025, before Judge Myong J. Joun. Court Reporter Name and Contact Information: Jamie Halpin at jkhhalpin@gmail.com. (DRK) (Entered: 09/01/2025) |
| 09/01/2025 | 31 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 09/01/2025) |
| 09/03/2025 | 32 | NOTICE by The Children's Hospital Corporation (Attachments: # 1 Exhibit A)(SP) (Entered: 09/03/2025) |
| 09/09/2025 | 33 | Judge Myong J. Joun: ORDER entered. MEMORANDUM OF DECISION re 2 Motion to Seal Case, 3 Motion to Quash filed by The Children's Hospital Corporation.<br><br>For the reasons explained in the attached memorandum of decision, Boston Children's Hospital's Motion to Seal [Doc. No 2 ] is **DENIED** and Motion to Quash [Doc. No. 3 ] is **GRANTED**.<br><br>(SKY) (Entered: 09/09/2025) |
| 09/09/2025 | 34 | Judge Myong J. Joun: ORDER entered. ORDER DISMISSING CASE. (SKY) (Entered: 09/09/2025) |
| 10/07/2025 | 35 | MOTION to Alter Judgment by United States Department Of Justice.(Runkle, Patrick) (Entered: 10/07/2025) |
| 10/07/2025 | 36 | MEMORANDUM in Support re 35 MOTION to Alter Judgment filed by United States Department Of Justice. (Runkle, Patrick) (Entered: 10/07/2025) |
| 10/07/2025 | 37 | AFFIDAVIT in Support re 35 MOTION to Alter Judgment filed by United States Department Of Justice. (Runkle, Patrick) (Entered: 10/07/2025) |

App.5

| | | |
|---|---|---|
| 10/21/2025 | 38 | MEMORANDUM in Opposition re 35 MOTION to Alter Judgment filed by The Children's Hospital Corporation. (Strachan, Amanda) (Entered: 10/21/2025) |
| 10/21/2025 | 39 | MOTION for Leave to File *Amicus Brief* by Commonwealth of Massachusetts. (Attachments: # 1 Exhibit Ex. 1 - Proposed Amicus Brief)(Cambier, Adam) (Entered: 10/21/2025) |
| 10/22/2025 | 40 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTIN** 39 Motion for Leave to File Amicus Brief.<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document.<br><br>(SKY) (Entered: 10/22/2025) |
| 10/22/2025 | 41 | Third Party MEMORANDUM in Opposition re 35 MOTION to Alter Judgment *[Leave to file granted on Oct. 22, 2025]* filed by Commonwealth of Massachusetts. (Cambier, Adam) (Entered: 10/22/2025) |
| 10/26/2025 | 42 | MOTION for Leave to File *Reply* by United States Department Of Justice. (Attachments: # 1 Exhibit A (Proposed Reply), # 2 Exhibit B (Ex. A to the Reply))(Runkle, Patrick) (Entered: 10/26/2025) |
| 10/27/2025 | 43 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 42 Motion for Leave to File Reply.<br><br>Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document.<br><br>(SKY) (Entered: 10/27/2025) |
| 10/27/2025 | 44 | REPLY to Response to 35 MOTION to Alter Judgment filed by United States Department Of Justice. (Attachments: # 1 Exhibit A)(Runkle, Patrick) (Entered: 10/27/2025) |
| 10/29/2025 | 45 | Notice of Supplemental Authorities re 35 MOTION to Alter Judgment (Attachments: # 1 Exhibit A)(Levy, Joshua) (Entered: 10/29/2025) |
| 11/07/2025 | 46 | NOTICE OF APPEAL as to 33 Memorandum & ORDER,, Terminate Motions, by United States Department Of Justice. Fee Status: US Government.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 11/28/2025. (Goldstein, Ross) (Entered: 11/07/2025)** |
| 11/07/2025 | 47 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 46 Notice of Appeal. (MAP) (Entered: 11/07/2025) |
| 11/07/2025 | 48 | USCA Case Number 25-2092 for 46 Notice of Appeal filed by United States Department Of Justice. (MAP) (Entered: 11/07/2025) |

App.6

| | | |
|---|---|---|
| 11/10/2025 | 49 | Notice of Supplemental Authorities re 35 MOTION to Alter Judgment (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Runkle, Patrick) (Entered: 11/10/2025) |
| 11/13/2025 | 50 | NOTICE by The Children's Hospital Corporation re 46 Notice of Appeal,,, (Strachan, Amanda) (Entered: 11/13/2025) |
| 11/13/2025 | 51 | Response by The Children's Hospital Corporation to 49 Notice of Supplemental Authorities . (Strachan, Amanda) (Entered: 11/13/2025) |
| 11/24/2025 | 52 | Judge Myong J. Joun: ELECTRONIC ORDER entered re 35 Motion to Alter Judgment.<br><br>On September 9, 2025, I entered an order granting Boston Children Hospital's ("BCH") Motion to Quash. [Doc. No. 33 ]. On October 7, 2025, the Department of Justice ("DOJ") filed a Motion to Alter (the "Motion"). [Doc. No. 35 ]. On November 7, 2025, the DOJ filed a Notice of Appeal of my September 9 Order. [Doc. No. 46 ]. That appeal has been assigned USCA Case Number 25-2092. [Doc. No. 48 ]. The parties have completed briefing of the merits of the Motion, however, after DOJ filed its Notice of Appeal, BCH filed a Notice indicating that this court no longer has jurisdiction to decide the Motion. [*See* Doc. No. 50 ].<br><br>"The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982). However, "in order to prevent unnecessary appellate review, the district court was given express authority to entertain a ***timely*** motion to alter or amend the judgment under Rule 59, even after a notice of appeal had been filed." *Id.* at 59 (emphasis added). As such, Rule 4(A)(iv) of the Federal Rules of Appellate Procedure provides that "[i]f a party files in the district court" a motion "to alter or amend the judgment under Rule 59" and "does so within the time allowed by those rules--the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion." Fed. Rule App. Proc. 4(A)(iv). Rule 59(e) of the Federal Rules of Civil Procedure provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Here, DOJ filed the Motion around 10:30 P.M. on October 7, 2025, or the 28th day following the entry of the judgment on September 9. However, an electronic filing made on the last day is timely if filed by midnight in the court's time zone, "[u]nless a different time is set by a... local rule." Fed. R. Civ. P. 6(a)(4). Our district's local rules state that, "[a]ll electronic transmissions of documents must be completed prior to 6:00 p.m. to be considered timely filed that day." L.R. 5.4(d). Accordingly, to have timely filed a Motion to Alter in this district, DOJ was required to file its Motion by 6:00 P.M. on October 7, 2025, but did not do so until about 10:30 P.M. [Doc. No. 44 at 4]. Contrary to DOJ's suggestion that our local rules may not apply to a "miscellaneous proceeding to quash an administrative subpoena," [Doc. No. 44 at n.2], the local rules clarify that they "apply to all proceedings in the United States District Court for the District of Massachusetts." L.R. 1.2(a). As such, the Motion is untimely. *See, e.g.*, *Sneade v. Rojas*, 11-cv-40061, 2014 WL 949635, at *2 n.2 (D. Mass. Mar. 10, 2014) ("[T]he motion to impound was filed after the 6:00 p.m. deadline and therefore, is deemed filed the next business day, *i.e.,* it was untimely"); *Romero v. McCormick & Schmick Rest. Corp.*, No. 18-cv-10324, 2020 WL 1430530, at *1 (D. Mass. Mar. 24, 2020) ("Under the Local Rules, all electronic filings must be completed prior to 6 p.m. to be considered timely filed that day. L. R. 5.4(d). As reflected on the docket, Plaintiffs electronically filed their motion and memorandum in support at 7:45 p.m. and their statement of material facts at 8:01 p.m. on the date dispositive motions were due. Accordingly, the filing was late.").<br><br>"District courts enjoy broad latitude in administering local rules." *Air Line Pilots Ass'n v. Precision Valley Aviation, Inc.*, 26 F.3d 220, 224 (1st Cir. 1994). DOJ asks that I exercise |

App.7

such discretion here to find that the four-hour delay be deemed timely because BCH does not identify any prejudice from the late filing, and other courts in this district have excused similar delays. *See, e.g.*, *Soo v. Bone Biologics Corp.*, No. 19-cv-11520, 2021 WL 1391458, at *4 (D. Mass. Apr. 13, 2021) (excusing four-hour delay in filing an amended complaint and citing cases). However, DOJ has not pointed to any case finding such a motion timely where a subsequent notice of appeal has also been filed, divesting the court of its jurisdiction. "To deviate from a local rule, the district court (1) must have a sound reason for doing so, and (2) must ensure that no party's substantial rights are unfairly jeopardized." *Belanger v. BNY Mellon Asset Mgmt., LLC*, No. 15-cv-10198, 2017 WL 1160570, at *6 (D. Mass. Mar. 28, 2017) (cleaned up). DOJ has not provided any "sound reason" for its late filing or for deviating from the local rules. *Carpenter v. Rivera*, 10-cv-40233, 2014 WL 4928963, at *2 n.2 (D. Mass. Sept. 30, 2014) ("Accordingly, even if the Court had the power to extend the deadline, I would not find that Plaintiff has established cause for doing so."). Because the Motion was untimely and the notice of appeal has not been tolled, jurisdiction is now vested with the First Circuit Court of Appeals. As such, I do not have jurisdiction to rule on the merits of the Motion to Alter. *See Malek v. Feigenbaum*, 116 F.4th 118, 127–128 (2d Cir. 2024) (finding appeal untimely where Rule 59(e) motion was filed late and did not toll the deadline for appeal). The Motion to Alter, [Doc. No. 35 ], is thus **DENIED**.

(SKY) (Entered: 11/24/2025)

| | | |
|---|---|---|
| 11/25/2025 | 53 | Supplemental Record on Appeal transmitted to US Court of Appeals re 46 Notice of Appeal. Documents included: ECF No. 52 (MAP) (Entered: 11/25/2025) |
| 01/23/2026 | 54 | NOTICE OF APPEAL as to 52 Order on Motion to Alter Judgment,,,,,,,,,,,,,,,,,,,,,,,, by United States Department Of Justice. Fee Status: US Government.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf.** **US District Court Clerk to deliver official record to Court of Appeals by 2/12/2026. (Goldstein, Ross) (Entered: 01/23/2026)** |
| 01/23/2026 | 55 | Electronic notice to counsel: Contested Miscellaneous Business Docket (MBD) Number 1:25-mc-91324 has been transferred to the civil docket of this Court as civil action number 1:25-cv-91324 and assigned to Judge Myong J. Joun. All further filings should be made in the new civil action. (Danieli, Chris) (Entered: 01/23/2026) |
| 01/24/2026 | 56 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 54 Notice of Appeal. (MAP) (Entered: 01/24/2026) |
| 01/26/2026 | 57 | USCA Case Number 26-1093 for 54 Notice of Appeal, filed by United States Department Of Justice. (MAP) (Entered: 01/26/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/14/2026 13:05:45 | | | |
| **PACER Login:** | btmayers75 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-91324-MJJ |

App.8

| Billable Pages: | 7 | Cost: | 0.70 |
|---|---|---|---|

App.9

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

In Re: Administrative Subpoena No. 25-1431-019

MBD No. _____

**FILED UNDER SEAL**

## BOSTON CHILDREN'S HOSPITAL'S
### <u>MOTION TO QUASH</u>

Pursuant to 18 U.S.C. § 3486(a)(5), Plaintiff The Children's Hospital Corporation d/b/a Boston Children's Hospital ("BCH") respectfully moves to quash a subpoena duces tecum issued by the U.S. Department of Justice ("DOJ") under Section 248 of the Health Insurance Portability & Accountability Act of 1996 ("HIPAA") (18 U.S.C. § 3486).[1]   In the alternative, BCH moves to modify the subpoena and for the issuance of a protective order.  The grounds for the Motion are explained in detail in the accompanying Memorandum and include the following:

1.       On June 11, 2025, DOJ served BCH with an administrative subpoena purportedly issued pursuant to 18 U.S.C. § 3486.  *See* Ex. 1.

2.       The subpoena's response deadline is July 9, 2025.  *Id.*

3.       The subpoena contains 15 separate requests for documents that seek practically every document related to BCH's patients, staff, and providers concerning BCH's provision of gender-affirming care ("GAC") over five and a half years.  *Id.*   The subpoena seeks highly sensitive, personally identifiable medical information and records regarding, among others, minor patients, as well as personnel records for nearly all medical employees at BCH, extensive billing and diagnosis coding materials, and communications with third parties.  *Id.*

---

[1] The subpoena is attached to the Declaration of Amanda Masselam Strachan as Exhibit 1.

4.    18 U.S.C. § 3486(a)(5) provides that "[a]t any time before the return date specified in the summons, the person or entity summoned may, in the United States district court for the district in which that person or entity does business or resides, petition for an order modifying or setting aside the summons, or a prohibition of disclosure ordered by a court under paragraph (6)."

5.    DOJ's discretion to issue subpoenas, though wide, is not unlimited.    An administrative subpoena must be issued for a congressionally authorized purpose, seek information relevant to that purpose, and adequately describe the information sought.  *United States Dep't of Just. v. Ricco Jonas*, 24 F.4th 718, 726 (1st Cir. 2022).  The subpoena here fails at every step of this analysis.

6.    *First*, it lacks a congressionally authorized purpose because it seeks to block lawful medical treatment.  It was issued as a result of President Trump's executive orders and DOJ's memoranda that explicitly seek to block a disfavored type of medical treatment that is guaranteed under Massachusetts law.  *Second*, even if DOJ were pursuing a valid and congressionally authorized purpose (which it is not), the subpoena seeks documents and information that are not relevant to any such purpose.  *Third*, the subpoena is overbroad, vague, and unduly burdensome and therefore the information sought is not adequately described.

For these reasons, as detailed in the Memorandum, BCH respectfully requests that the Court quash the subpoena in its entirety or, in the alternative, modify the subpoena and enter a protective order.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Local Rule 7.1(d), Plaintiff respectfully requests oral argument on this Motion.

Dated:  July 8, 2025                                          Respectfully submitted,


/s/ Joshua S. Levy                               /s/ Amanda Masselam Strachan
Joshua S. Levy                                   Amanda Masselam Strachan
BBO# 563017                                      BBO# 641108
ROPES & GRAY LLP                                 WILMER CUTLER PICKERING
800 Boylston Street                                HALE AND DORR LLP
Boston, MA 02119                                 60 State Street
Telephone:  (617) 951-7000                       Boston, MA 02109
joshua.levy@ropesgray.com                        Tel: (617) 526-6000
                                                 Fax: (617) 526-5000
Douglas Hallward-Driemeier                       amanda.masselamstrachan@wilmerhale.com
BBO# 627643
ROPES & GRAY LLP                                 Boyd Johnson*
2099 Pennsylvania Avenue NW                       Alan Schoenfeld*
Washington, DC 10036                             WILMER CUTLER PICKERING
Telephone:  (202) 508-4600                         HALE AND DORR LLP
douglas.hallward-                                7 World Trade Center
driemeier@ropesgray.com                          250 Greenwich Street
                                                 New York, NY 10007
Brian R. Blais                                   Tel.: (212) 230-8800
BBO# 660601                                      Fax: (212) 230-8888
ROPES & GRAY LLP                                 boyd.johnson@wilmerhale.com
1211 Avenue of the Americas                       alan.schoenfeld@wilmerhale.com
New York, NY 10036
Telephone:  (212) 596-9090                       Brian M. Boynton*
brian.blais@ropesgray.com                        WILMER CUTLER PICKERING
                                                   HALE AND DORR LLP
                                                 2100 Pennsylvania Avenue NW
                                                 Washington, DC 20037
                                                 Tel.: (202) 663-6000
                                                 Fax: (202) 663-6363
                                                 brian.boynton@wilmerhale.com

                                                 *pro hac vice application forthcoming

                                                 Counsel for Plaintiff The Children's Hospital
                                                 Corporation d/b/a Boston Children's Hospital


4
App.13

**<u>LOCAL RULE 7.1 CERTIFICATION</u>**

I, Amanda Masselam Strachan, certify that on July 7, 2025, the parties conferred in good faith to resolve or narrow the issues presented by this motion and were unable to resolve or narrow the issues.

/s/ Amanda Masselam Strachan_____
Amanda Masselam Strachan

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 8, 2025, the foregoing was filed under seal with the Clerk of the Court via electronic mail, and that a copy was served on counsel for the Defendant via electronic mail and First-Class US Mail.

/s/ Amanda Masselam Strachan_____
Amanda Masselam Strachan
BBO# 641108
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
amanda.masselamstrachan@wilmerhale.com

**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In Re: Administrative Subpoena No. 25-1431-019 | MBD No. _____ <br> **FILED UNDER SEAL** |

**DECLARATION OF AMANDA MASSELAM STRACHAN
IN SUPPORT OF BOSTON CHILDREN'S HOSPITAL'S
<u>MOTION TO QUASH</u>**

I, Amanda Masselam Strachan, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a partner at Wilmer Cutler Pickering Hale and Dorr LLP.  I represent Plaintiff The Children's Hospital Corporation d/b/a Boston Children's Hospital ("BCH") in the above-captioned action.  I am familiar with the facts set forth in this declaration.  I am competent and willing to testify to the matters contained in this declaration.

2.      I submit this declaration in support of BCH's Motion to Quash a subpoena duces tecum issued by the U.S. Department of Justice under Section 248 of the Health Insurance Portability & Accountability Act of 1996 ("HIPAA") (18 U.S.C. § 3486).

3.      Attached as **Exhibit 1** is a true and correct copy of the subpoena.

1

App.15

Dated: July 8, 2025

/s/ Amanda Masselam Strachan
Amanda Masselam Strachan
BBO# 641108
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
amanda.masselamstrachan@wilmerhale.com

*Counsel for Plaintiff The Children's Hospital
Corporation d/b/a Boston Children's Hospital*

2

App.16

# EXHIBIT 1

# UNITED STATES OF AMERICA
## DEPARTMENT OF JUSTICE

---

## SUBPOENA DUCES TECUM

No. 25-1431-019

**To:**   The Children's Hospital Corporation d/b/a Boston Children's Hospital
300 Longwood Avenue
Boston, Massachusetts 02115

*YOU ARE HEREBY COMMANDED TO APPEAR BEFORE Patrick Runkle, Ross Goldstein, and/or Francisco Unger, officials of the United States Department of Justice, and you are hereby required to bring with you and produce the following:*

Please see Attachment A

*which are necessary in the performance of the responsibility of the United States Department of Justice to investigate Federal health care offenses as defined in 18 U.S.C. § 24(a).*

*Please contact Assistant Director Patrick Runkle, Assistant Director Ross Goldstein, or Trial Attorney Francisco Unger at 202-616-0295 if you have any questions regarding this Subpoena Duces Tecum.*

### PLACE AND TIME FOR APPEARANCE:

U.S. Department of Justice, Consumer Protection Branch, 450 Fifth St., NW, Washington, D.C., on Wednesday, the 9th day of July, 2025, at ten o'clock a.m.

---

Failure to comply with the requirements of this subpoena will render you liable to proceedings in the district court of the United States to enforce obedience to the requirements of this subpoena, and to punish default or disobedience.

---

Issued under authority of Section 248 of the Health Insurance Portability & Accountability Act of 1996, Public Law No. 104-91 (18 U.S.C. § 3486)



*IN TESTIMONY WHEREOF*

Brett A. Shumate, Assistant Attorney General, the undersigned official of the United States Department of Justice, has set his hand this 11th day June, 2025.

BRETT
SHUMATE

Digitally signed by BRETT SHUMATE
Date: 2025.06.11 12:04:06 -04'00'

*(signature)*

App.18

# *RETURN OF SERVICE*

*I, being a person over 18 years of age, hereby certify that a copy of this subpoena was duly served on the person named herein by means of:*

1. **Personal delivery to an individual, to wit:**

_____
*(name)*

_____
*(title)*

_____
*(address)*

2. **Personal delivery to an address, to wit:**

_____
*(description of premises)*

_____
*(address)*

3. **Registered or certified mailing to:**

_____
*(name)*

_____
*(address)*

*At* _____ *a.m. | p.m. on*

_____
*(date)*

_____
*(signature)*

_____
*(title)*

Apr.19

# UNITED STATES OF AMERICA
# DEPARTMENT OF JUSTICE

# SUBPOENA DUCES TECUM

*Upon contumacy or refusal to obey, this subpoena shall be enforced by order of the appropriate United States District Court.*

# ATTACHMENT A TO SUBPOENA TO:

THE CHILDREN'S HOSPITAL CORPORATION d/b/a BOSTON CHILDREN'S HOSPITAL
300 LONGWOOD AVENUE
BOSTON, MASSACHUSETTS 02115

## I. DEFINITIONS

1. "You," "Your Company," and "the Company," means:

   a. The Children's Hospital Corporation d/b/a Boston Children's Hospital, a Massachusetts corporation, whose principal place of business is located at 300 Longwood Avenue, Boston, Massachusetts, without regard to any name under which it has done business;

   b. All of its predecessors, subsidiaries, affiliates, branches, divisions, groups, business units, business segments, operations, units, parent organizations, successors, assigns, plants, and any joint ventures of which they were or are a part, including, without limitation, the Gender Multispecialty Service at Boston Children's Hospital; and

   c. Each of its present or former officers, directors, employees, attorneys, representatives, and agents acting or purporting to act or appearing to act on behalf of the Company, whether or not acting within the proper scope of his or her actual authority.

2. "Employee" means any person including, but not limited to, any independent contractor or agent, all past and present directors, officers, agents, representatives, attorneys, accountants, advisors, and consultants who acted or purported to act on behalf of the Company or who have performed any service for the Company or under its name, whether on a full-time, part-time, piece-work, commission, volunteer, or other basis, and whether paid or unpaid.

3. "Document" should be afforded the broadest possible meaning and includes every writing or record of whatever type or description, including but not limited to any electronically stored data or paper document, in the possession, custody, or control of the Company. This includes, but is not limited to:

   a. All material that is handwritten, typed, printed, recorded, transcribed, taped, filmed, in graphic form, or in aural form;

1

App.20

b.      Drawings, designs, manuals, memoranda, emails, reports, financial reports, notes, diaries, notations of any sort of conversations, working papers, letters, envelopes, telegrams, messages, studies, analyses, books, articles, notebooks, booklets, circulars, bulletins, notices, instructions, pamphlets, pictures, films, videos, voice recordings, maps, work papers, arithmetical computations, calendars (including electronic calendars), date books, task lists, minutes, all communications of any type (e.g., e-mail, voice mail, text messaging, WhatsApp and similar applications), social media content (including posts, messages, comments, and metadata), audio and video files,

c.      Electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software), including metadata;

d.      Any electronic files saved as a backup, including metadata;

e.      Any deleted but recoverable electronic files, including metadata;

f.      Any electronic file fragments (files that have been deleted and partially overwritten with new data), including metadata;

g.      Every copy of every document where such copy is not identical to the original because of any addition, deletion, alteration, or notation; and

h.      All attachments, enclosures, or other matter affixed to, transmitted with, or incorporated by reference within documents responsive to this Subpoena including, but not limited to, any pages showing who reviewed, approved, or rejected a particular document.

4.      "Relevant Time Period" means January 1, 2020, through the present date. All responsive documents that were prepared, dated, sent, received, altered, in effect, or which came into existence during this period are to be produced pursuant to this Subpoena.

5.      "Or" as well as "and" shall be construed interchangeably in a manner that gives this Subpoena the broadest possible meaning.

6.      "Any" shall be construed to include the word "all" and the term "all" shall be construed to include the word "any."

7.      "Relate to" means to make a statement about, refer to, discuss, describe, reflect, identify, deal with, consist of, or in any way pertain, in whole or in part to the subject.

2

8.    "Communication" means any transmission or exchange of information, statements, ideas, inquiries, or data between two or more persons orally, in writing, digitally, visually, or electronically regardless of the medium or platform used, including social media interactions, voicemails, and virtual meetings (e.g., Zoom, WebEx, Microsoft Teams). The term includes all drafts, versions, replies, responses, forwards, and attachments associated with or forming part of the communication, as well as any records or logs reflecting the time, date, participants, and content of such communications.

9.    "Gender-related care" means any medical, surgical, psychological, or social treatment provided to individuals to alter their physical appearance or social presentation to resemble characteristics typically associated with the opposite biological sex.

10.   "Puberty blockers" means any gonadotropin-releasing hormone ("GnRH") agonists or related drugs (*e.g.,* leuprolide, triptorelin) used to delay the onset of puberty.

11.   "Hormones" includes testosterone, estrogen, and any other hormonal drugs used in hormonal treatments sometimes known as "gender affirming hormone therapy" ("GAHT") or transgender hormone therapy used to induce cross-sex characteristics.

12.   "Minor" means any patient under the age of 18 at the time of consultation, treatment, or prescription.

## II. GENERAL INSTRUCTIONS

1.    You are required to produce the **originals** of each document and other item that is responsive, in whole or in part, to any request set forth in this Subpoena, together with all copies of any such document that exist.

   a.    If a copy is identical to the original, you are not required to produce it, but if you choose not to, your records custodian (the "Custodian," as described below) must maintain a written log identifying the location(s) where each identical copy of the original document was located, including all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers of where the document is located.

   b.    If a copy differs from the original by virtue of any addition, deletion, alteration, notation, or inscription on any part of the front or back of the document, the original and copy must each be produced.

3

App.22

2.     **No document called for by this subpoena shall be destroyed, modified, redacted, removed, or otherwise made inaccessible.** Documents called for by this Subpoena for which a claim of privilege is made, in compliance with the instruction below, shall be retained and protected.

3.     Your Company is to designate someone as the person responsible to produce documents on the Subpoena return date (the "Custodian").

   a.     Such Custodian shall have personal, direct, and thorough knowledge of, and responsibility for, the search conducted by the Company for documents responsive to this Subpoena.

   b.     The Custodian shall be prepared on the return date to submit to examination concerning the method and completeness of the Company's response, the exact location(s) within the Company's premises at which documents produced in response to the Subpoena were found, and other matters pertaining to the search.

   c.     The Custodian shall further be prepared to provide a written log identifying the location(s) in which each produced document was located, indicating all locations, if more than one. This includes, in the case of information stored in electronic form, a description, including drives, directories, and computers, of where the document is located.

4.     The Company shall identify the paragraph and subparagraph of Section III of this Attachment to the Subpoena ("Documents to Be Produced") to which each document produced pursuant to this Subpoena is responsive.

5.     If the Company has knowledge of any document that would be responsive to this Subpoena, but has been lost, destroyed, or discarded, it shall identify the document to the extent possible, and provide an explanation of the loss, destruction or discarding, including identification of each person authorizing or having knowledge of the loss, destruction, or discarding.

6.     The singular form of a word shall be construed to include within its meaning the plural form of the word, and *vice versa*, and the use of any tense of any verb shall be considered to include all other tenses in a manner that gives this Subpoena the broadest reading.

7.     All electronically stored information must be collected using a forensically sound process. When the image file is produced, the Company must preserve the integrity of the electronic document's contents, including the original formatting of the document, its metadata and, where applicable, its revision history.

8.    If the Company withholds any document on the ground of any claimed privilege, it shall provide a statement with respect to each document setting forth

  a.    The name and title of the author (and if different, the preparer and signatory);

  b.    The name(s) and title(s) of the individual(s) to whom the document was addressed;

  c.    The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;

  d.    The date of the document;

  e.    The number of pages;

  f.    A brief description of the subject matter;

  g.    A statement of the specific basis on which privilege is claimed; and

  h.    The paragraph or subparagraph in Section III of this Attachment ("Documents to Be Produced") to which it is responsive.

## III. DOCUMENTS TO BE PRODUCED

1.    Complete personnel files for each employee, contractor, or affiliate of the Company in the following categories:  (a) executives, management employees, or board members with authority to direct any aspect of the Company's affairs; (b) employees, contractors, or affiliates who have authority to prescribe medications or perform medical evaluations; and (c) employees, contractors, or affiliates who are engaged in billing activities.

2.    All documents, including billing records, insurance claims, internal protocols, or guidance, concerning the use of ICD (*i.e.*, International Classification of Diseases) diagnosis codes in connection with the treatment of minor patients receiving gender-related care.

3.    All documents that show or relate to any use of diagnosis codes for minors other than those specifically identifying transsexualism, gender dysphoria, gender incongruence, or gender identity disorder (*e.g.*, codes for endocrine disorder, unspecified hormonal disorders, medication management, etc.).

5

App.24

4.     All documents reflecting communications among Company employees (including physicians, billing staff, and administrators), or between the Company and any third party, relating to whether or how to code or bill for treatment of gender dysphoria by using alternative diagnoses or alternative ICD codes.

5.     All communications with public or private health care benefit programs or plans regarding the use of ICD codes for gender-related care, including any inquiries, denials, or appeals related to claims for such care.

6.     Any training materials, coding manuals, presentations, or communications relating to billing or coding practices for gender-related care, puberty blockers, or hormone therapy.

7.     All documents relating to communications between You and any pharmaceutical manufacturer of puberty blockers or hormones, or any compounding pharmacy providing puberty blockers or hormones, relating to the use of such drugs in gender-related care for minors.

8.     All documents relating to communications with pharmaceutical sales representatives, marketing departments, or medical science liaisons regarding the use of puberty blockers or hormones for gender-related care or the treatment of gender dysphoria, including with regard to the safety and efficacy of such drugs for those uses.

9.     All documents, including presentations and promotional materials, received from pharmaceutical manufacturers or compounding pharmacies concerning uses of their products in minors for gender-related care or for the treatment of gender dysphoria, including so-called "scientific exchange" materials.

10.    All documents relating to contracts, sponsorships, speaking engagements, consulting agreements, grants, or financial or promotional arrangements between You and any manufacturer or compounder of puberty blockers or hormones.

11.    Documents sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy.

12.    For each such patient identified in Subpoena specification 11, *supra*, documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy.

13.    All documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena specification 11, *supra*, including any disclosures about off-label use (*i.e.,* uses not

6

App.25

approved by the United States Food and Drug Administration) and potential risks.

14.   All documents reflecting communications with pharmaceutical manufacturers, compounding pharmacies, or government agencies relating to the safety of puberty blockers or hormones used in the treatment of minor patients.

15.   All documents relating to any adverse event, side effect, or medically unfavorable consequence or outcome in a minor patient with regard to gender-related care.

## IV. FORM OF PRODUCTION

Documents responsive to this Subpoena should be produced in the format specified in the "Production Specifications," attached as ATTACHMENT B to this Subpoena.

7

App.26

**SUBPOENA ATTACHMENT B**

**Specifications for Production of ESI and Digitized ("Scanned") Images
("Production Specifications")**

**Collection of Electronically Stored Information (ESI)**

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

### 1.    Specification Modifications

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form.  Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

### 2.    Production Format of ESI and Imaged Hard Copy Documents

Responsive ESI shall be produced in its unprocessed form (i.e., in its native format), without altering native electronic file formats and maintains the integrity of all source, custodian, application, embedded and metadata related thereto.  The native electronic file formats provided shall be of a type and nature which is functionally useable by all parties.  No alteration shall be made to file names or extensions for responsive native electronic files.  If a producing party is converting native files to image files for its own purposes, the Government requests a copy of that image file along with production of the native file.

For ESI, a producing party may provide an image file without a native file only if the affected document requires a privilege redaction or other permitted redaction..  Except as outlined below in sections 5 – 21, the redacted document shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. Paper documents shall also be imaged pursuant to the requirements below.

All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

      a.  **Image File Format:** All imaged documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

      b.  When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT

App.27

*July 2022*

Group IV (2D Compression).  When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

   i.  All TIFF file names shall include the unique Bates number burned into the image.  (See section 22, below, regarding Bates number instructions.)
   ii.  All TIFF image files shall be stored with the ".tif" extension.
   iii.  Images without corresponding extracted text shall be OCR'd using standard COTS products.
      1.  An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images.  The report shall include the DOCID or Bates number(s) corresponding to each such image.
   iv.  All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.
   v.  No image folder shall contain more than 2,000 images.

c.  **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file.  The Cross Reference file should also contain the relative image file path for each Bates numbered page.  The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

        REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
        REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,
        REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,
        REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
        REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.

App.28

*July 2022*

- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

d. **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat database environment.  The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8.  The file should contain the required fields listed below in section 3.

   1. Text delimited load files are defined using the standard Concordance delimiters.  For example:

| | |
|---|---|
| *Field Separator* | *¶ or Code 020* |
| *Text Qualifier* | *þ or Code 254* |
| *Newline* | *® or Code 174* |
| *Multi-value* | *; or Code 059* |
| *Nested values* | *\ or Code 092* |

   2. This load file should contain the relative file path to the individual multi-page, document level text files.
   3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
   4. There should be one line for every record in a collection.
   5. The load file must contain a header listing the metadata/database fields contained within.  For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

     þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAMEþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:**  The directory structure for productions should be:
     \*CaseName*\\**LoadFiles**
     \*CaseName*\\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
     \*CaseName*\\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
     \*CaseName*\\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)

3

*July 2022*

\\*CaseName*\\**Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder) \\*CaseName*\\**Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

3.  **Required Metadata/Database Fields**

A "✓" denotes that the indicated field should be present in the load file produced.  "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13).  Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below.  Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | ✓ | ✓ | ✓ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | ✓ | ✓ | ✓ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | ✓ | ✓ | ✓ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| AUTHOR | Creator of the document | Text | 500 | | | ✓ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | ✓ | ✓ | ✓ |

4

App.30

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other. If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.: e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent. Do not provide 00/00/0000. | Date | MM/DD/YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |

6

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YY YY HH:MM:SS | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |

7

App.33

*July 2022*

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

**4.    Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures**

a. De-duplication of exact hash copies shall only be permitted if the producing party can meet all the provisions of this section. If a producing party cannot comply with any requirement of this section, it shall not conduct de-duplication of exact hash copies.

b. De-duplication of exact hash copies shall be performed globally – across all custodians. The custodian of each record shall be populated in the DupeCustodian field.

c. All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

d. All files should be globally de-duplicated with the following conditions:

8

App.34

*July 2022*

    i.  The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.

    ii.  The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.

    iii.  All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.

    iv.  No customization of hashing may occur without prior express approval by the Government.

    v.  De-duplication must be done by document family, not by individual document.

    vi.  A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government.  For every production after the first, a separate Unified Custodian overlay shall be provided.  If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be expressly stated in the cover letter accompanying the subsequent production(s).

e.  The Producing Party  shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government.  All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields.  The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

## 5. Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file.  Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file.  If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

## 6. Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced.  For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

9

**7.    Image-Only Files**

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

**8.    Encrypted Files**

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

    a.  The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b.  The unencrypted native file shall be produced pursuant to sections 10-21.

    b.  If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

**9.    Production of Imaged Hard Copy Records**

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

    a.  Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).

    b.  The first document in the collection represents the parent document and all other documents will represent the children.

    c.  All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression).  All documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.  Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.

    d.  All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

**10.    Production of Spreadsheets and Presentation Files**

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number.  *See* section 22 below.

10

*July 2022*

The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

## 11. Production of E-mail Repositories

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

## 12. Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

## 13. Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies. These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies. However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

Case 1:25-cv-91324-MJJ    Document 5-1    Filed 07/08/25    Page 22 of 28

App.38

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timestamp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

12

Case 1:25-cv-91324-MJJ    Document 5-1    Filed 07/08/25    Page 23 of 28

App.39

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **Chats** | **MMS** | **SMS** | **Email** | **Instant Message** | **Voicemail** | **Recordings** | **Notes** | **Calendar** |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

13

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

App.40

Case 1:25-cv-91324-MJJ    Document 5-1    Filed 07/08/25    Page 24 of 28

*July 2022*

### 14.     Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts.  Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering.  Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements:  (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements.  If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.     Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database.  Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format.  The information contained in any such report must be thoroughly explained to the government before production.

### 16.     Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created.  All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

15

### 17.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images.  The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.    Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format.  The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19.    Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production.  The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#.  The parties shall meet and confer regarding any required audio file redactions.

### 20.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government.  The following are examples:

a.    AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.

b.    GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

16

*July 2022*

    c.   Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

**22.    Bates Number Convention**

All images should be assigned Bates numbers before production to the government.  Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page.  The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document.  Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field).  The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion.  The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file).  If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production.  There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation."  Below is a sample of dot notation:

|  | *Document #1* | *Document #2* |
|---|---|---|
| *Page #1* | PREFIX00000000001 | PREFIX00000000002 |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002 |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003 |

**23.    Media Formats for Storage and Delivery of Production Data**

Electronic documents and data shall be delivered on any of the following media:

    a.   CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
    b.   External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives
    c.   Government approved File Transfer Protocol (FTP) technologies.
    d.   Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
    e.   Media should be labeled with the case name, production date, Bates range, and producing party.

**24.    Virus Protection and Security for Delivery of Production Data**

Production data shall be free of computer viruses.  Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government.  Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions.  All encryption software shall be used with approval by and with the written consent of the government.

17

*July 2022*

**25.     Privilege Logs**

a.        The name and title of the author (and if different, the preparer and signatory);
b.        The name(s) and title(s) of the individual(s) to whom the document was addressed;
c.        The name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;
d.        The date of the document;
e.        The number of pages;
f.        A brief description of the subject matter;
g.        A statement of the specific basis on which privilege is claimed; and
h.        The paragraph or subparagraph of the Subpoena to which it is responsive.


**26.     Compliance and Adherence to Generally Accepted Technical Standards**

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

**27.     Read Me Text File**

All deliverables shall include a "read me" text file at the root directory containing:  total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats.  The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

**28.     Exception Report**

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

**29.     Transmittal Letter to Accompany Deliverables**

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced.  Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

18

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


_____



In Re: Administrative Subpoena          No. 25-MC-91324-MJJ
No. 25-1431-019
                                        August 27, 2025


_____








BEFORE THE HONORABLE MYONG J. JOUN

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210








JAMIE K. HALPIN, CRR, RMR, RPR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 7-204
Boston, MA  02210
jkhhalpin@gmail.com

APPEARANCES:

FOR THE PETITIONER:

Joshua S. Levy
Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
617-951-7000
Email: Joshua.levy@ropesgray.com

Amanda M. Strachan
WilmerHale LLP
60 State Street
Boston, MA 02109
617-526-6000
Email: Amanda.masselamstrachan@wilmerhale.com

FOR THE RESPONDENT:

ROSS S. GOLDSTEIN
        &
PATRICK R. RUNKLE
U.S. Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044
Tel: (202) 353-4218
Ross.goldstein@usdoj.gov

**P-R-O-C-E-E-D-I-N-G-S**

THE CLERK: All rise.

(The Honorable Court Entered)

THE CLERK: Today is August 27, 2025. We're on the record in the matter of *Administrative Subpoena Number 25-1431-019, regarding The Children's Hospital Corporation v. United States Department of Justice*. Case Number for this case is *25-MC-91324*. Will counsel please identify themselves for the record.

MS. STRACHAN: Good morning, your Honor. Amanda Masselam Strachan for Boston Children's Hospital.

THE COURT: Good morning.

MR. LEVY: Good morning, your Honor. Joshua Levy for Boston Children's Hospital.

THE COURT: Good morning.

MR. RUNKLE: Good morning, your Honor. Patrick Runkle for the government.

MR. GOLDSTEIN: Good morning, your Honor. Ross Goldstein also for the government.

THE COURT: Good morning. So, welcome, everyone. I've read all of the submissions. I don't have any preference. Where do you want to start first?

MR. LEVY: Our preference is to start with the motion to quash which I think will provide an overview for some of the reasons why we want this matter sealed, your Honor. May we

start?

THE COURT: Whenever you're ready.

MR. LEVY: Thank you, your Honor, and before I begin, I just note that we're joined in the courtroom with additional lawyers who were working on this case and helped us get ready for this, several representatives from Boston Children's Hospital, including General Counsel, Mr. Chris Viney.

Your Honor, the Court should quash the subpoena that was issued to Boston Children's Hospital because the factual record is compelling and clear that this subpoena was issued for an improper purpose. That improper purpose is, namely, to bring an end to gender-affirming care for minors. This is not a purpose that Congress has authorized the Department of Justice or the executive branch to pursue, and as I will review, the Department of Justice has offered no evidence to this Court to substantiate that there is a proper purpose.

As a result, given the evidence of the improper purpose and the lack of any evidence on the other side, the government has failed to satisfy the *Powell* test in the Supreme Court in 1964. I would a hundred percent agree with the government that their latitude to investigate is wide but it is not unchecked, your Honor, especially when they're wading into an area that has been expressly delegated to the states, the practice of medicine, by both the Supreme Court and Congress in numerous statutes. There is a critical role for this Court to

play in ensuring that the government satisfies the *Powell* test and the government issues a subpoena for a proper purpose authorized by Congress.

The Supreme Court has said the role of the District Court in this context is not a rubber stamp, it's not minor or ministerial.  It is a check to make sure when you have an unusual case like we have here, where the improper purpose underlying the subpoena is crystal clear, that court action is necessary to prevent abuse of the subpoena process.

And in getting ready for this argument, your Honor, I went back to the first principles in Webster's dictionary.  I looked up the word "purpose."  It is what is the objective, what is the goal to be pursued, and I'd like to review four buckets of information and evidence that we think unmistakably shows that the true purpose of this subpoena served on Boston Children's Hospital is to bring an end to gender-affirming care in the United States.  It's designed to intimidate the hospitals, the people who run the hospitals, the clinicians who provide the care and the patients, intimidate them into ending gender-affirming care, and as I will get to in a few minutes your Honor, it's working because hospitals around the country are ending their practice of gender-affirming care.

What are the four buckets?  It's official statements by the administration, including President Trump and Attorney General Bondi.  The second bucket is the content of the

subpoena itself, the overbreadth and intrusiveness of the subpoena demonstrates the intent underlying the case, underlying the investigation. The government's own characterization in their papers of what they're trying to achieve here further substantiates that there is an improper purpose. And, lastly, your Honor, very importantly, the actions of the administration since the subpoena was issued in June corroborate that the true purpose here is to bring an end to gender-affirming care.

So I am going to get to those in a moment. Your Honor, please interrupt with any questions that you have, but before I tackle those four categories, I think it's important to make clear what the Court does not need to decide here. This Court, we're not asking this Court and the Court does not need to decide whether the United States Constitution or the Equal Protection Clause or other provisions provide a constitutional right to gender-affirming care. The Supreme Court took care of that in June the *Skrmetti* case when they decided that the people of Tennessee have a right under our system of federalism to make a policy decision for the people of Tennessee that they're going to ban gender-affirming care for minors. So that issue has been resolved about the constitutional right to gender-affirming care, but the second issue that this Court does not need to decide is whether gender-affirming care is appropriate, whether the vast medical

literature that supports gender-affirming care reaches a better outcome than the questions that have been raised about the treatment guidelines, that's not an issue this Court needs to decide. Why is that? Because in the *Skrmetti* case the Supreme Court reviewed what the people of Tennessee had done and the court ruled that under our system of federalism, an area of police powers, the regulated practice of medicine is delegated to the states. The quote from Justice Roberts is particularly important. Justice Roberts wrote that the Supreme Court "affords wide discretion to the states to pass legislation in areas where there is medical and scientific uncertainty," and he cited numerous Supreme Court cases of other situations where absent express authority from Congress to regulate a certain area, the federal government is not empowered to regulate the practice of medicine.

That principle that the Supreme Court was articulating in *Skrmetti* is reflected in numerous statutes as well. The Medicare Act which is the statute that enabled the Medicare and the Medicaid Program, 42 U.S.C. 1395 says, "nothing in this chapter shall be construed to authorize any federal officer to exercise any supervision or control over the practice of medicine."

Like the debate about physician-assisted suicide that was decided by the Supreme Court in 2006, the regulation of practice of medicine is an issue that is delegated to the

states. The scientific and policy judgment is left to the people of the states. And just as Tennessee was permitted to make its own judgment, about a mile from here, the people of Massachusetts spoke through the legislature, and in 2022 Governor Baker signed into law a statute that provided that access to gender-affirming care is a right under Massachusetts law and under the Massachusetts constitution; and just this month, your Honor, Governor Healey signed a second law strengthening those protections. The people of Massachusetts have spoken. They've made their policy decisions about the regulation of the practice of medicine in this space, and the Attorney General of Massachusetts, Andrea Campbell, has also spoken on behalf of the people. She has led a seventeen-state coalition to file a lawsuit in this court seeking injunctive and declaratory relief to stop the executive branch's effort to bring an end to gender-affirming care.

So if the rule of law means anything, it must mean that the Supreme Court case applies with equal force in Massachusetts as it does in Tennessee.

So the question of who gets to decide what's the appropriate care for minors who have gender dysphoria, the question of who gets to decide has been resolved, it's the people. The question of what the right treatment is is left to the people of the states, not to the federal government.

So it's against this legal landscape, your Honor,

empowering the states to regulate the practice of medicine, that I think is helpful context for what the Court's analysis needs to be under the 1964 *Powell* test, and that's been briefed, and I don't think the parties disagree.

First and foremost, was the subpoena issued for a congressionally authorized purpose? That's the key factor, and there is no need to read the crystal ball here about what's really going on. As I noted about those four categories, the administration has been very clear of what their objectives are here.

I will start with Bucket Number One, your Honor, the statements by the administration leading up to the issuance of this subpoena in June of 2025. On January 28, 2025, President Trump issued Executive Order 14187 and it was about ending gender-affirming care. The President characterized gender-affirming care for minors as a "stain on our Nation's history" and "it must end," and he directed his administration to rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures, and he ordered his Attorney General, Attorney General Bondi, to take action.

Attorney General Bondi issued a memo on April 22, 2025, and the title of that memo is Preventing Mutilation of American Children, and your Honor, the Attorney General is free to use whatever words she wants to use to characterize what's happening here. We strongly disagree with the characterization

of mutilation. This is medical practice that's been affirmed by numerous medical societies, but again, that's not the issue in front of this court, but I think it is a window into how strongly this administration feels and that they're willing to do whatever it takes to bring this practice to an end, and they don't have the right to regulate the practice of medicine even if they believe it's wrong. They need to go to Congress. They need to get a law passed in order to pursue what they're pursuing.

Let's look at what Attorney General Bondi said, and I think her real goal in that memo is in her own words. Page 6 of that memo, her conclusion, I am quoting from Attorney General Bondi, your Honor. "Every day, we hear more harrowing stories about children who will suffer for the rest of their lives because of the unconscionable ideology behind gender-affirming care. Under my leadership, DOJ will bring these practices to an end." DOJ will bring gender-affirming care to an end, that's what the purpose is behind this investigation. So that's what leads up to it.

Then we have the June 11 subpoena that's served on Children's Hospital and it's one of -- based on the press releases by the government -- it's one of twenty or so subpoenas that have been issued to hospitals that provide gender-affirming care across the country, and the one we have been able to see in Philadelphia which was unsealed by the

court there, it's an identical subpoena.

So what is the message behind these subpoenas?  There is 15 requests.  Request Number 1, we're coming after your people.  Request Number 1 asks for the complete personnel files for every person, current or former employee of Children's Hospital, who is involved in the management of the hospital, who directs the operations of the hospital, who sits on the board of the hospital, who provides any clinical services at the hospital, who has rights to prescribe any drug.  Not just gender-affirming care, all 2,000 people who are currently in that bucket, the government wants their personnel file, their names, their addresses, their Social Security numbers, names of their dependents, their personnel reviews.  That has nothing to do with billing fraud or off-label promotion.  That is designed to intimidate and harass, your Honor.  It has no nexus for the purported justification for this investigation.

What else does the subpoena say?  Requests 11 and 12, we're coming after your patients.  We want the names, the addresses, the dates of birth, the full medical records of any patient who has received gender-affirming care at Children's Hospital.  They want to go out and talk to minors, to kids, who are going through whatever they're going through in their lives that led them to seek medical care at Boston Children's Hospital.  That sends a chill through every clinician, every patient, every parent, every guardian, and the request also

requests information on parents and guardians.

And the burden of the subpoena is also designed to send this message of chill and intimidation. They use the broadest possible definitions. Employee includes contractors, agents, volunteers, people who show up a couple hours a week to push people around in wheelchairs to help the hospital with this mission. Everybody is included in this subpoena, and it is a very broad definition of what Boston Children's Hospital is, to include in any joint ventures, any predecessors. It is designed to send a message that the government is going to look in every file cabinet, in every folder and every electronic message, every text as part of this investigation.

And then we turn to what the government has said in this litigation, your Honor, about what their purpose is, and I think it's really telling. First, DOJ fundamentally misunderstands the holding in *Skrmetti*. On Page 9 of their opposition, the Department of Justice states to the Court that if the states are permitted to ban gender-affirming care for minors, then the executive branch is obviously permitted to pursue the same policy. That is 180 degrees wrong. The federal government is not allowed to pursue that policy. At a minimum, Congress would have to pass laws to authorize it at the executive branch, but the *Skrmetti* holding is about the police power that's delegated to the states in areas of debated medical science. So they're fundamentally wrong about the fact

that they can pursue regulation of the practice of medicine because the states can.

The second thing in the papers, your Honor, that I think is telling, on Page 5 of their opposition, the Department of Justice advises the court that this incredibly broad subpoena was issued "at the actual direction of Attorney General Bondi" in her April 2 memo. They are carrying through on the memo that I referenced earlier where Pam Bondi states -- Attorney General Bondi, excuse me, states that the objective is to bring this care to an end.

And third, your Honor, I made a reference, Children's Hospital of Philadelphia, this is a public record now, has received a subpoena from the Department of Justice, and similarly, the Department of Justice has filed pleadings in that case and there they justify their need for access to medical records of minors by saying, and I quote, "The Department of Justice investigation relates to potential misconduct committed against vulnerable children leaving lifelong mental and physical side effects and consequences." That's the heart of this investigation, and the law does not permit the Department of Justice to investigate this area.

And, your Honor, the fourth bucket, and maybe the most important one, is what's happened since these subpoenas were issued. On July 9, 2025, Attorney General Bondi issued a press release announcing that there were twenty hospitals that have

received subpoenas because those hospitals provide gender-affirming care to minors.

It's really unprecedented for the Department of Justice to announce an investigation. I ran this office, as you know, your Honor, upstairs and we never commented or confirmed investigations. We spoke through our court papers. We spoke through our charging instruments and our pleadings in court. Why would you announce the issuance of twenty subpoenas? Again, it's to drive home the message DOJ is coming after the people who provide this care to minors. It's not their role; but second, your Honor, it's more than just announcing the message that they're looking into it. Attorney General Bondi respectfully prejudged the outcome. Before even one piece paper had been provided to the Department of Justice in this investigation, forget about looking into the facts or looking at the law and reaching decisions based on the policies of federal prosecution, Attorney General Bondi revealed the true purpose behind these subpoenas. In her words, "we're going to hold accountable the health care providers and hospitals that mutilate children in this service of a warped ideology." Again, I find the reference to mutilation despicable but that's not what this is about. This is about the authority of the Depart of Justice to even investigate the practice of medicine. The subpoenas, your Honor, are a vehicle in this effort to intimidate hospitals.

Same day, July 9, 2025. Jordan Campbell, who is now the Deputy Assistant Attorney General who supervises the Consumer Protection Branch. He is the individual in the chain of reporting for Mr. Runkle and Mr. Goldstein, and he spoke at an FTC conference on July 9 that was entitled "The Dangers of Gender-Affirming Care," and on the panel, one of the panelists made a comment, it was a doctor who said "the Department of Justice's investigation into gender-affirming care could cause the blue states, his words, to cease providing gender-affirming care." Jordan Campbell's response was, and I quote, "We're working on it."

And I'm sorry to say, your Honor, that their efforts are working. They're working because hospitals are shutting down and stopped providing this care and families are being turned away, but, your Honor, you don't need to take my word for it. We heard it directly from the President of the United States. On July 25, 2025, the President issued a press release on gender-affirming care. There is not one word in there about billing fraud. There is not one word in there about promotional practices of pharmaceutical companies. The headline was "President Trump Promised to End Sexual Child Mutilation and He Delivered."

The President takes credit for being the only quote-unquote "politician," again policymaking, who actually delivered on ending what he calls the barbaric pseudoscientific

practice of gender-affirming care. The White House then proceeds to lists twenty different hospitals that it claims in response to the President's executive action have either stopped or curbed the provision of gender-affirming care.

Just yesterday the University of Michigan put out a press release and said that their hospital "In light of the DOJ investigation and the escalating external threats will no longer provide gender-affirming care to minors." That's the record before the court showing an improper purpose.

So what do we have on the other side? What's on the other side of the scale? In the face of the substantial questions that have been raised about the evidence -- by the evidence of the true purpose behind the subpoena, what has DOJ offered the court to counteract that or counterweight that? Candidly, it's very little. The Department of Justice has a section in their brief on their opposition here that there is "no free-standing bad faith exception;" except that's not what the Supreme Court said in *Powell*. The Supreme Court said in *Powell* that a court is authorized to examine whether there is an improper purpose and whether an improper purpose is present because the subpoena either is intended to harass, number one they say; number two, it's designed to pressure to settle a collateral dispute; or number three, the court is entitled to look for any other purpose reflecting on the good faith of the particular investigation. That's the Supreme Court's words on

page 58 of the *Powell* opinion.

In the First Circuit cases that we cite and that the government cites and in *Powell* itself, the government came forward with affidavits. When the purpose of the investigation was challenged, they submitted affidavits to the court to explain why they were looking into the particular issue. The *Comley* case out of the First Circuit that was cited by the government, it says, "affidavits of government officials have been deemed sufficient to make a prima facie showing that the *Powell* factors are satisfied." In that case, it was an affidavit from an Administrative Law Judge for the Nuclear Regulatory Commission that justified the information the government was seeking in that case. The *United States v. Lawn Builders* in the First Circuit also speaks about affidavits being submitted when a subpoena is challenged. The *Powell* case, same thing.

We haven't seen any affidavits in this case, your Honor, nothing from the Assistant Attorney General who issued the subpoena, nothing from any official at the Food and Drug Administration which is the agency responsible for enforcing the Food, Drug and Cosmetic Act, nothing from anyone at the Center for Medicaid Services, Medicaid and Medicare Services, which may shed light on potential anomalies to the billing for these services, that maybe arise to suspicion of billing fraud. The Court has been presented with no information to counteract

those four buckets of evidence I put before the Court.

The one data point the government cites to in their papers to justify the predication actually supports our position. The government cites to, in a section about the basis for the investigation -- excuse me, the section on Page 10 that says that the investigation's basis is legitimate, they cite to Justice Thomas' concurrence it *Skrmetti,* the June 2025 case. A side note, Justice Thomas forcefully supported the Supreme Court's outcome that this an issue for the states to decide, but more importantly, what Justice Thomas wrote about, what the government cites to, is Justice Thomas' concerns that international treatment guidelines about gender-affirming care were based on insufficient evidence and political influence. That's what they cite to as a basis for supporting this investigation. That, your Honor, goes to whether gender-affirming care is appropriate or not. It's not a proper basis for this investigation, and it's going to a policy, Judge, that's the exact type of authority that's been delegated to our states.

And one last comment about that data point and the purpose underlying the subpoena, they cite to this court the treatment guidelines as one of the reasons supporting this investigation. None of the 15 requests ask anything about treatment guidelines. It's not mentioned once in the subpoena. I would submit, your Honor, this is a post hoc justification

for a subpoena that's been issued for an improper purpose.

The government has fallen woefully short for providing this Court with any credible information rebutting the clear evidence of an improper purpose, and I direct the Court to look at the *Powell* case because the Supreme Court held in that case that the government is required to make a showing of its proper purpose for suspecting misconducted in an investigation once the party challenging the subpoena "raises a substantial question that the subpoena is improper." That's the Supreme Court telling all of us what the test is, and we have put forward all of this evidence in the papers, which I've recited for the Court today, that shows it's an improper purpose. The Supreme Court said it's their turn. They have to rebut that and show what the proper purpose is, and they have given this Court nothing it can rely on.

Your Honor, we don't come here lightly asking for this relief for a motion to quash, but reviewing the entire record, we think it's critical that this Court play its role as a check on the subpoena process and the investigative process and stop an investigation that's being driven by an improper purpose.

Happy to take any questions the Court has.

THE COURT: I don't really have any questions other than if I understand the totality of your argument, even if there is theoretically a basis for requesting some information under the subpoena, if there is an improper purpose, and I have

to make that finding explicitly and that there was a pretext, then I have to quash?

MR. LEVY: That is our position, your Honor. I think that's exactly right, and I think any abuse of subpoena could be dressed up with a legitimate request that's sound in prior cases, but if the true purpose of -- if there is an improper purpose underlying the investigation, which we have clearly demonstrated, we think the subpoena needs to be quashed in its entirety.

THE COURT: But would you agree with me that this would be an extraordinary sort of relief or, excuse me, to put it another way, grounds for quashing a subpoena?

MR. LEVY: I think it's absolute grounds for quashing the subpoena. I think there is several cases that have held that a subpoena has been issued improperly and I think there is numerous cases where the court has gone through just the balancing act that you're forecasting and decided based on the weight of the evidence in that case that the administrative subpoena was properly considered. So it's routine for a court to undertake this analysis. I would grant you it's more unusual for the court to find that the subpoena was issued for an improper purpose but it's happened in numerous cases and this is that case.

THE COURT: And so, in your view, what is sort of the standard for finding improper purpose or is it simply just a

weighing?

MR. LEVY: I would go back to the *Powell* test. Is it designed to harass, settle a collateral dispute, stop providing gender-affirming care to minors, or anything else reflecting on the good faith of the investigation? All the things that I've reviewed, your Honor, I think go directly to the fact that this is not a good-faith investigation, it's not authorized by Congress, it's not authorized by law, and they are pursuing this investigation to bring gender-affirming care to minors to a halt, and our system, our constitutional system, does not give the executive branch that power.

THE COURT: So in weighing this, your position is, look, we presented a facially reasonable allegation of improper purpose. They haven't responded after the burden has shifted and so it's clear at least from your position?

MR. LEVY: Yes. I will go more than reasonable, but yes, we think it's very clear under these facts, your Honor, and we have a different situation. If this subpoena just came out of the blue without all these statements before and after about the true purpose, it would be a different situation, but the administration has made very clear what they're trying to achieve here, and we need court relief to prevent this abuse of the subpoena process.

THE COURT: Thank you.

MR. LEVY: Thank you, your Honor.

MR. RUNKLE: Thank you, your Honor. I appreciate the opportunity to argue. With respect, I think that the test that you just had a colloquy about, I think that the hospital has gotten that test backwards. The *Powell* test, first of all, I just want to handle a few points first that are fresh in my mind. The *Powell* test, I believe, a closer reading of *Powell* reveals that there is a statute actually that prohibits, still on the books today, that prohibits the IRS from using administrative subpoenas in quote-unquote, "unnecessary ways as taxpayers," and I believe the *Powell* tests indicates a bunch of special types of tests in the IRS context, and so I think it's important to look at the binding First Circuit case law that actually says that a subpoena, a procedurally sound administrative subpoena, must be enforced unless the assertion of authority is, quote-unquote, "apocryphal."

And while I've heard a lot of disagreements today about the policy choices of the executive branch, I haven't heard anything questioning the authority of the Attorney General to issue such a subpoena in pursuance of a federal health care offense against a large regulated hospital which Boston Children's Hospital is.

THE COURT: I think Mr. Levy's point was that you had no authority to issue that subpoena for this purpose.

MR. RUNKLE: Right, and I am getting to that, your Honor. I appreciate the point, but obviously, I respectfully

disagree. So this is a statute. It's not about the CMS. It's not about the HHS. It's not about the FDA. This is a statute that gives the Attorney General the ability to issue an administrative subpoena in the furtherance of an investigation of a federal health care offense, and so here the Attorney General, we don't need an affidavit here because the movant put in the basis for the investigation as evidence, and he referred to it many times, which is that the Attorney General directed a quote-unquote, "appropriate investigation" by my office, it's my office that's named in the memo, to investigate the off-label use of powerful drugs in this context and that's exactly what this subpoena is, and so what the larger purposes are, I am not here today to deny anything that the President or the Attorney General said. They obviously have their policy positions about this practice which they strongly disagree with and that's the position of the executive branch, but this is a statute that Congress did authorize, the Department of Justice, not FDA, not HHS, to seek information about federal health care offenses, and I will go into exactly, you know, what those are and I'll go through the subpoena in a moment, but, again, and I think this keys on something your Honor said, is I think the hospital is the one who is asking for very unprecedented relief here. You know, we're not here on the merits of the dispute. We're not here on an enforcement action. We're here on an administrative subpoena matter and an administrative subpoena,

as I said, you can read the cases, I think we've cited some of the same cases, but there is no free-standing test for the Court to weigh what it thinks the purpose is and decide whether oh, the fact that General Bondi said that she wants this care eliminated is the actual purpose of the investigation and it's not to actually, you know, get documents from this hospital, review the documents and figure out whether federal health care offenses were, you know, committed, and that's actually what's going on here, is that there are veteran Department of Justice attorneys who are experienced in these case, FDCA violations, Federal Food Drug and Cosmetic Act violations, who are attempting to obtain documents from the hospital to evaluate whether the hospital, it might be a witness, it might be a subject, it might be a target, whether federal health care offenses have taken place, and that's what the Attorney General ordered us to do. She said a lot of other things in that memo, and I am not here to question anything the Attorney General said, but the Attorney General is the person who I answer to and she has ordered this investigation to take place and that is what has happened. The Attorney General also has the power from Congress to issue these types of administrative subpoenas and she's delegated that authority to the Assistant Attorney General for the Civil Division and that's the person who signed the subpoenas. So that's the basis of our position. Obviously, our papers say what they say and I'd like to rely on

on them.

Also, I think Mr. Levy gets the holding of -- he's trying to limit the holding of *Skrmetti* because *Skrmetti* was a loss. Obviously, *Skrmetti* sought to establish a constitutional right to this type of care and *Skrmetti* held the opposite, and so I think that goes to the improper purpose test that the hospital is asking you to implement. So the hospital is saying that it's an improper purpose for the executive branch to have this as a policy. You know, the policy is that the executive branch wants to reduce or eliminate gender-related care to minors, especially the medicalized gender-related care to minors that this investigation is about, but *Skrmetti* essentially says that there is no such constitutional right, and in addition to that, it says that it is a rational governmental objective or purpose to eliminate the medicalized gender-affirming care of minors and that's exactly what this investigation is about, and so, you know, I take the point that there are a lot of other things and lot of other statements made by the President and the Attorney General, but if we go into the realm where we're going to not only provide defenses to a potential enforcement action in the future because of things that the President said but we're going to allow the hospital not to produce a single scrap of paper on a Congressionally authorized subpoena issued by the Attorney General because they don't agree with or like things that the

Attorney General and President said in its statements, I think that would be a breathtaking expansion of administrative subpoena law, especially the way the First Circuit has annunciated.

THE COURT: So let me ask you, before we get to the contents of the subpoena and what's been requested, do you agree with Attorney Levy's argument that once it has raised a credible allegation or reasonable allegation of improper purpose, that somehow the burden shifts a little bit at least to the government to justify why it's not an improper purpose to prove with some evidence that this is a legitimate inquiry?

MR. RUNKLE: I disagree with that, your Honor, here. I agree that in a case where there is an agency that's not the Department of Justice, that has issued the subpoena, that there must be some factual matter presented to show the existence of the investigation, but I don't believe, as we said in our papers, that there is some sort of free-standing test that if the movant demonstrates that they don't like the basis of the investigation or that the politicians have said something they don't like about the investigation that somehow the department has some heightened burden to justify it factually. I don't think the law says that.

THE COURT: I am not sure that's being completely fair to the movants here. That's simply to suggest that, you know, they can just make allegations without any sort of evidence or

any sort of backing. Here, they have more than that, right? I mean, and I think to some degree the government concedes that it was at least why the subpoenas were sent, and so just rationally thinking this through, it would seem to make sense then that the government ought to counter some of that allegation to say, look, this is -- there is a legitimate basis here, despite all of this craziness in terms of what's going on outside these walls, that there is a legitimate basis here, don't you have to show something?

MR. RUNKLE: So I believe that we have shown that as a matter of law here for two reasons. One is that the memo that they put in directs -- this is an investigation of -- that is only a very small part of the memo that Attorney General Bondi wrote. So this investigation, she ordered an appropriate investigation into off-label use of these powerful drugs that are given to minors. So that's one -- you know, that's the factual basis for it. So the Court or the movant may disagree with some of the other statements that were made in there, but I don't believe that they've made a showing at all that the investigation is somehow illegitimate because they disagree, because the President or the Attorney General disagree, you know, fundamentally with this practice. You know, this is an attempt to get documents to look at a factual matter. It's not -- I don't believe that the government, I don't think the case law bears out the idea, again, that even if the executive

branch has a policy priority with which the movants disagree that that somehow itself raises a factual dispute over pretext.

I think, you know, I have issued many subpoenas in my career, your Honor. Nobody has ever really wanted to get one, and in many instances, the issues that we deal with in my office are, you know, politically charged or are notable. There were numerous off-label cases tried in this very courthouse, you know, a decade ago and before that.

THE COURT: This is more than that. It's not simply, look, this is a controversial topic, and, again, the movants have put forward various public statements that were made by the administration through various individuals about not only how they feel about or how they think about these issues but a clear directive to the DOJ and to your department to pursue these investigations, and I don't think that's in dispute, right?

MR. RUNKLE: The investigation exists because of the Attorney General's memorandum. That's her prerogative to issue such memorandum, yes.

THE COURT: Right. So as the guy who is going to be sort of deciding it, I think it would be helpful if, for example, the government had proffered something along the lines of, look, we've looked at our data and there appears to be X amount of numbers of billing codes under this code for this particular drug and that is raising an eyebrow or we see sort

of whatever through affidavits of different individuals who are more familiar with this on the ground, something along the lines of we understand that there is this promotion of a use of a particular drug for this purpose which was not approved by the FDA, something, right, but what I am hearing from you is, and let me know if I have it wrong, feel free to push back, but what I am hearing is despite everything that the movants have put forward here in their briefs, we have no obligation to explain anything, we can simply issue it and the Court must enforce it.  That's what I am hearing.

MR. RUNKLE:  And that's not my argument, your Honor. So this investigation is being conducted by Department of Justice attorneys.  I signed the brief that's before your Honor and it contains assertions of facts about the investigation which we haven't talked about yet but I can talk to you about them.  So, as I said, unlike an investigation that would be conducted by the Nuclear Regulatory Commission or the IRS, this is an investigation being conducted by the Department of Justice, and so we absolutely do need to show the existence of a lawful investigation in order to enforce the subpoena and I believe we have done so here through our papers.  I don't think affidavits discussing, you know, non-public investigative materials are necessary in an administrative subpoena enforcement matter and I think that there is quite a bit of law on this topic.  I think that the affidavits that Mr. Levy was

talking about essentially talked about the fact that the investigation exists and a general description of what the investigation is looking into. I think that the sort of test that your Honor is positing would be in stark contention with the *Morton Salt* case where the Supreme Court held that an agency consented in an administrative subpoena just to equip itself of the idea that the law wasn't violated, right, it does not need probable cause. It's not even articulable suspicion that those things have happened, but I am getting to why there is that here also but I don't think we need to do that. I am not telling you we don't need to justify the subpoena in any way, we just can issue it and they have to respond.

THE COURT: I don't want to conflate the issues here about -- and there is some overlap, but I think as the first step, before we can get to the second, is whether this is a pretext, whether this is a legitimate inquiry, right?

MR. RUNKLE: So on that, I am just going to have to disagree with my friend across the aisle that I don't believe that the policy position of the President or the Attorney General to decrease or eliminate gender-related care to minors is -- that that is a pretext. I think in many investigations, the executive has policy priorities. That's the consequences of elections and confirmations of officials, and so the President and the Attorney General have policy priorities and those are carried out in a number of ways and one of the ways

those can be carried out is looking into conduct and issuing subpoenas to determine whether federal law was violated. I don't consider that to be pretext and so that's something that we may just need to disagree on but it's not a pretext. In fact, as I said, this is -- and if you take the factual assertions about the investigation that are in the brief that I signed as factual assertions of what the investigation is looking into, and this is the point I was going to make a few minutes ago, I apologize, th hospital -- so I fundamentally disagree also with my friend across the aisle about the nature of the use of drugs in this context, right, of pharmaceuticals that are regulated by the federal government. So the practice of medicine, of course, is a matter of state law but it's not exclusively a matter of state law in any way, shape or form. Here, the hospital in its papers has admitted to using these powerful drugs on minors off-label. As I said, that's a topic that has been -- you know, it's been a topic of legal controversy for many years.

There is a statute. Mr. Levy asked what statute we're looking at here. There is a statute that actually allows the federal government to look into these practices and it's 21 U.S.C. 355 which is about new drugs, and so FDA has to approve a new drug for a specific purpose and distributing that new drug in violation of Section 355 is a prohibited act under 21 U.S.C. 331(d), and so here a lot of things flow from their

admission that it's a fundamental basis of their practice of, you know, of the practice that they use -- practices that they do at the Gender Clinic at Boston Children's.

THE COURT: So what do you make of the FDA's own sort of view that once a drug is approved that a doctor using it for some other purpose off-label, they're not concerned about?

MR. RUNKLE: Right. So the FDA -- that's absolutely correct in some instances. So I would view it as an exception or it's really a judicially-created exception because it's not in the statute at all. There is a statutory exception for devices that are used off-label, but under longstanding practice, the FDA does not enforce against specific doctors who write prescriptions, and again, there is a difference between writing prescriptions and dispensing medicine, but the FDA does not enforce against doctors who write -- the bare act of writing an off-label prescription is correct, that is not something FDA enforces.

THE COURT: Because that is a practice of law.

MR. RUNKLE: No because it's an exception to a prohibition against distributing unapproved new drugs, but I could give your Honor examples of a series of cases I did in Georgia in 2022 and 2023 that were exactly, if you strip all of the invective away from this case, it's exactly the same pattern. There is a drug that is approved for an FDA-approved purpose called hCG. It's called human chorionic gonadotropin

or something like that. It is often marketed as a weight loss drug off-label and doctors would be allowed to prescribe it off-label but we have -- because it was a policy priority of a prior administration or a prior official, we pursued actions against doctors who were selling hCG or prescribing hCG, most of them were dispensing it themselves which also takes it out of the exception that I just talked about, for the purpose of weight loss, because in addition to other things, it was potentially harmful, it was off-label and so it was illegal and many of the drugs, we determined after the investigation, were being imported illegally from China and, you know, were mislabeled and made in unregistered facilities and things like that. And so, to me, this investigation is a normal investigation being conducted by experienced attorneys who have experience in these fields, and so to the idea that Boston Children's gets a pass because there is controversy over this topic, I think is unprecedented.

THE COURT: I'm just looking at the time, just for efficiency, can we get to maybe the substance of the subpoena?

MR. RUNKLE: Yes, absolutely, your Honor. The first thing I would mention about the substance of the subpoena was that the -- sorry.

THE COURT: And I will tell you where I might find argument helpful. Off-label promotion came across clearly. The sort of billing practices, the false billing, that came

across.  I wasn't completely sure what other basis you were pursuing.  Is misbranding part of it or not?

MR. RUNKLE:  Yes.  So I believe that -- so one other important factor to talk about here is that the distribution of these drugs in conjunction with a false or misleading statement could itself be independently illegal.  So under, you know, controlling case law, an FDCA felony violation can be committed not by just lying to a patient about the effects of a medicine or lying to the person who is receiving the medicine but also to the government or an insurance company and so that's how that all fits in; but first of all, we never got to the point where we were negotiating over scope with the movant and so we would be happy to negotiate over scope of some of the broader requests for the movant.

I would point out that I think, you know, most of the experienced lawyers in this courtroom are familiar with very broad discovery requests and subpoena requests, and I do take a lot of concern with the allegations that somehow the idea that we would want personnel files of people involved in this care or the patient files are somehow an attempt to intimidate or to harass those people, I think that's a very typical discovery request in this field, but what I could say about that is that we would be willing to negotiate scope with them but we never got to that point.  We'd be willing to negotiate over those things.

The other point that I would make which I think short circuits some of the allegation or the assertions that my friend was making, is that this statute and these subpoenas are actually more protective of patient materials than any other way the government could get these materials. So there is statutory prohibition on using any of the patient material. There is an asterisk in the statute but we'll skip that. There is a statutory prohibition against using these materials against patients basically in any way and so that would not apply to a grand jury subpoena. It wouldn't apply to a search warrant. It wouldn't apply to a Rule 17 subpoena or something like that.

THE COURT: So I got all of that in your papers. So on the one hand, you spell out at clearly the off-label use and the false claims and then you make the argument that, look, these records are -- look, there is protections. We don't have to be worried about HIPAA. So you have these things but don't you have to connect the dots about how these records are relevant to these things?

MR. RUNKLE: Well, I don't think that we have the burden of -- I can -- the standard of relevance under an administrative subpoena is extraordinarily broad under the case law and so obviously these -- so, for example, the patient records are commonly sought in any type of health care fraud investigation to determine which patients were given the

medications, under what circumstances, what were they told, how many patients out of the total population were provided off-label treatments, when in the process, you know, did the hospital follow its own policies in prescribing these drugs off-label, that's -- these are -- as I said, the cases that have been done by my office all have those types of records involved in them and this subpoena power was passed as part of the HIPAA statute. Congress anticipated that the government would get these types of records in these types investigations and be able evaluate the federal health care offense under investigation whether it's miscoding, whether it's health care fraud, whether it's FDCA violations. The FDCA violations under -- investigations of federal health care offense do relate to billing records and so it's very difficult to investigate how health care was delivered and, you know, how these drugs were distributed and delivered if we don't have the records of how the drugs were delivered and distributed to patients. It seems like a very logical -- it doesn't seem like the relevance inquiry is -- has a gap in it in my mind and so I apologize if your Honor doesn't believe that we made that showing but that's what the patient records are in there for.

We'd be willing to limit the personnel files to people who actually prescribe medicines as well as their superiors and people who are involved with decisions about, you know, off-label prescribing and billing at the gender clinic, but as

I said, we never got there because we never got to negotiate the scope of the subpoena.

THE COURT: And this might be just a little bit off topic but just for my own understanding when we talk about billing codes, so there is no billing code for gender-affirming care?

MR. RUNKLE: There is. It's F64. I am not an expert on billing codes because really the primary focus of our investigation is the FDCA stuff, but yes, there are billing codes for gender dysphoria. There are allegations in this field, again, I am not aware of specific ones because we don't have any documents from Boston but there are allegations that visits are miscoded, you know, in order to have insurance companies pay for them. So there are also multiple billing codes associated with each visit and so --

THE COURT: Are you saying doctors are using some other code besides the gender-affirming care code?

MR. RUNKLE: Yes, that has been a persistent allegation.

THE COURT: In Massachusetts?

MR. RUNKLE: There is nothing specific because we don't have the documents, your Honor.

THE COURT: Right, but I am just logically thinking through. I mean, I don't need to know now but a constitutional right, at least under our state declaration of rights, why

would a doctor use some other code?

MR. RUNKLE: I think the national insurance companies are the short answer to that question or the most obvious answer is that insurance companies have policies about what they'll pay for in the gender care space and what they won't pay for and that's the short answer to your Honor's question.

If your Honor doesn't have any more questions, we could move on to the sealing motion.

THE COURT: Sure.

MR. LEVY: Your Honor, sixty seconds?

THE COURT: Sure.

MR. LEVY: Thank you. Your Honor, a couple of points. They talk about *Powell* and it is an IRS tax case. It's been cited repeatedly across numerous administrative subpoenas, and you mentioned *Morton Salt*. *Morton Salt*, we misread *Powell*, because Morton Salt gives the government the right to make sure that no crime has been committed. *Powell* cites *Morton Salt*. *Powell* comes after *Morton Salt* and reviews that principle and says yes, but there is a check on the ability to investigate. It has to be done for a proper purpose.

Second, your Honor, we said in our papers, and this was not responded to by the government, there have been no allegations regarding billing or any other fraud at Boston Children's Hospital. You just heard it. They don't have any allegations that anything went wrong at Boston Children's. The

reason there is no affidavits is because they don't have anything justifying the investigation.

Third, *Buckman*, Supreme Court case from 2001, clearly states that it is legal for physicians to prescribe drugs for off-label use. So the doctors at Children's Hospital who use products off-label and most drugs in the pediatric space are not on-label because there aren't clinical studies done on kids. So the vast majority of therapeutic treatment at a Children's Hospital is off-label. That is clearly allowed under the Supreme Court principles.

So, your Honor, the last thing I'd say is we are not asking this Court, obviously, to decide what the executive branch's policy can be on gender-affirming care. That's way above our mutual pay grades, but the administration, elections have consequences, they can pursue whatever policies they want to pursue. They have to do them legally, and they're using an improper purpose here to pursue the policy of ending gender-affirming care to minors. That's the crux of this motion.

THE COURT: Do you want to address your other motion?

MS. STRACHAN: Yes. I would love to, your Honor, thank you. Thank you, your Honor.

Sealing these proceedings is justified under the good cause standard for sealing and is consistent with Section 3486 which is the authorizing statute under which this subpoena was

issued which is both for an administrative subpoena and a criminal one as well and it is consistent with longstanding, deeply entrenched practice of conducting criminal investigations outside of public view.

Now, there is no dispute here that DOJ issued the subpoena as part of an ongoing criminal investigation of and involving Boston Children's, and because the subpoena is part of a criminal investigation, there is no presumption of public access to either the subpoena or to these proceedings.

The Administration's choice to enlist DOJ and its criminal subpoena authority to pursue its policy goal of ending gender-affirming care does not change the fact of having chosen to play on this playing field, they must abide by its rules, and yet the government comes before you today without citing a single case for the proposition that litigation over a criminal subpoena should be conducted publicly.

THE COURT: So is it your position that as a default rule that all administrative subpoena cases should be sealed?

MS. STRACHAN: Your Honor, I am not here to advocate for a default rule, but in this matter, where this subpoena is issued to conduct a criminal investigation, as DOJ has acknowledged, and there is, as we set forth, good cause to show under the good cause standard that there is both reputational and potential physical harm to Boston Children's that these proceedings should be sealed, and it is a fact that there is

longstanding, as veteran health care fraud prosecutors know, there is a longstanding practice of sealing and conducting criminal and civil health care fraud investigations outside of public view.

The Department of Justice comes before judges in this courthouse every day seeking for extensions in False Claims Act cases and begging this court, and I know because I used to be on the other side of this, to be able to conduct their investigations under seal, in criminal investigations seeking non-disclosure orders, in civil False Claims Act matters seeking extensions of the seal claiming that they need to be able to conduct their investigations --

THE COURT: So in those cases or grand jury proceedings, I mean, there are statutes and rules specific for those which is why I am asking. It's not like it's a secret. On the one hand, as Attorney Levy mentioned earlier, the Attorney General publicly announced that twenty of these subpoenas have been served on hospitals across the country. I mean, that's public information. The hospital here touts their gender-affirming care in their hospital and that's not a secret. So I am just trying to understand why there is good cause. I just don't see it. On this issue, I think maybe the government has a better argument. So I am just pushing back a little bit here.

MS. STRACHAN: I appreciate that, your Honor. Let me

address that in a couple ways.

First of all, we have the statute itself.  Under 3486, under Section 6 of that -- Subsection 6 of that statutory cite talks about the ability of the government to come in and seek a non-disclosure order on the subpoena.  Section 5 talks about the recipient of that subpoena being able to fight any NDO that is issued, and I suggest to you the fact that the statute contemplates the government moving for an NDO and the recipient having the ability to dispute it if certain factors are met, and we put them in our papers, they include two that are applicable here which involve the endangerment to the life or physical safety of any person and intimidation of potential witnesses.  Those are the two criteria that are met here.

I suggest, your Honor, that the reason that Congress gave the government the ability to seek an NDO and the recipient the ability to dispute it is because that is the norm.  That is how things normally work and it goes to show what an Alice in Wonderland world we have found ourselves in, that the government is coming before you without a single case cite saying that there is a public right of access to health care fraud investigation that's ongoing and non-public.

The fact that the Attorney General issues a press release, which is contrary to longstanding department practice, it is contrary to Justice Manual Section 17.40, DOJ generally will not confirm the existence of or otherwise comment about

ongoing investigations, it's contrary to the model Rule of Professional Conduct 3.8(f) that refers to a prosecutor's special responsibilities, the fact that they have come in here and they argue that the cat is out of the bag but they are the ones that opened the bag and they are not supposed to have done that, your Honor, and Boston Children's has rights and that's why they have come before us, and there is both Supreme Court and First Circuit precedent that I think is instructive for the Court that contemplates that in a pre-charge investigation, sealing is appropriate here and it is, I think, quite analogous to Rule 6(e), privacy, the reputational harm that can be suffered as a result of being named as a recipient of a subpoena is very real, whether it's a grand jury investigation or whether it's a HIPAA subpoena.

And so if I could just point your Honor not only, obviously, as I said, the Supreme Court, we cite this in our papers, we talk about the *Douglas Oil* decision and Justice Powell talking about the reputational harm that can be inflicted upon a recipient of subpoena pre-charge, they're entitled to have the government conduct those investigations outside of public view.

And we also have the *United States v. Kravetz*, which is a First Circuit decision here in which we have the court addressing a Rule 17(c) subpoena served in a criminal prosecution, and in that decision we have the First Circuit

holding, this is Judge Howard, that there is no presumptive right of public access to a subpoena or any related materials issued in connection with an underlying criminal prosecution, your Honor, and so I direct the Court to that as well.

And I think the reputational harm that can befall a hospital, and despite the fact that we do have DOJ's press release, there are news articles, we have a press secretary re-tweet, but there has been no official confirmation by DOJ that there is a subpoena that has been issued to Boston Children's, and so I think that's very important, it's very important to Children's.

In addition to the reputational harm that the court talks about, and we have that and we talk about in the First Circuit *In Re Gitto Global Corporation,* which is cited in our papers, courts routinely exercise their discretion in civil matters to abrogate the right of public access where doing so is necessary to prevent judicial records from being used to gratify private spite or promote public scandal which I suggest is exactly what is happening here, your Honor.  We also have the *Douglas Oil* decision of the Supreme Court which talks about the public ridicule for a potentially innocent party.

But here we have a second independent basis for sealing that is more acute and in many ways more real to Boston Children's and that is the threat to the personal safety of the hospital, its providers and its patients.  There is -- we set

forth in our papers that there is just a torrent of online attacks that have seen an uptick since recent announcement of DOJ's investigation into this care. We cite some in our papers.

I just would like to point your Honor to a few more. We have just on August 8 a user who posted videos of Boston Children's providers discussing gender-affirming care. There were hundreds of adverse or threatening comments made in response including a GIF "kill them all." Another user comments, "Dude needs a bullet to the face and the doctors." Another user replied to the comment, "Public hangings need to be a thing once more." On July 28, a user tags Boston Children's and states The hospital is "mutilating children," that Boston Children's is "lucky that @agpambondi is going to take care of you so I dont. You F-ing Godless perverts." The same day another user writes, "Hope Pam brings these evil ass mother F-ers down. How about we just issue legal kill orders to special forces and take care of this F-ing problem once and for all. These are our children, our future." We have posts calling for the bombing of Children's Hospital, the fact that gender-affirming care should be punishable by death. "End it or get ended." "Burn it down."

In addition, we don't just have words, your Honor. We have criminal prosecution that was brought by the U.S. Attorney's Office last year in this district against a woman

who called in a bomb threat to Boston Children's which the government, I would suggest, makes light of because she didn't actually bomb the hospital and she was prosecuted in this district.  It caused a shutdown in the hospital, and I do not think that it could be overstated the fear that it causes for the hospital, its doctors, the people that work there, the patients, and all whom Boston Children's serve; and the fact that the government now -- you know, the U.S. Attorney's office is not here in this courtroom, but were they to be, I wonder what they would think about the fact --

THE COURT:  So, Ms. Strachan, I am just going to interrupt you a little bit here because I do understand the concern and I empathize with the sort of fear and other feelings that these comments from the public create, but it's not like we're foreign to this.  You know, as participants in this system, we get these threats for advocating a certain position or a case involves some controversial topic and it creates -- and I do agree with you to some degree that given the current climate things do seem wretched and it's no secret that -- I will just use something closer to home which is I think every judge in this district and most judges across the country get a lot of these similar comments and not only in public forums but sent directly to them and their family members, right, but does that mean that we issue our decisions without a name, with just the court?  Do we -- how far do we go

in terms of -- I mean, the rule is that, absent exceptions, that we operate in the light, we don't operate in the dark, and so it has to be more than an exception rather than -- there is some merit to the government's argument that if this is enough to not just -- and by the way, there are other tools and mechanisms available to protect and address some of these concerns, but if I seal entire cases, and if this is enough for me to do that, then the exception somehow swallows the rule, right?

MS. STRACHAN: I understand your perspective, your Honor. I respectfully disagree that this is the rule in an ongoing criminal investigation. I think that the case law that we are all thinking about and that is being cited is civil, it is in civil cases. I think that there is a heightened protection and need for secrecy in criminal investigations which is why the U.S. Attorney's office seeks the NDOs in this courthouse that it does. It's why they ask for sealing in matters that are ongoing investigations. It is both to protect their investigations but also to protect the innocent.

In addition, your Honor, and I understand and I am very cognizant of the fact of my signature on this brief, and you know, should this brief become public, I thought very deeply about the fact that my name will be out there and will be included in this. I understand it, your Honor, but it's not just words. It's not just social media posts. It is a bomb

threat called into the hospital that warranted a criminal prosecution. It is packages that have been sent to physicians' homes. It is a man who stood in the lobby on Inauguration Day screaming and threatening hospital staff, and we can provide further information about these things to the Court if this is the linchpin for your decision, but I believe the statutory text of 3486 contemplates this exactly, this precise situation when it talks about the endangerment to the life or physical safety of any person or the intimidation of any witnesses.

As we've set forth, your Honor, I believe there is good cause here. Not every matter -- I agree that this court needs to conduct its business in the light of day and I understand that, but there is good cause, we believe the record demonstrates, and we will provide further information if the Court requests it that there is good cause for sealing this matter and the fact that DOJ has flipped its arguments on its head about the fact that it now claims that ongoing criminal investigations, there is a public right of accesses to litigation about, and I think it would be interesting to see them if they had to live with that position in all the other times they've come before this court and asked for secrecy in criminal cases, and make no mistake, this is a criminal subpoena. I worked upstairs for eighteen years and the entire eighteen years I was there, I either was in the health care fraud unit or I supervised it, and I have signed countless

HIPAA subpoenas. They are criminal subpoenas, and in every case, we seek secrecy in our ongoing criminal investigations before they are charged.

The fact that the argument has been completely flipped on its head goes to show that the purpose here of this investigation is intimidation. The purpose is to threaten Boston Children's and other providers of gender-affirming care and to threaten them to stop a provision of care to fulfill a campaign promise to end a type of medical care that this administration disfavors.

They've thrown a match at the hospital. They now want to throw kerosene on the fire because Boston Children's is standing up for its right to treat all of its patients; and for that reason, your Honor, we urge the Court not to countenance this on its watch. I am happy to answer any other questions if you have any.

THE COURT: I am all set. Thank you.

MR. RUNKLE: Thank you, your Honor, just briefly. I'd like to mostly rely on the papers here. I do think that I really do want to respond to some of the tone that I just heard which I am concerned about because what happened here was that they asked to seal this. We went and looked at the controlling law and the fact that there are numerous HIPAA subpoenas that are litigated in public including many of the ones that are cited in the papers in this case and we feel like it just

doesn't meet the standard, and the standard is actually given by the judicial conference about sealed cases. They didn't ask to proceed under a pseudonym. They didn't ask to redact sensitive materials in the documents they filed, which there aren't any. There is no sensitive, you know, information there about patients or anything like that which we would happily agree under proper circumstances to seal.

What they asked to do is to litigate entirely in secret which there is a special standard for which is that sealing the entire case file is required by statute or rule or is justified by showing of extraordinary circumstances, and the absence of narrower, feasible and effective alternatives such as sealing discrete documents or redacting information, and they didn't ask to do any of that and so that's -- we just felt like they didn't meet the standard and that's why we're here opposing the motion. It's not to intimidate them. It is not to carry out some improper purpose. It is because we don't feel like they meet the standard, and I think that your Honor's comments are on target on those topics.

If there is something that we need to seal, we can seal it, but I don't believe that the entire case file should be sealed. Thank you.

THE COURT: All right, thank you very much. I will take it under advisement.

**(A-D-J-O-U-R-N-E-D)**

- - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/Jamie K. Halpin_____        August 31, 2025_____
Jamie K. Halpin, CRR, RMR, RPR            Date
Official Court Reporter

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| IN RE ADMINISTRATIVE SUBPOENA<br>NO. 25-1431-019 | Case No.: 1:25-MC-91324-MJJ<br><br>GOVERNMENT'S MOTION TO ALTER<br>OR AMEND |

The Government respectfully moves under Federal Rules of Civil Procedure 59(e) and 60(b) to alter or amend the Court's judgment.  The grounds for the Motion are explained in detail in the accompanying memorandum and include the following:

1.  The Court, in its opinion of September 9, 2025 quashing the subpoena, made four manifest errors, each of which provides an independent basis to revise its opinion and deny BCH's motion to quash:

2.  The Court manifestly erred by shifting the burden of proof to the Government.

3.  The Court manifestly erred by heightening the burden on the Government in a manner contrary to law.

4.  The Court manifestly erred by failing to provide the Government an opportunity to make a showing under the Court's new framework—a showing the Government can amply make, as demonstrated by this filing.

5.  The Court manifestly erred by making a finding of bad faith not supported by the record.

For these reasons, as detailed in the accompanying memorandum, the Court should revise its opinion and deny BCH's motion.

1

App.96

BRETT A. SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

LISA K. HSIAO
Acting Director

*/s/ Patrick R. Runkle*
ROSS S. GOLDSTEIN
PATRICK R. RUNKLE
Assistant Directors
SCOTT DAHLQUIST
Trial Attorney

U.S. Department of Justice
Enforcement and Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044
Tel: (202) 353-4218
patrick.r.runkle@usdoj.gov

2

App.97

## CERTIFICATE OF CONFERENCE

I hereby certify that on July 7, 2025, the parties conferred in good faith to resolve or narrow the issues in dispute and were unable to resolve or narrow the issues.


_/s/ Patrick R. Runkle_
PATRICK R. RUNKLE


## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2025, I served the foregoing Motion via ECF to counsel of record.


_/s/ Patrick R. Runkle_
PATRICK R. RUNKLE

3

App.98

# DECLARATION OF LISA K. HSIAO

Pursuant to 28 U.S.C. § 1746, I, Lisa K. Hsiao, hereby declare as follows:

## GENERAL BACKGROUND

1.      I am the Acting Director of the Enforcement and Affirmative Litigation Branch ("EALB") within the United States Department of Justice.

2.      EALB's Enforcement Section ("Enforcement") is the successor to the Consumer Protection Branch ("CPB") and is vested with all of CPB's legal authorities, including handling investigations and litigation arising under federal statutes that protect consumers' health, safety, economic security, and identity integrity. Enforcement, as the successor to CPB, is authorized to oversee and conduct all civil and criminal matters arising under the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301, *et seq. See* 28 C.F.R. § 0.45(i) and Justice Manual 4-8.000.

3.      Through Presidentially-appointed, Senate-confirmed officers of the Department of Justice, Enforcement is authorized to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act (FDCA) relating to the on- or off-label use by manufacturers and distributors of drugs, including puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called "gender transition." *See* AG Bondi Memo dated April 22, 2025.

4.      The Attorney General may authorize other officers of the Department of Justice to perform certain functions of the Attorney General. *See* 28 U.S.C. § 510. In any investigation of a federal health care offense, the Attorney General may issue in writing and cause to be served a subpoena requiring the production and testimony described in 18 U.S.C. § 3486(a)(l)(B). *See* 18 U.S.C. § 3486(a)(l)(A).

1

App.99

5.     Pursuant to Attorney General Order Number 3591-2015, dated November 10, 2015, the Attorney General authorized the Assistant Attorney General for the Civil Division to issue and serve administrative subpoenas pursuant to 18 U.S.C. §§ 3486(a)(l)(A) and (a)(l )(B) to investigate violations of the FDCA that relate to a health care benefit program.

6.     The subpoena to Boston Children's Hospital ("BCH"), No. 25-1431-019 was lawfully issued and authorized by Brett A. Shumate, Assistant Attorney General for the Civil Division, in connection with a valid investigation being conducted in my office.

7.     The facts in this Declaration come from my personal observations, my training and experience, and information obtained from other government personnel. This Declaration is intended to demonstrate that the administrative subpoena discussed herein was issued in the furtherance of an investigation authorized by law, and that the records and other things the subpoena seeks are relevant to that investigation. Accordingly, this Declaration does not set forth all my knowledge about this matter.

## LEGAL BACKGROUND

8.     The overriding purpose of the FDCA is to protect the public health. *United States v. Article of Drug … Bacto-Unidisk*, 394 U.S. 784, 798 (1969). The FDCA's purpose should "infuse construction of the [FDCA]" so that courts give the FDCA a liberal construction that furthers protection of the public health, including in criminal enforcement of the FDCA. *Id. United States v. Dotterweich*, 320 U.S. 277, 280 (1943); *See also United States v. Park*, 421 U.S. 658, 672–73 (1975). This consideration applies even more strongly where the Government seeks to enforce the FDCA to protect the health of children.

9.     A "federal healthcare offense" for purposes of a subpoena issued under 18 U.S.C. § 3486 is defined by 18 U.S.C. § 24(a) as "a violation of, or a criminal conspiracy to violate … section 301 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 331) … if the violation or

2

conspiracy relates to a health benefit program." 18 U.S.C. § 24(a). The statute defines "health care benefit program" to mean "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b). A subpoena issued under Section 3486 (commonly referred to as a "HIPAA subpoena") may be used to investigate both substantive violations of the FDCA, as well as conspiracies to violate the FDCA if the violation or conspiracy relates to products or services that might ultimately be paid for by a private or public health insurance program.

10.    Administrative subpoenas issued under 18 U.S.C. § 3486 are routinely used to obtain categories of medical, billing, and related information in federal healthcare offense investigations. The materials requested by the subpoenas issued in this investigation fall within that framework and include the same kinds of records—patient files, insurance submissions, treatment documentation, and communications (such as emails)—that federal investigators typically review to determine whether a federal health care offense may have occurred.

## FDA's Approval of Drugs

11.    The FDCA regulates the development, manufacturing and distribution of drugs in the United States. For a "new drug" to enter interstate commerce, the manufacturer must first demonstrate to the United States Food and Drug Administration ("FDA") that the drug is both safe and effective for each of its intended uses. 21 U.S.C. §§ 331(d), 355(a). The introduction into interstate commerce of an unapproved new drug violates the FDCA. 21 U.S.C. § 331(d).

12.    A drug manufacturer obtains FDA approval for a new drug through a new drug application ("NDA") that demonstrates that its drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a). As part of the approval process, FDA reviews the proposed labeling for

3

the drug in the NDA, which must include adequate directions for how to use the drug for each of its intended uses. 21 U.S.C. § 352(f); 21 C.F.R. § 201.5. When FDA approves an NDA, it determines that the drug is safe and effective **for the specific use or uses identified in the application.** As part of that approval, FDA also approves the product's proposed labeling, including prescribing information, as providing adequate directions for use for those approved indications. FDA's approval of a drug for one or more particular uses does **not** mean that the drug is safe and effective for unapproved uses, nor does approval mean that the labeling provides adequate directions for unapproved uses. While physicians are permitted to prescribe an FDA-approved drug for an unapproved use, such prescribing may warrant investigation because it may provide evidence of FDCA violations. Also, depending on the circumstances, prescribing for unapproved uses can itself involve FDCA violations—for example, where the physician is engaged in the distribution or labeling of an unapproved drug.

**MISBRANDING OF DRUGS PRESCRIBED FOR UNAPPROVED USES THROUGH ILLEGAL LABELING**

13.    A drug is misbranded if its labeling does not have adequate directions for the use of the drug. 21 U.S.C. § 352(f). FDA-approved labeling contains directions only for the drug's approved uses. If a drug manufacturer or other person distributes an approved drug for an unapproved use, the manufacturer or other person could be charged with misbranding the drug or distributing a misbranded drug with labeling that lacks adequate directions for its intended uses.[1] 21 U.S.C. §§ 331(a), 331(b), 331(c), 331(k), and 352(f)(1). CPB has participated in successful prosecutions of drug manufacturers for such illegal conduct. *See, e.g.*, *United States v. Pharmacia & Upjohn Co.*, Case No. 09-CR-10258-DPW (D. Mass. 2009); *United States v. Eli Lilly & Co.*, Case No. 09-CR-00020-RK (E.D. Pa. 2009).

---

[1]    As noted above, it is possible for doctors to prescribe an approved drug for an unapproved use without violating the FDCA.

App.102

14.    A drug is also misbranded if its labeling is false or misleading in any particular. 21 U.S.C. § 352(a).

15.    Under the FDCA, drug labeling is broadly defined as any "written, printed, or graphic matter … *accompanying*" the drug. 21 U.S.C. § 321(m) (emphasis added). The term "accompanying" is interpreted broadly and includes materials that are separate from the drug but nonetheless related to it, including any material that supplements, explains, or is designed for use with the drug. *See* 21 U.S.C. § 321(m); 21 C.F.R. § 1.3(a); *Kordel v. United States*, 335 U.S. 345 (1948); *United States v. Urbuteit*, 335 U.S. 355 (1948); *United States v. 47 Bottles … Jenasol RJ Formula 60*, 320 F.2d 564, 569 (3d Cir. 1963) (literature shipped by company to sales agent and then stored in agent's bedroom closet was labeling: "[I]t cannot be said that … the Court promulgated or intended to promulgate a requirement that there be an actual use in order that the literature constitute labeling."). Labeling can include promotional materials, advertisements, brochures, flyers, instruction sheets, posters, and similar materials.

16.    If a drug manufacturer or other person distributes (or causes the distribution of) an approved drug with false or misleading labeling for an unapproved use, the manufacturer or other person could possibly be charged with misbranding the drug or distributing a misbranded drug. 21 U.S.C. §§ 331(a), 331(b), 331(c), 331(k), and 352(a). CPB has participated in successful prosecutions of manufacturers for false and misleading labeling. *See, e.g., United States v. Avanos Medical, Inc.*, Case No. 21-CR-0307-E (N.D. Tex. 2021) (deferred prosecution agreement for false and misleading labeling for medical device).

**ILLEGAL DISTRIBUTION OF AN UNAPPROVED NEW DRUG**

17.    A "new drug" is any drug that is "not generally recognized, among [qualified] experts . . . as safe and effective for use under the conditions prescribed, recommended, or suggested in the *labeling* thereof … ." 21 U.S.C. § 321(p)(1) (emphasis added). Even if a substance has been

5

on the market for years, it can be a "new drug" if used for an indication that has not been approved by FDA and is not generally recognized as safe and effective for that indication. The vast majority of prescription drugs on the market are "new drugs" under the FDCA.

18.    If a drug manufacturer or other person distributes (or causes the distribution of) an approved drug for an unapproved use with labeling for that unapproved use, the manufacturer or other person could be charged with distributing an unapproved new drug in violation of the FDCA. 21 U.S.C. § 331(d).

### INTENT IN FDCA CRIMES

19.    A violation of 21 U.S.C. § 331 is a federal criminal offense that is punished as a strict liability misdemeanor without any proof of criminal intent. *See Park*, 421 U.S. at 672–73; *United States v. Wiesenfeld Warehouse Co.*, 376 U.S. 86, 91 (1964). Through its strict liability misdemeanor provision, the FDCA imposes rigorous criminal accountability on companies and individuals involved with drugs that affect the health of consumers in circumstances where consumers realistically cannot protect themselves. *See Weisenfeld*, 376 U.S. at 91; *Dotterweich*, 320 U.S. at 280–81. This heightened accountability is even more acute when the consumers at risk are children. Consequently, any violation of Section 331, including the causing of any prohibited act listed in Section 331, is a federal crime, even in the absence of any criminal intent.

20.    A felony FDCA violation requires the same conduct as the strict liability misdemeanor, but with the added element of an intent to defraud or mislead. 21 U.S.C. § 333(a). Evidence of intent to defraud or mislead—whether directed at a government agency, a patient, or an insurance company—thus transforms a misdemeanor FDCA violation into a felony offense. Evidence of an intent to defraud or mislead a government agency or another third-party, such as a patient or insurer, in connection with an FDCA violation is sufficient to establish a felony

6

App.104

FDCA offense. Efforts to conceal a violation or evade detection also can demonstrate the requisite intent to defraud or mislead.

### THE DRUGS AT ISSUE IN THIS INVESTIGATION

21.     This investigation focuses on prescription drugs typically used in gender-related care for children and adolescents suffering from a recognized mental disorder known as gender identity disorder or, as the most recent version of the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS refers to it, gender dysphoria. Included in this group of prescription drugs are (1) drugs used to suppress the production of sex hormones to delay puberty—the most common being gonadotropin-releasing hormone agonists ("GnRH agonists"), commonly referred to as "puberty blockers;" and (2) cross-sex hormones meant to induce physical changes to alter the child's secondary sexual characteristics to resemble those typically seen in the opposite sex and less like the individual's biological sex. Testosterone, a Schedule III controlled substance under the Controlled Substances Act, is included in this latter group.

22.     FDA has not determined these drugs to be either safe or effective for the treatment of gender dysphoria. Nor has FDA approved any of these drugs for the treatment of gender dysphoria or any other psychiatric disorder. While these prescription drugs are FDA-approved for other indications (e.g., precocious puberty, prostate cancer, hypogonadism, etc.), FDA has not approved any NDA that establishes the safety and efficacy of these drugs for use in minors with gender dysphoria. As explained above, introducing such a "new drug" into interstate commerce without an FDA-approved indication is unlawful. Thus, to the extent these drugs are intended to treat gender dysphoria in minors, they constitute unapproved new drugs under federal law, and their distribution for that unapproved indication violates the FDCA and is a federal crime.

23.     Some of these drugs, including puberty blockers, are not administered orally. Rather, they are typically administered by injection by a medical professional or through an outpatient

7

App.105

surgical procedure to implant the drug. Puberty blockers are typically implants or injectables that require administration by a physician or nurse in a medical facility that must purchase, store, and administer the drug, placing healthcare providers in the chain of distribution of that drug. Similarly, testosterone may be, and often is, administered by injection.

24.    The United States Government is aware of credible, publicly available evidence relating to the widespread practice of prescribing cross-sex hormones and puberty blockers to treat gender dysphoria in minors that casts doubt on the safety and efficacy of this practice. The United States Department of Health and Human Services ("HHS"), of which FDA is a component agency, has determined that the evidence for the safety and efficacy of these drugs for the treatment of gender dysphoria in minors is weak. *See generally*, U.S. Dep't of Health & Human Svcs., *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* (May 2025), https://opa.hhs.gov/gender-dysphoria-report. Specifically, HHS found that some of the pharmacologic interventions under investigation here "carry risk of significant harms including infertility/sterility, sexual dysfunction, impaired bone density accrual, adverse cognitive impacts, cardiovascular disease and metabolic disorders, [and] psychiatric disorders." *Id.* at 10. HHS further determined that "the overall quality of [scientific] evidence concerning the effects of any intervention on psychological outcomes, quality of life, regret, or long-term health is **very low**." *Id.* at 13 (emphasis added).

25.    The Government is also aware of other major scientific publications and national health authorities that have questioned the strength and quality of the evidence base for the efficacy of puberty blockers and other medical interventions to treat youth for gender dysphoria. In the United Kingdom, for example, the British National Health Service ("NHS") commissioned an independent review led by Dr. Hilary Cass, a pediatrician and the former President of the Royal College of Pædiatrics and Child Health, to evaluate how NHS was providing care for

8

App.106

children experiencing gender-related distress. *See generally* NHS England, *Independent Review of Gender Identity Services for Children and Young People: Final Report* (Apr. 10, 2024), https://cass.independent-review.uk/home/publications/final-report/ ("*Cass Review*"). Dr. Cass's review concluded: "This is an area of remarkably weak evidence, and yet results of studies are exaggerated or misrepresented by people on all sides of the debate to support their viewpoint. The reality is that we have no good evidence on the long-term outcomes of interventions to manage gender-related distress." *Cass Review* at 13.

26.    With regard to puberty blockers, Dr. Cass reported that a systematic review conducted by the University of York "found no evidence that puberty blockers improve body image or dysphoria" while "a known side effect of puberty blockers on mood is that it may reduce psychological functioning." *Id.* at 179. Regarding cross-sex hormones, the *Cass Review* agreed with another systematic review that concluded that:

> There is a lack of high-quality research assessing the outcomes of hormone interventions in adolescents with gender dysphoria/incongruence, and few studies that undertake long-term follow up. No conclusions can be drawn about the effect on gender dysphoria, body satisfaction, psychosocial health, cognitive development, or fertility. Uncertainty remains about the outcomes for height/growth, cardiometabolic and bone health.

*Id.* at 184.

27.    As a result of the *Cass Review's* findings, in December 2024, the United Kingdom banned puberty blocker treatment for gender dysphoria. *See* Press Release, U.K. Dep't of Health & Soc. Care, *Ban on Puberty Blockers to be Made Indefinite on Experts' Advice* (Dec. 11, 2024), https://www.gov.uk/government/news/ban-on-puberty-blockers-to-be-made-indefinite-on-experts-advice (stating that "there is currently an unacceptable safety risk in the continued prescription of puberty blockers to children"). Press reports indicate that Great Britain is similarly considering banning cross-sex hormones for minors. *See* Alison Holt, *Cross-Sex*

9

App.107

*Hormones for Under 18s Could be Restricted or Banned*, BBC NEWS (May 22, 2025), https://www.bbc.com/news/articles/cg711xevd89o.

28.     Other European countries have likewise enacted restrictions on the use of these pharmacologic interventions for treating gender-related disorders in minors, or are considering them. *See, e.g., Sweden Puts Brakes on Treatments for Trans Minors*, FRANCE 24 (Aug. 2, 2023), https://www.france24.com/en/live-news/20230208-sweden-puts-brakes-on-treatments-for-trans-minors; Siobhan Harris, *Europe & the Puberty Blocker Debate*, MEDSCAPE MED. NEWS (Apr. 25, 2024), https://www.medscape.com/viewarticle/europe-and-puberty-blocker-debate-2024a1000831 (reporting on European countries' practices and findings including France's National Academy of Medicine recommendation that the "greatest reserve" be used in puberty blockers and/or hormones in children and adolescents; Sweden's conclusion that risks of puberty blockers and hormones currently outweigh potential benefits).

29.     Both the HHS review and the UK's independent *Cass Review*—along with numerous other systematic reviews of the evidence that the Government is aware of—justify questioning the scientific foundation for prescribing puberty blockers and cross-sex hormones for minors as limited and potentially problematic. It is far from certain, therefore, that prescribing these drugs—that have not been approved by FDA for treating minors with gender-related disorders—would ever be considered by the agency as safe and effective for that indication. To the contrary, the available public record suggests there is serious potential for harm.

### EVIDENCE OF FDCA AND HEALTH CARE FRAUD VIOLATIONS IN PEDIATRIC GENDER-RELATED CARE

30.     From testimonies of public whistleblowers and leading national medical experts on the subject matter, the Government is aware of potential violations of federal law in connection with the provision of gender-related treatments for minors occurring at healthcare providers across the country.

10

31.     This includes allegations and evidence of fraudulent billing practices to secure insurance coverage/payment. Such practices include, but are not limited to, providers (i) using the incorrect diagnosis and/or billing code (e.g., "endocrine disorder, unspecified" instead of "gender dysphoria" to prescribe cross-sex hormones, or "precocious puberty" instead of "gender dysphoria" to prescribe puberty blockers) because they know that certain insurance plans may not cover the off-label prescription of puberty blockers or cross-sex hormones for gender-related treatment[2]; (ii) changing or misrepresenting a patient's sex in the medical records and coding and billing for "endocrine imbalance," which is supported by accompanying bloodwork showing endocrine levels atypical of the incorrectly documented sex (but consistent with the patient's actual sex); and (iii) fraudulently making a gender dysphoria diagnosis where patients do not meet the DSM-5 diagnostic criteria, but the providers know that the carrier or plan will cover off-label prescription of cross-sex hormones or puberty blockers to treat gender dysphoria.

32.     The Government also knows of evidence and allegations of many cases where providers failed to provide adequate labeling and to provide the information necessary to obtain informed consent, actively deceived patients and parents with false claims and statements regarding the drugs' effectiveness or alternatives, and misrepresented to minor patients and their parents the risks associated with and the science claimed to support taking the drugs described herein for gender dysphoria.

33.     The Government has also reviewed evidence (including transcripts and video recordings) from national conferences on treating transgender patients, including minors, wherein presenters describe and encourage attendees to engage in the provision of purely patient-driven care (or "embodiment goals"), with little regard for gender dysphoria diagnoses,

---

[2]    In fact, one nonprofit organization has published guidance to health care providers advising them of "coding alternatives for trans healthcare," which detailed "codes that are commonly rejected by insurance providers" and "codes that are commonly accepted by insurance providers."

App.109

assessment, or clinical criteria. These recommendations include prescribing cross-sex hormones and puberty blockers to minors. The Government is concerned that such facially deficient care may be accompanied by facially deficient or misleading labelling.

34.    BCH runs one of the largest pediatric gender clinics in the country. Given the significant number of children treated there, the Government has ample reason to suspect that potential federal healthcare offenses in the provision of gender-related medical care for minors may systematically be occurring at BCH. Beyond that, the Government is aware of information particular to BCH that raises concerns that federal healthcare offenses may be occurring there.

35.    This information includes an analysis of anonymized data relating to insurance claims submitted by clinicians at BCH. Based on the diagnosis codes, it appears that between 2015 and 2024, BCH provided a first diagnosis of central precocious puberty to over 500 minors age 10 or older, including numerous teenagers aged 14 to 18—much older than children who are typically diagnosed with precocious puberty.  The following is a simple chart of that data, with the x axis representing the year of first diagnosis, the y axis the number of patients diagnosed, and the different colors of the graph lines representing the age at first diagnosis.



App.110

36.    I have viewed a video that appears to be Dr. Jeremi Carswell stating that puberty blockers are given out "like candy." I have also watched a portion of a presentation from Dr. Carswell describing certain potential side effects of puberty blockers, including effects on "brain maturation," "bone density," and "fertility." I have seen a screen shot of a BCH website from around the same time stating that puberty blockers are "temporary," "fully reversible" and "do not cause any permanent changes."

37.    I have heard an audio recording of court testimony from Dr. Amy Tishelman describing how the evaluation time for minors at BCH with apparent gender dysphoria was dramatically reduced after 2017 from 20 hours to two and a half hours, which Dr. Tishelman described as "reckless."

38.    I have reviewed an article that appeared in the Washington Post in 2021 written by Laura Edwards-Leeper, a doctor at BCH, describing how children suffering from gender dysphoria may be "rushed" into a medical pathway without adequate mental health support, and also describing how some endocrinologists prescribe puberty blockers and hormones without obtaining informed consent from minor patients' parents.

**THE SUBPOENA SPECIFICATIONS SEEK INFORMATION RELEVANT TO THE INVESTIGATION**

39.    The fifteen requests in the investigative HIPAA subpoena issued to BCH seek to further the investigation described above. The requests can be broadly broken down into four main categories: (1) requests related to personnel and corporate oversight (Request 1); (2) requests related to billing, coding, and reimbursement practices (Requests 2–6); (3) requests related to the practice's relationships with drug manufacturers, distributors, and pharmacies (Requests 7–10); and (4) requests regarding clinical practices and drug safety (Requests 11–15).

13

App.111

All the subpoenaed records and documents are relevant to the federal healthcare investigation described herein. *See* 18 U.S.C. § 3486(a)(1).

40.    Request 1 seeks information to identify who had authority to direct prescribing, billing, or marketing practices to determine liability. Under strict liability doctrines, including the responsible corporate officer doctrine, officers and responsible personnel can be held criminally liable for FDCA violations even without direct participation. Personnel files also show financial incentives, disciplinary history, and/or training which can establish knowledge and intent.

41.    The requests in the second group (regarding billing, coding, and reimbursement practices) are necessary to determine whether the clinic disguised treatment for gender-related mental disorders as another, physical illness (*e.g.,* endocrine disorder) to secure health benefit program reimbursement. Such practices are especially important to demonstrate an "intent to defraud or mislead" under 21 U.S.C. § 333(a)(2) if the clinic misrepresented the intended use of the drugs. Moreover, training materials and internal discussions can reveal whether improper coding was a deliberate strategy.

42.    The third group of requests (relating to relationships with drug manufacturers, distributors, and pharmacies) are probative of an intent to market or promote drugs for unapproved uses. If BCH, or one of its affiliated healthcare providers, received promotional materials, "scientific exchange information," or payments to encourage prescribing of puberty blockers or cross-sex hormones, such information would support a FDCA theory (including conspiracy) involving unlawful off-label promotion. Similarly, information regarding financial arrangements (consulting agreements, sponsorships, speaking honoraria) may suggest improper influence to reinforce a showing an intent to misbrand, including with intent to defraud or mislead.

App.112

43.    The final group of requests (relating to patient-level clinical practices and drug safety) will permit the United States to evaluate the scope of prescribing the drugs described herein (including the number and age range of patients treated), and consistency of diagnoses. It also establishes the scope of interstate distribution and the scale of potential FDCA violations. Linking each patient's clinical record to corresponding billing and insurance claims can demonstrate whether diagnoses were miscoded, which can prove fraudulent intent. Documentation of clinical justification, informed consent, and disclosure of off-label use is key to assessing whether the clinic (and/or potential co-conspirators) concealed or downplayed risks associated with using these drugs in a manner not approved by FDA. Absence or minimization of such warnings could establish the intent to mislead. Patient charts also typically capture adverse outcomes, side effects, and complications of drug use. By reviewing multiple patient records, the investigative team may reveal systemic use of the same masking codes, fraudulent informed consent documents, etc. This enables investigators to distinguish between mere errors and an institutionalized practice. Finally, providing patient records, including patient identities, can provide essential investigative leads. Parents may be witnesses about what disclosures were made. Patients (depending on age and circumstances) may provide information about the informed consent process, side effects, or other false or misleading information about the drugs conveyed during treatment. Health benefit programs tied to identified patients could provide additional information, including claim records, creating a triangulated evidentiary record. In sum, without this information, the Government cannot fully determine the scope of the violations, identify patterns of misbranding or fraudulent billing, or assess whether the conduct was undertaken with intent to defraud or mislead, as required for felony liability under 21 U.S.C. § 333(a)(2).

15

**GOVERNMENT INVESTIGATIVE RESOURCES**

44.      This is a bona fide, high-priority, and substantial national investigation of potential FDCA violations in the provision of gender-related care for minors. Substantial government resources have been assigned to it. It is being handled by several veteran, career prosecutors with many decades of experience in healthcare fraud and FDCA enforcement between them, supported by a team of document analysts and other forensic specialists. The Federal Bureau of Investigation has assigned agents and analysts to assist with various field activities and is employing advanced data analytics to identify prescribing patterns, potential unlawful off-label promotion, and patterns in reimbursement. The scope and coordination of these efforts reflect the seriousness with which the Government is pursuing potential violations of federal law.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 7th day of October, 2025.


LISA K. HSIAO
Acting Director
Enforcement & Affirmative Litigation Branch
United States Department of Justice

16

App.114

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: ADMINISTRATIVE SUBPOENA NO. 25-1431-019 | Misc. Case No. 1:25-MC-91324-MJJ |

**GOVERNMENT'S NOTICE OF APPEAL**

Notice is hereby given the that the United States of America, the respondent in the above-captioned case, hereby appeals to the United States Court of Appeals for the First Circuit from the order of this Court entered on September 9, 2025. (ECF 33).

Dated this 7th day of November, 2025.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

BRETT A. SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

LISA K. HSIAO
Acting Director

 */s/ Ross S. Goldstein*
ROSS S. GOLDSTEIN
PATRICK R. RUNKLE
Assistant Directors

SCOTT B. DAHLQUIST
Trial Attorney

United States Department of Justice
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, D.C. 20044
Tel:        202-353-4218
Fax:        202-514-8742
Ross.Goldstein@usdoj.gov

App.115

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to any indicated as non-registered participants on November 7, 2025.

Dated: this 7th day of November, 2025.

_/s/ Ross S. Goldstein_

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

IN RE ADMINISTRATIVE SUBPOENA
NO. 25-1431-019

Misc. Case No. 1:25-MC-91324-MJJ

**GOVERNMENT'S NOTICE OF APPEAL**

The United States of America hereby appeals the Order entered by this Court on

November 24, 2025, to the United States Court of Appeals for the First Circuit. *See* ECF Dkt. 52.

Dated this 23rd day of January, 2026.

Respectfully Submitted,

BRETT A. SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

LISA K. HSIAO
Acting Director

*/s/ Ross S. Goldstein*
ROSS S. GOLDSTEIN
PATRICK R. RUNKLE
Assistant Directors

SCOTT DAHLQUIST
Trial Attorney

United States Department of Justice
Enforcement and Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044
Tel:  (202) 353-4218
Fax: (202) 514-8742
Ross.Goldstein@usdoj.gov

App.117

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to any indicated as non-registered participants on January 23, 2026.

Dated this 23rd day of January, 2026.

/s/ Ross S. Goldstein
ROSS S. GOLDSTEIN