Nos. 25-2092, 26-1093

# UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

IN RE: ADMINISTRATIVE SUBPOENA NO. 25-1431-019

THE CHILDREN'S HOSPITAL CORPORATION, d/b/a Boston Children's Hospital,

*Petitioner-Appellee*,

*v.*

UNITED STATES DEPARTMENT OF JUSTICE,

*Respondent-Appellant.*

On Appeal from the United States District Court
for the District of Massachusetts, No. 1:25-mc-91324
Before the Honorable Myong J. Joun

**BRIEF FOR PETITIONER-APPELLEE**
**THE CHILDREN'S HOSPITAL CORPORATION**


JOSHUA S. LEVY
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02119
(617) 951-7000
joshua.levy@ropesgray.com

ALAN SCHOENFELD
BOYD JOHNSON
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
alan.schoenfeld@wilmerhale.com
boyd.johnson@wilmerhale.com

*Attorneys for Petitioner-Appellee The Children's Hospital Corporation, d/b/a Boston Children's Hospital*


July 14, 2026

*ADDITIONAL COUNSEL LISTED ON INSIDE COVER*

DOUGLAS HALLWARD-DRIEMEIER
ROPES & GRAY LLP
2099 Pennsylvania Avenue
Washington, DC 20006
(202) 508-4600
douglas.hallward-driemeier@ropesgray.com

AMANDA MASSELAM STRACHAN
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
amanda.masselamstrachan@wilmerhale.com

BRIAN R. BLAIS
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9090
brian.blais@ropesgray.com

BRIAN M. BOYNTON
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
brian.boynton@wilmerhale.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioner-Appellee hereby makes the following disclosures:

The Children's Hospital Corporation, d/b/a Boston Children's Hospital, is a Massachusetts charitable corporation, which is controlled by The Children's Medical Center Corporation, another Massachusetts charitable corporation. No publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........ i

TABLE OF CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iv

STATEMENT REGARDING ORAL ARGUMENT ........ xiii

INTRODUCTION ........ 1

STATEMENT OF ISSUES ........ 4

STATEMENT OF THE CASE ........ 5

A. BCH Provides Medically Necessary Gender-Affirming Care Under Massachusetts Law ........ 5

B. The Administration's Campaign To End Gender-Affirming Care ........ 7

C. DOJ Issues A HIPAA Subpoena To BCH ........ 12

D. The District Court Quashes The Subpoena ........ 13

E. Other Courts Quash Similar Subpoenas, And The Administration Ratchets Up Its Campaign ........ 15

STANDARD OF REVIEW ........ 20

SUMMARY OF ARGUMENT ........ 20

ARGUMENT ........ 21

I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN QUASHING THE SUBPOENA ........ 21

A. The District Court Correctly Concluded That The Subpoena Was Issued For An Improper Purpose And That The Government Had Not Met Its Burden To Demonstrate An Authorized Purpose ....................22

1. The subpoena was issued for the improper purpose of intimidating BCH into ending the provision of lawful gender-affirming care ....................23

2. The subpoena was not issued for a congressionally authorized purpose. ....................28

B. The Government's Contrary Arguments Are Meritless ....................38

1. Identifying a criminal statute does not necessarily suffice to establish a congressionally authorized purpose. ....................38

2. The government's "sole purpose" argument is forfeited, wrong, and unavailing here. ....................41

C. In Any Event, The Subpoena Is Overbroad, Vague, And Unduly Burdensome Such That Enforcing It Would Be Unreasonable ....................46

II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING THE GOVERNMENT'S BELATED MOTION TO ALTER OR AMEND THE JUDGMENT ....................51

A. The Government's Appeal Divested The District Court Of Jurisdiction To Consider The Untimely Post-Judgment Motion ....................51

B. The Government's Untimely Motion Is Meritless ....................53

CONCLUSION ....................55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

## CASES


Page(s)

*Buckman Co. v. Plaintiffs' Legal Committee*,
531 U.S. 341 (2001)........................................................................ 34-35

*Coe v. Blanche*,
No. 1:26-cv-04641-KPF, 2026 WL 1815507 (S.D.N.Y. June 24, 2026)...........18

*Coe v. Blanche*,
No. 1:26-cv-04641-KPF, 2026 WL 1951390 (S.D.N.Y. July 6, 2026) .............18

*Colón-Torres v. Negrón-Fernández*,
997 F.3d 63 (1st Cir. 2021).........................................................................52

*Davila v. Corporacion De Puerto Rico Para La Difusion Publica*,
498 F.3d 9 (1st Cir. 2007)......................................................................41, 42

*Department of Commerce v. New York*,
588 U.S. 752 (2019).....................................................................................38

*Donaldson v. United States*,
400 U.S. 517 (1971).....................................................................................44

*Fisher v. Kadant, Inc.*,
589 F.3d 505 (1st Cir. 2009)..........................................................20, 51, 53, 54

*Gonzales v. Carhart*,
550 U.S. 124 (2007).......................................................................................6

*Gonzales v. Oregon*,
546 U.S. 243 (2006)...........................................................................7, 24, 34

*Gregory v. Ashcroft*,
501 U.S. 452 (1991)....................................................................... 6-7, 24, 34

*Griggs v. Provident Consumer Discount Co.*,
459 U.S. 56 (1982) (per curiam)...................................................................52

*Hillsborough County v. Automated Medical Laboratories, Inc.*,
471 U.S. 707 (1985)...........................................................................6, 24, 34

*In re 2025 UPMC Subpoena*,
No. 2:25-mc-01069-CB, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025)............16

*In re Children's National Hospital*,
No. 1:25-cv-03780-JRR, 2026 WL 160792 (D. Md. Jan. 21, 2026)...... 16, 50-51

*In re Department of Justice Administrative Subpoena No. 25-1431-030*,
No. 25-mc-00063-SKC, 2026 WL 33398 (D. Colo. Jan. 5, 2026)...............16, 50

*In re Grand Jury Proceedings*,
632 F.2d 1033 (3d Cir. 1980) ........................................................................43

*In re Grand Jury Proceedings of Beverly*,
468 F.2d 732 (5th Cir. 1972) ........................................................................43

*In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*,
823 F.Supp. 3d 1 (D.D.C. 2026), *reconsideration denied*, No. MC
26-12 (JEB), 2026 WL 1224046 (D.D.C. Apr. 3, 2026)........................25, 40, 43

*In Re Grand Jury Subpoenas Nos. 2022R00519-A*,
*2022R00519-B, 2022R00519-C, 2022R00519-D, 2022R00519-E,*
*2022R00519-F*, No. 26-mc-43 PJS, 2026 WL 1783899 (D. Minn.
June 22, 2026)..............................................................................................25

*In re Motion to Quash Administrative Subpoena to Rhode Island*
*Hospital*, No. 1:26-mc-0007-MSM, __ F.Supp.3d __, 2026 WL
1392565 (D.R.I. May 14, 2026) .....................................................................45

*In re Sealed Case (Administrative Subpoena)*,
42 F.3d 1412 (D.C. Cir. 1994).......................................................................40

*In re Subpoena Duces Tecum*,
228 F.3d 341 (4th Cir. 2000) .........................................................................46

*In re Subpoena Duces Tecum No. 25-1431-016*,
No. 2:25-mc-00041-JHC, 2025 WL 3562151 (W.D. Wash. Sept. 3,
2025) ..............................................................................................................16

*In re Subpoena No. 25-1431-014*,
810 F.Supp.3d 555 (E.D. Pa. 2025)...........................................................16, 50

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996)........................................................................................24

*National Rifle Association of America v. Vullo*,
602 U.S. 175 (2024).....................................................................................25

*Northwestern Memorial Hospital v. Ashcroft*,
362 F.3d 923 (7th Cir. 2004) ........................................................................49

*Oklahoma Press Publishing Co. v. Walling*,
327 U.S. 186 (1946).....................................................................................46

*Oregon v. Kennedy*,
No. 6:25-cv-02409-MTK, 2026 WL 1048354 (D. Or. Apr. 18, 2026) .............17

*Palmer v. Champion Mortgage*,
465 F.3d 24 (1st Cir. 2006)...................................................................20, 51, 53

*Quality Cleaning Products R.C., Inc. v. SCA Tissue North America, LLC*,
794 F.3d 200 (1st Cir. 2015) .........................................................................54

*QueerDoc, PLLC v. United States Department of Justice*,
807 F.Supp.3d 1295 (W.D. Wash. 2025) .....................................................16, 50

*Resolution Trust Corp. v. Thornton*,
41 F.3d 1539 (D.C. Cir. 1994).......................................................................43

*Schubert v. Nissan Motor Corp. in U.S.A.*,
148 F.3d 25 (1st Cir. 1998)...........................................................................20

*United States Department of Justice v. Ricco Jonas*,
24 F.4th 718 (1st Cir. 2022)..........................................................................20

*United States v. Aero Mayflower Transit Co.*,
831 F.2d 1142 (D.C. Cir. 1987).....................................................................42

*United States v. Alvarado*,
840 F.3d 184 (4th Cir. 2016) .........................................................................43

*United States v. Arthur Young & Co.*,
465 U.S. 805 (1983).....................................................................................44

*United States v. Calk*,
87 F.4th 164 (2d Cir. 2023) ..........................................................................43

*United States v. Comley*,
890 F.2d 539 (1st Cir. 1989)....................................................21, 22, 24, 39, 42

*United States v. Facteau*,
89 F.4th 1 (1st Cir. 2023)..........................................................................35

*United States v. Flemmi*,
245 F.3d 24 (1st Cir. 2001).........................................................................43

*United States v. Gertner*,
65 F.3d 963 (1st Cir. 1995)...................................................................43, 44, 45

*United States v. Lawn Builders of New England, Inc.*,
856 F.2d 388 (1st Cir. 1988) (per curiam).........................................................39

*United States v. Mitcheltree*,
940 F.2d 1329 (10th Cir. 1991) ....................................................................37

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950)...........................................................................21, 41, 43

*United States v. Powell*,
379 U.S. 48 (1964)...........................................................................*passim*

*United States v. R. Enterprises, Inc.*,
498 U.S. 292 (1991)..................................................................................40

*United States v. Skrmetti*,
605 U.S. 495 (2025)....................................................................................6

*United States v. Sturm, Ruger & Co.*,
84 F.3d 1 (1st Cir. 1996)................................................................. 21, 39, 46-47

*United States v. Theodore*,
479 F.2d 749 (4th Cir. 1973) ....................................................................40, 47

*United States v. Tiffany Fine Arts, Inc.*,
718 F.2d 7 (2d Cir. 1983), *aff'd*, 469 U.S. 310 (1985).......................................44

*United States v. US Infrastructure, Inc.*,
576 F.3d 1195 (11th Cir. 2009) ....................................................................43

*United States v. Wadlington*,
233 F.3d 1067 (8th Cir. 2000) ....................................................................43

*United States v. Westinghouse Electric Corp.*,
638 F.2d 570 (3d Cir. 1980) ................................................................ 48-49, 50

*United States v. Westinghouse Electric Corp*.,
788 F.2d 164 (3d Cir.1986) ..................................................................21, 42

*United States v. Woods*,
544 F.2d 242 (6th Cir. 1976) ......................................................................43

*Washington Legal Foundation v. Henney*,
202 F.3d 331 (D.C. Cir. 2000).....................................................................35

*Williams v. United States*,
858 F.3d 708 (1st Cir. 2017)........................................................................46

*Z.A. v. Blanche*,
No. 26-cv-04998-PCP, 2026 WL 1907181 (N.D. Cal. July 2, 2026) ................18

## STATUTES, REGULATIONS, AND RULES

18 U.S.C. §24.................................................................................................12

18 U.S.C. §24(a)(2)........................................................................................28

18 U.S.C. §3486...................................................................................*passim*

18 U.S.C. §3486(a)(1)(A)(i)(I) .....................................................................28

21 U.S.C. §333(a)(2)......................................................................................37

21 U.S.C. §396.....................................................................................7, 34, 35

42 U.S.C. §1395.............................................................................................7, 17

Federal Food, Drug, and Cosmetic Act section 301 (21 U.S.C. §331) .............29, 32

Freedom of Information Act (5 U.S.C. §552(b)(6)) ..............................................48

Mass. Gen. Laws ch. 12, §11I½(b) ...................................................................6, 24

Executive Order No. 14148 of January 20, 2025, 90 Fed. Reg. 8237 (Jan. 28, 2025)....................7

Executive Order No. 14168 of January 20, 2025, 90 Fed. Reg. 8615 (Jan. 30, 2025)....................7, 8

Executive Order No. 14183 of January 27, 2025, 90 Fed. Reg. 8757 (Feb. 3, 2025)....................7

Executive Order No. 14187 of January 28, 2025, 90 Fed. Reg. 8771 (Feb. 3, 2025)....................7, 8

Executive Order No. 14190 of January 29, 2025, 90 Fed. Reg. 8853 (Feb. 3, 2025)....................8

Executive Order No. 14201 of February 5, 2025, 90 Fed. Reg. 9279 (Feb. 11, 2025)....................8

Fed. R. App. P. 4(a)(4)(A)....................51

Fed. R. Civ. P. 26(b)....................48

Fed. R. Civ. P. 35(a)(2)....................48

Local Rule 5.4(d)....................51-52

## OTHER AUTHORITIES

AG Order No. 3591-2015, *In re Subpoena No. 25-1431-014*, No. 2:25-mc-00039-MAK (E.D. Pa. Nov. 19, 2025), ECF No. 42-1....................28, 29, 32

Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 452 (5th ed. 2022)....................5

Bassma, Keenan, *Boston Children's Hospital Given 'All-Clear' After Police Investigate Bomb Threat*, Boston 25 News (June 11, 2026), https://perma.cc/62R7-PRPD....................49

Casiano, Louis, *Trump's Justice Department Targets Doctors, Clinics Who Provide Sex Change Procedures To Minors*, Fox News (July 9, 2025), https://perma.cc/UBX6-PBLN....................50

Complaint, *Federal Trade Commission et al. v. World Professional Association for Transgender Health, Inc. et al.*, No. 4:26-cv-00748-O (N.D. Tex. June 17, 2026), ECF No. 1 .......... 19

*Declaration of the Secretary of the Department of Health and Human Services Re: Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents* (Dec. 18, 2025), https://perma.cc/JC7H-4M3A .......... 17

Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, *American Academy of Pediatrics v. Kennedy*, No. 1:25-cv-11916-BEM (D. Mass. Sept. 4, 2025), ECF No. 104 .......... 36

Federal Bureau of Investigation (@FBI), Help the FBI Protect Children, X (June 2, 2025), https://perma.cc/FAF9-R7VP .......... 9

Federal Trade Commission, *The Dangers of "Gender-Affirming Care" for Minors* (July 9, 2025), https://perma.cc/6D4T-6PG9 .......... 11

Food & Drug Administration, *Guidance for Industry: Responding to Unsolicited Requests for Off-Label Information about Prescription Drugs and Medical Devices*, (Dec. 2011), https://perma.cc/9TAG-G9D9 .......... 36

Food & Drug Administration, *Understanding Unapproved Use of Approved Drugs "Off Label,"* (Feb. 5, 2018), https://perma.cc/8ZPS-2KJU .......... 35

Ghorayshi, Azeen & Glenn Thrush, *Justice Department Demands Patient Details From Trans Medicine Providers*, The New York Times (July 10, 2025), https://perma.cc/A7RE-2KUN .......... 50

Goldstein, Joseph, *Trump Administration Investigating Gender Treatments at Mount Sinai*, The New York Times (June 5, 2026), https://perma.cc/5FKZ-BUEX .......... 18

Harmon, Amy, *Trans Minors Sue to Stop Justice Department Access to Medical Records*, The New York Times (June 2, 2026), https://perma.cc/79UW-MEVU .......... 18

*Information for NYU Langone Health Patients*, NYU Langone Health, https://perma.cc/7ADW-JN7G .......... 18

John Williams (@JohnWillia71018), X (July 28, 2025), https://perma.cc/6EB7-Q6DZ ....................................................................49

Justice Manual §1-7.400 ....................................................................10

LaValley, Myles N., et al., *Making a Statement: Positions of Professional Medical Organizations Towards Gender-Affirming Care*, 281(2) Ann Surg. 219-220 (2025) , https://perma.cc/K4G7-LWWJ ....................................................................6

Mayo Clinic, *Gender Dysphoria*, https://perma.cc/4TR5-XSKK ....................................................................6

Memorandum from the Attorney General to Select Component Heads, *Preventing the Mutilation of American Children* (Apr. 22, 2025) at 2, https://perma.cc/VW4Y-6ZGU ....................................................................8, 9

*President Trump is Delivering on His Commitment to Protect our Kids*, The White House (Feb. 3, 2025), https://perma.cc/UA8H-K5VD ....................................................................8

*President Trump Promised to End Child Sexual Mutilation - and He Delivered*, The White House (July 25, 2025), https://perma.cc/87LP-82BH ....................................................................11

Press Release, U.S. Attorney's Office, D. Mass, Westfield Woman Sentenced for Making Hoax Bomb Threat Against Boston Children's Hospital (July 22, 2024), https://perma.cc/4H7N-M9FE ....................................................................49

Rachel W (@Raechullgreene), X (July 26, 2025), https://perma.cc/W88F-UC9P ....................................................................49

Transcript of TRO Proceeding, *Coe v. Blanche*, No. 1:26-cv-04641-KPF (S.D.N.Y. June 24, 2026), ECF No. 77 ....................................................................18

U.S. Dep't of Justice, Civil Division, *Memorandum Regarding Civil Division Enforcement Priorities* (June 11, 2025), https://perma.cc/254K-DTLH ....................................................................10

U.S. Dep't of Justice, *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children* (July 9, 2025), https://perma.cc/9YZX-WECU ....................................................................10, 11

U.S. Dep't of Justice, *Justice Department Secures Resolution with Cleveland Clinic to End Pediatric "Gender-Affirming Care*," (June 5, 2026), https://perma.cc/CYY8-W2MJ ............ 19

*Whether the Food and Drug Administration Has Jurisdiction over Articles Intended for Use in Lawful Executions*, 43 Op. O.L.C. 81 (2019) ............ 36

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary. The district court's decisions were plainly correct. Counsel for Boston Children's Hospital stands ready to deliver oral argument to the extent it would assist the Court.

## INTRODUCTION

This case arises from the current Administration's unrelenting campaign to intimidate providers of gender-affirming care ("GAC") into cutting off access to this medically necessary treatment even where it is expressly protected under state law, as it is in Massachusetts, where Boston Children's Hospital ("BCH") is located. The federal government does not regulate the practice of medicine; States do. The Supreme Court confirmed the point just last year in a decision focused on transgender healthcare, and Congress has repeatedly enshrined the principle in legislation regulating Medicare, drugs, and other aspects of healthcare over which it does have constitutional powers. But those constraints have done nothing to deter the Administration from its campaign to end GAC and strip the States of their constitutional prerogative to regulate medical practice.

Since day one, this Administration has trained its focus on ending the practice of GAC. In the opening weeks of his second term, the President issued six executive orders with the cumulative and express goal of "ending" GAC for transgender youth, a practice he maligned as "maiming and sterilizing." The Department of Justice ("DOJ") quickly joined the effort, declaring GAC a "fraud" and "exploitation," and directing the deployment of all the tools in its arsenal to criminally investigate providers of GAC and manufacturers and distributors of drugs used in this care in furtherance of that goal. The Federal Trade Commission ("FTC") hosted a widely

publicized conference to discuss the "dangers" of GAC, where a high-ranking DOJ official reassured that DOJ was "working on it" when another presenter suggested prosecuting GAC providers would "stop" GAC "even in blue States." And the Department of Health and Human Services ("HHS") issued (without any legal authority) a declaration that "sex-rejecting procedures" were contrary to acceptable standards of medical care and then publicly threatened to exclude hospitals (including BCH) from federal healthcare programs if they continued to offer GAC.

At every step, the government broadcast its efforts—even traditionally confidential criminal investigations—as a warning shot to providers. The Administration's actions have had their intended and predictable effects. Without a single criminal charge or affirmative civil action filed in court against a provider, the Administration has succeeded in intimidating numerous healthcare professionals and institutions into turning away patients and ending the provision of GAC.

As part of this campaign, the government issued a subpoena to BCH. When BCH moved to quash the subpoena, the government conceded to the district court that it had no basis to believe that BCH had done anything wrong, or even that there was any misconduct to investigate in Massachusetts, where GAC is not just permitted, but legally protected. When pressed to justify the subpoena, the government offered plainly incorrect interpretations of the federal Food, Drug, and Cosmetic Act ("FDCA") that contradicted litigation positions that this

Administration and its predecessors have repeatedly taken. And the subpoena's broad requests—demanding sensitive information even about BCH board members and staff who have nothing to do with GAC—can only be understood as an attempt to conjure fear among BCH's personnel. A demand for the names, social security numbers, and home addresses of every single child who received GAC over five and a half years, plus all "assessments" from their medical records, was further designed to have a chilling effect on this care. At argument in the district court, the government conceded the purpose of this investigation: "[T]o eliminate the medicalized gender-affirming care of minors … that's exactly what this investigation is about." App.69.

The district court saw the record for what it was: a singular chronicle of the government's unlawful attempts to accomplish through intimidation what it could not achieve through lawful means. Applying settled Supreme Court and First Circuit law, the court quashed the subpoena. It properly held that the government failed to show any proper purpose for the subpoena, and instead that the record amply demonstrated the subpoena's improper purpose.

The government's arguments on appeal all collapse under the weight of the record and the district court's careful application of precedent to case-specific facts. The government's attempt to distort the standards for quashing a subpoena and the scope of the FDCA fail under Supreme Court and First Circuit case law. And its

effort to rewrite the record in this case—including through its untimely submission of an affidavit to the district court—does nothing to dislodge the clear conclusion that its subpoena was issued for the improper purpose of intimidating BCH into ceasing lawful medical care.

The federal government's subpoena power is not unfettered. A subpoena can be issued only for a congressionally authorized purpose; a subpoena issued for an improper purpose must be quashed. Issuing a subpoena without any suspicion of wrongdoing and a spurious legal theory, for the express purpose of accomplishing indirectly through intimidation a result the government could not obtain directly, is improper. The district court's judgment should be affirmed.

## STATEMENT OF ISSUES

1. Whether the district court abused its discretion in quashing the subpoena issued to BCH when the government offered no evidence of an authorized purpose and the record instead demonstrated the government's purpose was the improper one of intimidating BCH into ending the lawful provision of state-regulated and protected medical care.

2. Whether the district court abused its discretion in denying the government's untimely motion to alter or amend the judgment.

## STATEMENT OF THE CASE

### A. BCH Provides Medically Necessary Gender-Affirming Care Under Massachusetts Law

BCH is a world-renowned pediatric hospital dedicated to improving and advancing the health and well-being of its patients through clinical care, biomedical research, and community engagement. Founded in 1869, BCH provides a complete range of healthcare services for children of all ages from all over the world, treats more children with rare diseases and complex conditions than any other hospital, and operates as the nerve center for pediatric care for all of New England and beyond. In 2007, BCH established the first pediatric and adolescent transgender health program in the United States, the Gender Multispecialty Service ("GeMS").

Among the children and adolescents who receive GAC through BCH are those diagnosed with gender dysphoria—"[a] marked incongruence between one's experienced/expressed gender and assigned gender." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 452 (5th ed. 2022). Gender dysphoria is characterized by "clinically significant distress or impairment" in social, school, occupational, or "other important areas of functioning." *Id.* at 451-452. When left untreated, gender dysphoria can cause serious physical and emotional harm, including debilitating anxiety, severe depression, self-harm, and

suicide.[1] Major medical organizations across specialties—including the American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, American College of Physicians, American Medical Association, American Psychiatric Association, and Endocrine Society—recognize gender dysphoria as a medical condition that can cause significant distress but can be treated by GAC.[2] Since launching GeMS nearly two decades ago, BCH has provided GAC in accordance with Massachusetts law and prevailing medical standards of care.

Massachusetts has codified under state law a right to access GAC under Mass. Gen. Laws ch. 12, §11I½(b). That is Massachusetts' prerogative, as "health and safety matters [are] primarily, and historically, a matter of local concern." *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 719 (1985). The Constitution "afford[s] States 'wide discretion to pass legislation in areas where there is medical and scientific uncertainty.'" *United States v. Skrmetti*, 605 U.S. 495, 524 (2025) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007)). If Congress intends to modify the "'usual constitutional balance between the States and the Federal Government'" over regulating the practice of medicine, "'it must make its

---

[1] Mayo Clinic, *Gender Dysphoria*, https://perma.cc/4TR5-XSKK.

[2] LaValley et al., *Making a Statement: Positions of Professional Medical Organizations Towards Gender-Affirming Care*, 281(2) Ann Surg. 219-220 (2025), https://perma.cc/K4G7-LWWJ.

intention to do so unmistakably clear.'" *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991); *see also Gonzales v. Oregon*, 546 U.S. 243, 274 (2006) ("[T]he background principles of our federal system … belie the notion that Congress would use … an obscure grant of authority to regulate areas traditionally supervised by the States' police power," such as the practice of medicine.). Congress has not done so in any area of legislation relevant to the standards applicable to the provision of GAC. To the contrary, Congress has repeatedly forbidden federal officials from "exercis[ing] any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. §1395 (Medicare); *see also* 21 U.S.C. §396 (similar, in the FDCA).

### B. The Administration's Campaign To End Gender-Affirming Care

Despite having no basis to do so under federal law, the current Administration has threatened and intimidated hospitals and providers into ending GAC even in States where that care is protected by state law. In his first month in office, the President issued six executive orders aimed at restricting the rights of transgender people.[3] On day one, he issued Executive Order 14168, "Defending Women From

---

[3] Exec. Order No.14148 of January 20, 2025, 90 Fed. Reg. 8237 (Jan. 28, 2025) (Initial Rescissions of Harmful Executive Orders and Actions); Exec. Order No.14168 of January 20, 2025, 90 Fed. Reg. 8615 (Jan. 30, 2025) (Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government); Exec. Order No.14183 of January 27, 2025, 90 Fed. Reg. 8757 (Feb. 3, 2025) (Prioritizing Military Excellence and Readiness); Exec. Order No.14187 of January 28, 2025, 90 Fed. Reg. 8771 (Feb. 3, 2025) (Protecting

Gender Ideology Extremism and Restoring Biological Truth to the Federal Government," which declared that gender identity is a "false" idea, that U.S. policy recognized "two sexes, male and female," and that "[t]hese sexes are not changeable."[4] A week later, he issued Executive Order 14187, "Protecting Children from Chemical and Surgical Mutilation," the stated purpose of which was to "end" GAC for transgender youth.[5] This order accused medical professionals of "maiming and sterilizing" children in service of a "trend."[6] The executive orders were a warning that many providers of GAC heeded. The Administration took its first victory lap in February 2025, boasting that, as a result of the orders, "[h]ospitals around the country [took] action to downsize or eliminate their so-called 'gender-affirming care' programs."[7]

The executive orders were only the beginning. Then-U.S. Attorney General Pamela Bondi issued a memorandum titled, "Preventing the Mutilation of American Children" (the "Bondi Memo"), which described GAC as "fraud" and "exploitation"

---

Children from Chemical and Surgical Mutilation); Exec. Order No.14190 of January 29, 2025, 90 Fed. Reg. 8853 (Feb. 3, 2025) (Ending Radical Indoctrination in K-12 Schooling); Exec. Order No.14201 of February 5, 2025, 90 Fed. Reg. 9279 (Feb. 11, 2025) (Keeping Men Out of Women's Sports).

[4] Exec. Order No.14168.

[5] Exec. Order No.14187.

[6] *Id.*

[7] *President Trump is Delivering on His Commitment to Protect our Kids*, The White House (Feb. 3, 2025), https://perma.cc/UA8H-K5VD.

by the medical community.[8] The memo "direct[ed] the Civil Division's Consumer Protection Branch to undertake appropriate investigations of any violations of the [FDCA] by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'"[9] Bondi also directed the division "to pursue investigations under the False Claims Act ["FCA"] of false claims submitted to federal health care programs for any non-covered services related to radical gender experimentation."[10] The memo left no doubt that the Administration's ultimate goal was to deploy these investigative and enforcement tools to end GAC, proclaiming that "the Department of Justice *will bring these practices to an end*."[11] Consistent with the Bondi Memo's directive to "end" GAC, the FBI announced a tip line purportedly to "protect our children and hold accountable those who mutilate them under the guise of gender-affirming care."[12]

---

[8] Memorandum from the Attorney General to Select Component Heads, *Preventing the Mutilation of American Children* (Apr. 22, 2025) at 2, https://perma.cc/VW4Y-6ZGU.

[9] *Id.* at 4.

[10] *Id.*

[11] *Id.* at 6 (emphasis added).

[12] Federal Bureau of Investigation (@FBI), Help the FBI Protect Children, X (June 2, 2025), https://perma.cc/FAF9-R7VP.

Assistant Attorney General Brett Shumate then issued a memorandum to all DOJ Civil Division employees laying out "Civil Division Enforcement Priorities" (the "Shumate Memo").[13] The memo directed the Civil Division to "use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities," including for violations of the FDCA "by (1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs," as well as violations of the FCA by "providers that bill the federal government for impermissible services."[14]

DOJ then initiated enforcement actions aimed at intimidating providers of GAC. But rather than keep DOJ's investigations confidential as has been the practice for decades under DOJ policy,[15] Attorney General Bondi issued a highly unusual statement broadcasting that DOJ had sent more than twenty criminal administrative subpoenas to such providers, including BCH.[16] Publicizing these

---

[13] U.S. Dep't of Justice, Civil Division, *Memorandum Regarding Civil Division Enforcement Priorities* (June 11, 2025), https://perma.cc/254K-DTLH.

[14] *Id.* at 2-3.

[15] Justice Manual §1-7.400 ("DOJ generally will not confirm the existence of or otherwise comment about ongoing investigations.").

[16] U.S. Dep't of Justice, *Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children* (July 9, 2025), https://perma.cc/9YZX-WECU.

ongoing criminal investigations was yet another intimidation tactic aimed at chilling the provision of GAC, with Bondi promising to hold accountable all "[m]edical professionals and organizations that mutilated children in the service of a warped ideology."[17] The President touted his role in this intimidation campaign in a press release titled "President Trump Promised to End Child Sexual Mutilation—and He Delivered," giving himself credit for ending "this barbaric, pseudoscientific practice" by driving twenty hospitals and clinics to "end" GAC.[18]

The FTC joined the fray, intensifying DOJ's chilling message to providers of GAC. During an FTC-hosted "workshop" on the "dangers" of GAC, one panelist argued that doctors providing GAC should be prosecuted to create a chilling effect and "stop" GAC "even in blue states."[19] Jordan Campbell, the Deputy Assistant Attorney General in the Civil Division overseeing the GAC investigations, including the investigation of BCH that is the subject of this appeal, responded that DOJ was "[w]orking on it."[20]

---

[17] *Id.*

[18] *President Trump Promised to End Child Sexual Mutilation – and He Delivered*, The White House (July 25, 2025), https://perma.cc/87LP-82BH.

[19] Federal Trade Comm'n, *The Dangers of "Gender-Affirming Care" for Minors* (July 9, 2025) at 29, https://perma.cc/6D4T-6PG9.

[20] *Id.*

### C. DOJ Issues A HIPAA Subpoena To BCH

The campaign to eliminate GAC came to Massachusetts in June 2025, when DOJ served BCH with an administrative subpoena issued under 18 U.S.C. §3486, which authorizes the issuance of subpoenas as part of criminal investigations of "federal health care offense[s]." App.17; *see also* 18 U.S.C. §24. The subpoena includes fifteen requests seeking nearly six years of documents concerning all aspects of BCH's operations, including records and communications regarding billing, administration, patients, physicians, and training, many of which have nothing to do with GAC. Among other things, it demands the "[c]omplete personnel files" for every BCH board member and executive, as well as for "*each* employee, contractor, or affiliate" at the hospital with "authority to direct *any* aspect of the [hospital's] affairs," "to prescribe medications or perform medical evaluations," or to "engage[] in billing activities." App.24 (emphasis added). The requests that actually relate to GAC are extraordinarily invasive, including requests for the "name, date of birth, social security number, address, and parent/guardian information" of each patient "who was prescribed puberty blockers or hormone therapy" and documents related to "informed consent" for minor patients receiving GAC. App.25. The subpoena also demands sensitive patient medical records, including "clinical indications, diagnoses, or assessments," and any "adverse event, side effect,

or medically unfavorable consequence or outcome" for patients receiving GAC. App.25-26.

### D. The District Court Quashes The Subpoena

BCH moved to quash the subpoena, contending that it was issued for the improper purpose of intimidating BCH into ending GAC. In response, the government asserted that it had issued the subpoena "to investigate whether BCH was engaged in unlawful off-label promotion of puberty blockers and cross-sex hormones" and "other false claims that may have been submitted to federal healthcare programs." Add.1. At argument, however, the government stated its true purpose: "[E]liminat[ion] [of] the medicalized gender-affirming care of minors" is "exactly what this investigation is about." App.69. When the district court asked whether the government had any allegations about improper conduct relating to GAC at BCH or in Massachusetts, the government admitted that it was "not aware of specific" allegations. App.81.

The district court granted BCH's motion. Applying settled Supreme Court and First Circuit law, the court analyzed the subpoena in two steps: It "first assess[ed] whether the Government ha[d] made [a] prima facie showing of proper purpose." Add.10. It then considered "whether BCH ha[d] shown that the subpoena was issued for an improper purpose." *Id.*

At the first step, the court held that the government had "failed to show" that it had issued the subpoena for a "proper purpose." Add.11, 14. The court explained that the government had not submitted any evidence of a congressionally authorized purpose or articulated even "an iota of suspicion" to justify its "astonishingly broad array" of requests. Add.12. It also rejected the government's contention that because the subpoena was issued pursuant to the Shumate Memo, which only authorized "appropriate" investigations, the subpoena was necessarily proper. The court cautioned that "[t]his logic, if followed, would preclude any form of judicial review as the Government's self-proclaimed say-so would always be sufficient to defeat a motion to quash." Add.11.

At step two, the court concluded that "even if" the government had made a showing of a proper purpose, "BCH ha[d] demonstrated that the subpoena was issued for an improper purpose." Add.14. The court observed that "[n]umerous statements by the Administration, executive orders, and memorandums, detail the Administration's goal of ending GAC" and have "no connection to the Government's asserted purpose of stopping alleged fraudulent billing practices or unlawful off-label promotion." Add.11, 13. The court also emphasized that the government's theory would displace States' traditional authority to regulate the practice of medicine. Add.13. The court dismissed DOJ's suggestion that hospitals were "evad[ing] state bans" on GAC because that theory did not make sense in

Massachusetts, which protects access to GAC. Finding it "abundantly clear that the true purpose of issuing the subpoena is to interfere with the Commonwealth of Massachusetts' right to protect GAC within its borders, to harass and intimidate BCH to stop providing such care, and to dissuade patients from seeking such care," the court held that "the subpoena was issued for an improper purpose, motivated only by bad faith." Add.14.

DOJ moved to alter or amend the district court's judgment. App.96. Although a timely motion would have tolled the deadline to appeal the order quashing the subpoena, DOJ filed its motion on the last day available, but failed to comply with the District of Massachusetts' local rule prescribing a 6:00 p.m. filing deadline. Recognizing its error, DOJ noticed an appeal from the order quashing the subpoena on November 7, shortly before its window expired. App.115. The district court then denied the government's motion to alter or amend, holding that, because the motion was not timely filed, the notice of appeal had divested the district court of jurisdiction to consider the motion. App.7-8, Dkt. No. 52. DOJ separately appealed that order, and this Court consolidated the two appeals.

### E. Other Courts Quash Similar Subpoenas, And The Administration Ratchets Up Its Campaign

Numerous courts have considered motions to quash nearly identical subpoenas; each has held that the subpoena either lacked an authorized purpose or was issued for an improper one (or both) and quashed the subpoena in whole or in

part. *See In re Subpoena Duces Tecum No.25-1431-016*, 2025 WL 3562151, at *12 (W.D. Wash. Sept. 3, 2025) ("Considering the DOJ's threadbare support for its subpoena, th[e] evidence shows that the DOJ requested documents as part of an effort to end gender-related care for minors."); *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F.Supp.3d 1295, 1303 (W.D. Wash. 2025) ("No clearer evidence of improper purpose could exist than the Government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating."); *In re Subpoena No.25-1431-014*, 810 F.Supp.3d 555, 579-580 (E.D. Pa. 2025) ("[T]he connection between child-patient-identifying information and potential … unlawful off-label promotion is tenuous at best and cannot shoulder the weight of compelled disclosure of a child's medical files."); *In re 2025 UPMC Subpoena*, 2025 WL 3724705, at *2 (W.D. Pa. Dec. 24, 2025) ("[T]he government's demand for deeply private and personal patient information carries more than a whiff of ill-intent."); *In re DOJ Admin. Subpoena No.25-1431-030*, 2026 WL 33398, at *7 (D. Colo. Jan. 5, 2026) ("[T]he evidence … paints a compelling picture illustrating that the government's aim is not actually to investigate FDCA violations, but to use the FDCA as a smokescreen for its true objective of pressuring pediatric hospitals into ending gender-affirming care through commencing vague, suspicionless 'investigations.'"); *In re Children's Nat'l Hosp.*, 2026 WL 160792, at *9 (D. Md. Jan. 21, 2026) ("The Subpoena bears no credible connection to an investigation of

any statutory violation" but instead "seeks to fulfill [the government's] policy agenda through compliance born of fear."). This flood of decisions concluding that the Administration was engaged in an improper effort to regulate the practice of medicine did nothing to deter it. Instead, the government deployed new tools in its intimidation campaign.

In December 2025, without prior notice or public comment, HHS Secretary Robert F. Kennedy Jr. issued a declaration claiming that "sex-rejecting procedures" for minors "fail to meet professional recognized standards of health care."[21] Although the Medicare statute prohibits federal officials from "exercis[ing] any supervision or control over the practice of medicine," 42 U.S.C. §1395, Secretary Kennedy's declaration claimed to "supersede" state standards of care and threatened providers offering GAC to minors with exclusion from all federal healthcare programs.[22] Twenty-two States and the District of Columbia successfully challenged the declaration, with the court noting that it could "scarcely recall an APA action that has come before it in which the agency's action was so clearly unlawful." *Oregon v. Kennedy*, 2026 WL 1048354, at *16 (D. Or. Apr. 18, 2026).

---

[21] *Declaration of the Secretary of the Department of Health and Human Services Re: Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents*, at 9 (Dec. 18, 2025), https://perma.cc/JC7H-4M3A.

[22] *HHS Declaration* at 2-3.

In May 2026, DOJ opened a new front, issuing grand jury subpoenas from the Northern District of Texas to hospitals that treat patients thousands of miles away, including NYU Langone, Mount Sinai, and Stanford University Children's Hospital.[23] These hospitals had previously received administrative subpoenas that DOJ struggled to enforce, and were now subject to grand jury subpoenas nearly identical to the administrative subpoena at issue in this case.[24] NYU and Stanford patients sought temporary restraining orders to enjoin DOJ from obtaining their medical records, which both courts granted. *Z.A. v. Blanche*, 2026 WL 1907181, at *1 (N.D. Cal. July 2, 2026); *Coe v. Blanche*, 2026 WL 1815507, at *1 (S.D.N.Y. June 24, 2026).[25] In doing so, one court noted that it will not "blind itself to [the] reality … of DOJ's efforts … to recast discredited civil administrative subpoenas as grand jury subpoenas from a hand-picked faraway jurisdiction in order to minimize judicial review of constitutional infirmities." Transcript of TRO Proceeding 8:6-11, *Coe v. Blanche*, No.1:26-cv-4641 (S.D.N.Y. June 24, 2026) (ECF No. 77).

---

[23] Harmon, *Trans Minors Sue to Stop Justice Department Access to Medical Records*, NY Times (June 2, 2026), https://perma.cc/79UW-MEVU; Goldstein, *Trump Administration Investigating Gender Treatments at Mount Sinai*, NY Times (June 5, 2026), https://perma.cc/5FKZ-BUEX.

[24] *Information for NYU Langone Health Patients*, NYU Langone Health, https://perma.cc/7ADW-JN7G (linking subpoena).

[25] The patients subsequently filed requests for preliminary injunctions, which both courts granted. *Z.A.*, 2026 WL 1907181, at *1; *Coe v. Blanche*, 2026 WL 1951390, at *1 (S.D.N.Y. July 6, 2026).

And then last month, the FTC and four States sued the World Professional Association for Transgender Health ("WPATH") and its U.S. counterpart accusing them of engaging in unfair and deceptive acts by developing, promoting, and disseminating its Standards of Care related to GAC for transgender minors. *Federal Trade Commission et al. v. World Professional Association for Transgender Health, Inc. et al.*, No.4:26-cv-00748 (N.D. Tex. June 17, 2026) (ECF No. 1). The complaint seeks to enjoin WPATH's work and to obtain civil penalties, restitution, and attorneys' fees from the nonprofit organization. *See id.* at 118.

Notwithstanding courts' consistent recognition that the administrative subpoenas are improper, GAC providers remain risk-averse given the Administration's intimidation campaign. Last month, DOJ announced it had secured settlements with Texas Children's Hospital and the Cleveland Clinic Foundation related to purported fraudulent billing for GAC.[26] Both settlement agreements include provisions that require the hospital to establish multi-million-dollar funds for "de-transition services," and that bar them from providing GAC to transgender youth for decades—relief that would have been unavailable to the government even if it had succeeded on its FCA claim.

[26] U.S. Dep't of Justice, *Justice Department Secures Resolution with Cleveland Clinic to End Pediatric "Gender-Affirming Care*," (June 5, 2026), https://perma.cc/CYY8-W2MJ.

## STANDARD OF REVIEW

This Court reviews a decision to quash an administrative subpoena for abuse of discretion. *U.S. Dep't of Just. v. Ricco Jonas*, 24 F.4th 718, 725 (1st Cir. 2022). A district court's decision as to a Rule 59(e) or Rule 60(b) motion is also reviewed for abuse of discretion. *Fisher v. Kadant, Inc.*, 589 F.3d 505, 512 (1st Cir. 2009); *Palmer v. Champion Mortg.*, 465 F.3d 24, 30 (1st Cir. 2006). A decision "cannot be set aside" as an abuse of discretion unless the reviewing court "has a definite and firm conviction that the court [] committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Schubert v. Nissan Motor Corp. in U.S.A.*, 148 F.3d 25, 30 (1st Cir. 1998).

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion when it applied well-settled law to an extraordinary record of patent bad faith and quashed the subpoena. The court correctly held that the subpoena was not issued for an authorized purpose. To this day, the government cannot articulate a congressionally authorized purpose that can be squared with the subpoena itself, much less the rest of the record. In contrast, overwhelming evidence supports the court's holding that the government issued the subpoena for the improper purpose of intimidating BCH into ceasing its lawful provision of GAC. Indeed, the government has repeatedly confirmed as much.

The court also did not abuse its discretion when it denied the government's motion to alter or amend the judgment. The motion was untimely under the court's rules, thereby failing to toll the deadline to file an appeal, and the notice of appeal the government was required to file divested the district court of jurisdiction to consider the motion. The motion was based on evidence the government could have submitted earlier and, in any event, fails to support the subpoena.

## ARGUMENT

### I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN QUASHING THE SUBPOENA

The standard for evaluating a motion to quash an administrative subpoena is well-settled. First, the government must show that "(1) the subpoena is issued for a congressionally authorized purpose, the information sought is (2) relevant to the authorized purpose and (3) adequately described, and (4) proper procedures have been employed in issuing the subpoena." *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 4 (1st Cir. 1996) (citing *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)); *see also United States v. Powell*, 379 U.S. 48, 57 (1964) ("[The agency] must show that the investigation will be conducted pursuant to a legitimate purpose …"). Even if the government satisfies those requirements, the party challenging the subpoena can nonetheless prevail by showing that the subpoena was "issued for an improper purpose." *United States v. Comley*, 890 F.2d 539, 542-543 (1st Cir. 1989) (quoting *United States v. Westinghouse Elec. Corp.*, 788 F.2d 164, 166-167 (3d Cir.

1986)). A subpoena that might otherwise be congressionally authorized, but was issued to "harass" or "pressure" a private citizen "to settle a collateral dispute" with the government, serves an improper purpose and must be quashed. *Powell*, 379 U.S. at 58.

The district court properly applied this test. Because the government could not articulate any suspicion that BCH had committed an FDCA offense, and because the subpoena's requests for information had nothing to do with any reasonable investigation into such an offense, the court held that the government had failed to demonstrate that the subpoena was issued for an authorized purpose. Add.11, 14. In light of overwhelming evidence that the subpoena was issued to intimidate BCH into ending GAC, the court also concluded that the subpoena was issued for an improper purpose. Both holdings are correct, and the government's arguments lack merit.

### A. The District Court Correctly Concluded That The Subpoena Was Issued For An Improper Purpose And That The Government Had Not Met Its Burden To Demonstrate An Authorized Purpose

The district court did not abuse its discretion when it held that the subpoena fails both steps of the *Powell* and *Comley* inquiry. Even if the government had made an adequate threshold showing, BCH discharged its burden by demonstrating that the actual purpose of the subpoena was improper: to "harass" and intimidate BCH into ending its provision of GAC, a political and "collateral dispute." *Powell*, 379

U.S. at 58. In fact, the government conceded that this was its aim. And although that alone justifies affirmance, the government also failed to make even a threshold showing that it issued the subpoena for a congressionally authorized purpose. The only permissible purpose for the subpoena is to investigate violations of the FDCA. Yet the government has failed to articulate a plausible theory of FDCA liability or explain how most documents the subpoena requests relate to such a theory. For that reason, too, the decision to quash the subpoena was correct.

#### 1. The subpoena was issued for the improper purpose of intimidating BCH into ending the provision of lawful gender-affirming care.

Overwhelming evidence establishes that the subpoena was issued for an improper purpose: to intimidate BCH to stop providing lawful GAC. As the district court observed, "[n]umerous statements by the Administration, executive orders, and memorandums, detail the Administration's goal of ending GAC." Add.11. From the executive orders vilifying GAC to the DOJ memos undertaking to "bring these practices to an end," the throughline is clear: The directives leading to this subpoena declared a mission of ending GAC. *See supra* pp.7-10. And the government has since confirmed—in the press releases and public statements already discussed (pp.8, 11)—that the subpoena is part of a campaign to end GAC.

But the Administration lacks authority to pursue that end by harassing hospitals and doctors with section 3486 subpoenas. Although providing GAC to

minors may be the subject of "'fierce scientific and policy debates,'" Br.4, it is not a crime. In fact, the people of Massachusetts have enshrined access to GAC as "a right secured by the constitution and laws of the commonwealth." Mass. Gen. Laws ch. 12, §11I½(b). And "[i]t is their prerogative as citizens of a sovereign State to do so." *Gregory*, 501 U.S. at 473. As the Supreme Court has recognized, "regulation of health and safety matters is primarily, and historically, a matter of local concern." *Hillsborough County*, 471 U.S. at 719. While Congress has only rarely "set uniform national standards in these areas," *Oregon*, 546 U.S. at 271, the States have often "exercised their police powers to protect the health and safety of their citizens," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996). So, if Congress intends to alter that "'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear.'" *Gregory*, 501 U.S. at 460. It has not done so here. Nothing in section 3486 or any other federal statute criminalizes GAC. Indeed, DOJ implicitly concedes that it cannot declare GAC "categorically unlawful or … change federal law in any respect." Br.33.

Absent a basis in federal law, the subpoena can only be understood as a means of "harass[ing]" or "pressur[ing]" physicians into ending the provision of medical care that state law protects. *Powell*, 379 U.S. at 58; *see also Comley*, 890 F.2d at 542-543. But that is plainly an improper purpose under the standard set forth in *Powell* and *Comley*. *Powell* makes clear that the government's subpoena cannot be

used as an intimidation tactic to settle a "collateral dispute"—here, attempting to end GAC.

As another court recently observed in quashing a grand jury subpoena to the Federal Reserve Bank meant to pressure then-Chair Jerome Powell into taking actions the White House could not compel, "Government may not use threats of prosecution to coerce people into doing what it cannot directly order them to." *In re Grand Jury Subpoenas*, 823 F.Supp.3d 1, 9 (D.D.C. 2026), *reconsideration denied*, 2026 WL 1224046 (D.D.C. Apr. 3, 2026). After all, "a government official cannot do indirectly what she is barred from doing directly." *NRA of Am. v. Vullo*, 602 U.S. 175, 190 (2024). Similarly, a court recently concluded that "[i]nitiating a criminal investigation in order to harass political opponents or to coerce them into taking official action—particularly official action that the federal government cannot directly require those political opponents to take—is a blatantly unlawful and unethical use the grand-jury process." *In Re Grand Jury Subpoenas*, 2026 WL 1783899, at *6 (D. Minn. June 22, 2026).

The scope of the subpoena to BCH confirms the government's intent to intimidate the hospital into ending GAC. Among other things, the subpoena demands complete personnel files from BCH board members to medical residents, most of whom have nothing to do with GAC. *See, e.g.*, App.24 (requesting "[c]omplete personnel files for each employee, contractor, or affiliate" of BCH with

authority to direct "any aspect" of BCH's affairs, to prescribe medication or perform medical evaluations, or to engage in billing activities). It also seeks detailed information—names, family status, social security numbers, treatment information, addresses, and more—about BCH's patients, most of whom are children. *See, e.g.*, App.25 (requesting "[d]ocuments sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy" along with documents relating to such patients' "clinical indications, diagnoses, or assessments"). These requests are telling because they seek information that is both highly sensitive and, as discussed below, irrelevant to any plausible theory of FDCA liability, *see infra* pp.28-38. That disconnect, coupled with the government's avowed hostility to the transgender community, raises obvious concerns that the information will be put to improper use. And it reveals that the subpoena is designed to maximize the government's leverage over BCH to pressure it into stopping its GAC program—a tactic that has succeeded in several instances already.

DOJ has confirmed as much in this proceeding. At oral argument, DOJ told the district court "exactly what this investigation is about": "[T]he executive branch wants to reduce or eliminate gender-related care to minors, especially the medicalized gender-related care to minors that this investigation is about[.]" App.69. The government's brief on appeal similarly makes clear that the

government has gone after BCH because BCH provides GAC. *See* Br.32-38. Throughout these proceedings, the government has embraced the notion that the Administration's opposition to BCH's lawful conduct is a permissible basis for subjecting it to a criminal investigation. *Id.* at 36.

After federal courts uniformly quashed or limited these subpoenas, *see supra* pp.15-17, the government shifted tactics, attacking GAC by other means. HHS tried to exclude hospitals providing GAC from federal healthcare programs by purporting to redefine the standard of medical care, although the courts again intervened. *See supra* p.17. DOJ, for its part, began issuing grand jury subpoenas out of the Northern District of Texas, an obvious attempt at forum shopping. *See supra* p.18. And the Administration has sued WPATH, seeking to stop its work supporting GAC. *See supra* p.19. Lacking a lawful means of ending GAC, the government has thrown every coercive tool and pressure tactic it can identify against the wall, hoping one will stick, and knowing that each new action it takes achieves the desired effect of intimidating additional providers into ending GAC.

Faced with this evidence, the government insists that the Administration's policy objections to GAC "do not negate [its] investigatory authority." Br.31. But the Administration's policy preferences cannot create investigative authority where none exists. Nor can they justify the improper use of authority the government possesses. And although the government argues that the district court's reasoning

would foreclose criminal investigations into other organizations engaged in controversial-but-lawful activities, in fact, there is no such slippery slope. *See* Br.34. The only thing the district court's reasoning forecloses is the government's reliance on spurious theories of criminal liability to intimidate organizations into ceasing lawful conduct. And rightly so: Subpoenas are for investigating crimes, not for coercing private citizens to stop engaging in conduct Congress has not criminalized by "pressur[ing]" them to settle "collateral" policy disputes. *Powell*, 379 U.S. at 58.

### 2. The subpoena was not issued for a congressionally authorized purpose.

Although the Court can affirm solely on the strength of BCH's showing of improper purpose, DOJ has not satisfied even its threshold burden to show that the subpoena serves a congressionally authorized purpose. The Attorney General is authorized to issue subpoenas in connection with investigations into "Federal health care offense[s]." 18 U.S.C. §3486(a)(1)(A)(i)(I). That term encompasses violations of several federal criminal statutes, including statutes prohibiting fraud, embezzlement, false statements, and kickbacks, when those violations "relate[] to" a health benefit program. *Id.* §24(a)(2). But this subpoena was issued by DOJ's Civil Division. App.18. And the Attorney General has delegated authority for the Civil Division to issue section 3486 subpoenas to investigate violations only of a single statute: the FDCA. *See* AG Order No.3591-2015, *In re Subpoena No.25-1431-014*, No.25-mc-39 (E.D. Pa. Nov. 19, 2025), ECF No. 42-1 (limiting Civil

Division's authority to issue section 3486 subpoenas "to the investigation of violations of section 301 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §331) that relate to a health care benefit program"). The Civil Division's section 3486 subpoena thus was authorized only if it was issued for the purpose of investigating legitimate FDCA offenses.[27] But in the district court, the government could neither articulate a valid theory of FDCA liability nor tie its document requests to a suspected FDCA violation. The government cannot outrun that record on appeal by devising new and baseless theories of FDCA liability in the first instance.

To begin, the government has not demonstrated even "an iota of suspicion that BCH" has committed any FDCA offense. Add.12. Indeed, DOJ conceded at oral argument that it was "not aware of [allegations] specific" to BCH or even Massachusetts. App.81. As the district court correctly recognized, the lack of any factual predicate for DOJ's investigation undercuts its claim of an authorized purpose. Add.12. In reaching that conclusion, the district court did not, as the government suggests (Br.18, 39), hold the government to a probable cause standard.

---

[27] DOJ did not acknowledge this limit on the Civil Division's delegated authority until its belated motion to alter or amend the judgment—after full briefing, oral argument, and a decision on the motion to quash. *See* App.100 (citing AG Order No.3591-2015). Even then, DOJ did not produce the delegation order that it relied upon in the sworn declaration that it submitted to support its post-judgment motion. DOJ has still not produced the delegation order to the district court or this Court, nor has DOJ cited the order in its appellate brief.

To the contrary, the court recognized that probable cause was not required. Add.12. Instead, the court properly deemed the admitted absence of suspicion suggestive of an improper "fishing expedition"—a suggestion the rest of the record amply confirms. *See id.*

Most notably, the subpoena's expansive document requests cannot be squared with the government's stated purpose. *See supra* pp.12-13. The only FDCA offense the government has identified as a target of its investigation is misbranding. *See* Dkt. No. 21, Opp. to Mot. to Quash ("MTQ Opp.") at 5; Br.21-22. More specifically, the government suggests that it is investigating misbranding violations involving the marketing and promotion of FDA-approved drugs for unapproved or "off-label" uses. But almost every category of documents requested has no connection to misbranding, whether committed through off-label promotion and marketing or otherwise. *See* Add.10-12; App.24-26. For example:

- Request No. 1 seeks personnel files for BCH executives, management employees, and hospital board members; individuals who have authority to prescribe medications or perform medical evaluations (presumably physicians, residents, interns, nurse practitioners, and nurses); and individuals who are engaged in billing activities.

- Requests Nos. 2-6 seek documents and communications—including billing records, insurance claims, internal protocols, and guidance—concerning the use of diagnosis or billing codes in connection with GAC for minor patients, as well as certain training materials.

- Requests Nos. 11-15 seek records identifying patients who were prescribed puberty blockers or hormone therapy; the clinical indications and diagnoses that formed the basis of such prescriptions;

> documents related to the informed consent, patient intake, and parent or guardian authorization for minor patients prescribed puberty blockers or hormone therapy; and documents related to the safety and side effects of puberty blockers and hormone therapy in the treatment of minor patients.

These requests are extraordinarily broad and invasive. And the government has never explained what they have to do with misbranding, or any other legally valid theory of FDCA liability, especially in light of established law (discussed below) that off-label *prescribing* or *use* by doctors is not governed by the FDCA *at all*.

DOJ initially suggested that the Civil Division could investigate a broader range of potential violations, a further indication that the subpoena cannot be justified in reference to the FDCA alone. In its opposition to BCH's motion to quash, the government stated that it issued the subpoena to investigate false claims and billing fraud. *See, e.g.*, MTQ Opp. 5, 11, 12. And in fact, most of the subpoena's requests appear more relevant to billing issues than to misbranding. *See, e.g.*, App.24-25 (requests seeking "billing records, insurance claims, internal protocols, or guidance;" information "relating to whether or how to code or bill;" and documents "relating to billing or coding practices"). Even now, the government attempts to justify those requests by asserting they may show how "treatments are being described for purposes of insurance claims." Br.42; *see also* Br.15 (questioning the "legitimacy of BCH's billing practices"); Br.36-37 ("fraudulent billing practices"). But submitting false claims and committing billing fraud are not

violations of the FDCA—the only statute the Civil Division is authorized to consider in issuing a section 3486 subpoena under the delegation of authority. *See* AG Order No.3591-2015 (limiting investigation to 21 U.S.C. §331). The Civil Division therefore has no authority to issue section 3486 subpoenas to investigate billing practices, and these theories of liability cannot supply an authorized purpose for its subpoena.

Perhaps recognizing its error in initiating an investigation outside its delegated authority, the government now attempts to twist both the subpoena and the law to link BCH to a possible FDCA offense. The government says that BCH's communications with drug companies "may show whether drug companies are misbranding the drugs or are participating in a conspiracy to do so." Br.42. But even this theory cannot be squared with the requests in the subpoena. As the government recognizes, fewer than a third of those requests "seek documents related to the relationship between BCH and drug manufacturers." Br.22. The remainder seek documents relating to personnel, billing, and patient files that have nothing to do with communications with drug companies or those companies' branding practices. The government's shifting theories and tortured post hoc explanations are further evidence of the pretextual nature of the entire investigation.[28]

[28] Just as the government continues to shift the offense it purports to be investigating, the government also "has not made a decision" as to what role it thinks BCH has played. MTQ Opp. 13. The government told the district court BCH "*might* be a

Lacking a coherent link between the subpoena requests and any recognized FDCA offense, the government is forced to concoct novel and specious theories of FDCA liability that conflict with the statute and precedent. Most remarkably, the government has suggested that it may be investigating BCH personnel for prescribing or administering drugs for off-label uses. *See* Br.41-42 (asserting that BCH records are "relevant to the Department's investigation" since they "may show whether certain drugs are being used for off-label purposes"); *see also* App.75-76.[29] But that theory of liability cannot supply an authorized purpose for the subpoena. By collapsing the distinction between off-label sales, promotion, and marketing (*i.e.*, by the manufacturer) and off-label prescription and administration (*i.e.*, by the healthcare practitioner) in order to justify the subpoena, the government contradicts

---

witness, it *might* be a subject, it *might* be a target." App.68 (emphasis added); *see also* MTQ Opp. 13. And even before this Court, the government does not commit, stating that it seeks to determine "whether BCH itself may have engaged in conduct that implicates the FDCA" and "whether manufacturers and distributors of the drugs at issue may have violated the FDCA." Br.22.

[29] At times, the government seems to suggest that while off-label *prescribing* does not violate the FDCA, off-label *administering* may do so. *Compare* Br.36 ("The Department does not contend that the act of writing a prescription for an off-label use would, in and of itself, give rise to FDCA liability."), *with* Br.7 (arguing that if someone "causes the distribution of an approved drug for an unapproved use" that person "could be charged with misbranding"); *see also* App.76 (acknowledging that "the bare act of writing an off-label prescription … is not something FDA enforces," but caveating that "there is a difference between writing prescriptions and dispensing medicine").

settled law and invents an enforcement theory that would significantly disrupt the practice of medicine throughout the nation.

Prosecuting doctors for off-label prescribing and administering would upend the balance between the federal and state governments by licensing federal intrusion into the practice of medicine, traditionally "a matter of local concern." *Hillsborough County*, 471 U.S. at 719. When the federal government seeks to disrupt that balance, courts look for a clear indication that Congress intended it to do so. *Gregory*, 501 U.S. at 460; *see also Oregon*, 546 U.S. at 275 (Controlled Substances Act did not "delegate[] to a single executive officer the power to effect a radical shift of authority from the States to the Federal Government to define general standards of medical practice in every locality").

But rather than clearly authorizing a dramatic shift in the federal-state balance, the FDCA disclaims such a shift. In a provision entitled "[p]ractice of medicine," the FDCA specifies that it is not to be construed "to limit or interfere with the authority of a health care practitioner to *prescribe* or *administer* any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship." 21 U.S.C. §396 (emphases added). Accordingly, courts have consistently recognized that the FDCA permits rather than criminalizes off-label prescribing and administering. The Supreme Court has recognized that off-label use is an "accepted and necessary corollary of the FDA's mission to regulate

in this area without directly interfering with the practice of medicine." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001). And this Court has likewise recognized that "the FDCA expressly protects the 'authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease.'" *United States v. Facteau*, 89 F.4th 1, 15 (1st Cir. 2023) (quoting 21 U.S.C. §396); *see also Washington Legal Found. v. Henney*, 202 F.3d 331, 333 (D.C. Cir. 2000).

In keeping with those decisions, the primary agency charged with enforcing the FDCA—the FDA—has consistently reaffirmed doctors' right to engage in off-label prescription and administration. For example, one guidance document states: "[O]nce the FDA approves a drug, healthcare providers generally may *prescribe* the drug for an unapproved use when they judge that it is medically appropriate for their patient."[30] Another notes that "once a drug or medical device has been approved or cleared by FDA, generally, health care professionals can lawfully *use* or *prescribe* that product for uses or treatment indications that are not included in the product's

---

[30] FDA, *Understanding Unapproved Use of Approved Drugs "Off Label,"* (Feb. 5, 2018), https://perma.cc/8ZPS-2KJU (emphasis added).

approved labeling."[31] In fact, the "FDA recognizes that these off-label uses … may even constitute a medically recognized standard of care."[32]

Before litigating this case, DOJ itself recognized that the FDCA permits off-label prescribing and administering. A formal opinion from the Office of Legal Counsel (which is binding on DOJ and other executive branch agencies) affirms: "[W]hile the FDCA bars a manufacturer or distributor from selling any drug or device for an unapproved use, physicians may, with limited exceptions, *prescribe* and *administer* FDA-approved drugs and devices for unapproved uses." *Whether the Food and Drug Administration Has Jurisdiction over Articles Intended for Use in Lawful Executions*, 43 Op. O.L.C. 81, 85 (2019) (emphasis added). Even after oral argument in this case, DOJ has continued to represent to other federal courts that off-label prescribing and administration is appropriate and common. *See, e.g.*, *American Acad. of Pediatrics v. Kennedy*, No.1:25-cv-11916, at 4 (D. Mass. Sept. 4, 2025), ECF No. 104 ("From FDA's perspective, with few exceptions, healthcare professionals generally may choose to prescribe or use a legally marketed vaccine for an unapproved (or uncleared) use (also called an 'off-label' use) when they judge

---

[31] FDA, *Guidance for Industry: Responding to Unsolicited Requests for Off-Label Information about Prescription Drugs and Medical Devices*, (Dec. 2011) (draft guidance for comment purposes only), https://perma.cc/9TAG-G9D9 (emphasis added).

[32] *Id.*

that the unapproved use is medically appropriate for an individual patient."). Given the controlling judicial and executive branch precedent undergirding these representations, the government cannot jettison them here to salvage its misbegotten subpoena.

Regardless, no theory of misbranding, recognized or otherwise, can justify the subpoena's requests. The government asserts that BCH's billing records may be relevant to proving "fraudulent intent." Br.15, 22, 43. But that just raises the question: Fraudulent intent as to what? While fraudulent intent can lead to increased penalties under the FDCA, *see* 21 U.S.C. §333(a)(2), such intent must be connected to an underlying FDCA violation, *see United States v. Mitcheltree*, 940 F.2d 1329, 1349 (10th Cir. 1991). The government, however, has articulated no connection between BCH's billing practices and any misbranding violation. And the possibility of uncovering evidence of fraudulent intent divorced from any offense the Civil Division is authorized to investigate is not a permissible purpose for the subpoena.

In sum, the government's shifting theories and unavailing efforts to connect the requests in the subpoena to an authorized purpose make plain that no such purpose exists. Even after extensive briefing, the government cannot provide a coherent account of how the bulk of the materials that the Civil Division subpoenaed pertain to a recognized FDCA violation. A misbranding investigation simply does not call for personnel and billing records or the details of medical diagnoses,

informed consent, or the side effects of medications for minors. When an agency's explanations for its action are "incongruent with what the record reveals about the agency's priorities," a court may infer that the agency's stated rationales are "contrived." *Department of Com. v. New York*, 588 U.S. 752, 785 (2019). That is the case here. The government's burden is not onerous. But it is not so toothless as to require a court to accept a stated purpose for a subpoena bearing little connection to the substance of the subpoena itself.

### B. The Government's Contrary Arguments Are Meritless

Unable to overcome BCH's evidence of improper purpose and unable even to articulate a congressionally authorized purpose, DOJ would move the goalpost at each step of the analysis. Its arguments—all in service of lightening its burden and justifying a subpoena that has no plausible tether to a legitimate purpose—fail.

#### 1. Identifying a criminal statute does not necessarily suffice to establish a congressionally authorized purpose.

The government primarily argues that it necessarily satisfies its burden to show an authorized purpose by identifying a statute and an investigation purportedly aimed at enforcing it. Br.25-28. Recognizing that it failed to support the subpoena with even a single declaration or affidavit, the government asserts that "[g]iven the context"—namely, in the issuance of the subpoena pursuant to the Bondi and Shumate Memos—"nothing more is needed." Br.27-28. That is not correct.

While a fairly cursory showing may suffice when the authorized purpose of a subpoena is manifestly clear, courts need not—and do not—accept "the government's 'self-proclaimed say-so'" in every case. Br.28 (quoting Add.11). Rather, even at the threshold, a court may consider whether the other evidence before it is consistent with the government's articulated purpose. *Comley*, 890 F.2d at 541-542. How else is a court to probe, as it must, whether the government's assertion of authority is unsupported or "'obviously apocryphal?'" Br.20 (quoting *Sturm, Ruger & Co.*, 84 F.3d at 5). Confirming the point, this Court has reviewed—at the threshold—both the substance of a subpoena's requests and "affidavits of government officials" to substantiate the government's asserted purpose. *Comley*, 890 F.2d at 541-542; *see United States v. Lawn Builders of New England, Inc.*, 856 F.2d 388, 391-392 (1st Cir. 1988) (per curiam) (relying on "[a]ssertions by affidavit of the investigating agent"). If a statutory citation and the government's word were sufficient, that analysis would have been superfluous.

Although the government seeks to ground its contrary position in *Powell*, its reliance is misplaced. Br.1, 19, 39. No one disputes *Powell*'s holding that the government generally need not establish "probable cause" to support issuance of a subpoena at the threshold. 379 U.S. at 57. But that does not mean the government may demand troves of sensitive documents absent *any* suspicion that the investigation's target or anyone affiliated with it committed any offense within the

agency's authority to investigate. To the contrary, *Powell* itself recognizes that courts must "inquire into the underlying reasons for the examination" since "a court may not permit its process to be abused." *Id.* at 58. And by the same token, *Powell* does not foreclose the possibility that the government must show something close to probable cause when a challenger "raises a substantial question that judicial enforcement of the administrative summons would be an abusive use of the court's process." *Id.* at 51; *see also In re Grand Jury Subpoenas*, 823 F.Supp.3d at 11 ("In the rare case when the evidence of improper purpose is overwhelming, that might require the Government to show something akin to probable cause.").

Consistent with *Powell*, courts have held that the government may not engage in "fishing expeditions" in which it "cast[s] about for potential wrongdoing." *In re Sealed Case (Administrative Subpoena)*, 42 F.3d 1412, 1418-1419 (D.C. Cir. 1994); *see also United States v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973) ("The Government cannot go on a 'fishing expedition' … , and where it appears that the purpose of the summons is 'a rambling exploration' of a third party's files, it will not be enforced."); *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991) ("Grand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass."). That is a basic guardrail against abuse and one the government cannot dispense with through a mere statutory citation.

*Morton Salt* does not say otherwise. Although *Morton Salt* mentioned in passing that the government may "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not," 338 U.S. at 642-643, it did not bless subpoenas wholly unconnected to any suspected violation of the law. Just the opposite: *Morton Salt* affirmed the government's obligation to show at the outset that "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *Id.* at 652. Thus, under *Morton Salt*, a court properly may examine "the information sought" and other evidence before it to determine whether a subpoena was properly issued, as the district court did here.

#### 2. The government's "sole purpose" argument is forfeited, wrong, and unavailing here.

The government also errs in suggesting for the first time on appeal that, at step two of the analysis, a subpoena may be quashed only if its "sole purpose" is improper. Br.18, 29-32. That argument has been forfeited and is, in any event, legally incorrect. It also makes no difference on the record before this Court because, as the district court held (Add.14), the sole purpose of this subpoena to BCH was improper.

The government forfeited its "sole purpose" argument since it did not present that argument to the district court. *See Davila v. Corporacion De Puerto Rico Para La Difusion Publica*, 498 F.3d 9, 14 (1st Cir. 2007). This Court reviews forfeited

issues for plain error and "will resuscitate a forfeited argument only if the appellant demonstrates that '(1) an error occurred (2) which was clear or obvious and which not only (3) affected the [appellant's] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of the judicial proceedings.'" *Id.* at 14-15. The government demonstrates none of that here.

There was no error, let alone a "clear or obvious" one. Rather than a "sole improper purpose," the Supreme Court and this Court require only "*an* improper purpose" to quash a subpoena. As the government recognizes (Br.24-25), the Supreme Court held in *Powell* that even a facially valid subpoena may be quashed if it was issued for "*an* improper purpose." *Powell*, 379 U.S. at 58 (emphasis added). The Court explained that "any other purpose reflecting on the good faith of the particular investigation" can taint a subpoena such that it should be quashed, never suggesting that this must be the subpoena's only purpose. *Id.* at 58. This Court's decision in *Comley* is to the same effect, stating that quashal is appropriate if a subpoena was issued for "*an* improper purpose." 890 F.2d at 542-543 (emphasis added). The decisions of other courts of appeals are in accord. *See United States v. Aero Mayflower Transit Co.*, 831 F.2d 1142, 1145 (D.C. Cir. 1987) ("an improper purpose"); *Westinghouse*, 788 F.2d at 166-167 (same).

Even in the grand jury setting, a subpoena's improper purpose need not be its "sole" purpose for it to be quashed. Rather, grand jury subpoenas may be quashed

if their "dominant" or "primary" purpose is improper. *See United States v. Flemmi*, 245 F.3d 24, 28 (1st Cir. 2001) (asking whether the "primary purpose" of a grand jury investigation is improper); *United States v. Calk*, 87 F.4th 164, 186 (2d Cir. 2023) ("sole or dominant purpose"); *In re Grand Jury Procs.*, 632 F.2d 1033, 1041 (3d Cir. 1980) ("sole or dominant purpose"); *United States v. Alvarado*, 840 F.3d 184, 189 (4th Cir. 2016) ("sole or dominant purpose"); *In re Grand Jury Procs. of Beverly*, 468 F.2d 732, 743 (5th Cir. 1972) ("sole or principal purpose"); *United States v. Woods*, 544 F.2d 242, 250 (6th Cir. 1976) ("sole or dominant purpose"); *United States v. Wadlington*, 233 F.3d 1067, 1074 (8th Cir. 2000) ("sole or dominant purpose"); *United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1214 (11th Cir. 2009) (whether grand jury was "used solely or even primarily" for improper purpose). Indeed, the government itself recently endorsed that standard. *In re Grand Jury Subpoenas*, 823 F.Supp.3d at 8 ("[T]he parties themselves expressly agreed at the hearing that" the sole-or-dominant "standard should govern."). And there is no conceivable reason why an administrative subpoena should be harder to quash than a grand jury subpoena. *See Resolution Trust Corp. v. Thornton*, 41 F.3d 1539, 1546 (D.C. Cir. 1994) ("[A]n administrative agency's subpoena power is analogous to that of a grand jury …." (citing *Morton Salt*, 338 U.S. at 642-643)).

The government derives its proposed sole-purpose rule from dicta in *United States v. Gertner*, 65 F.3d 963 (1st Cir. 1995), but that decision does not suggest that

a subpoena may be enforced if its primary or dominant purpose is improper. There, this Court upheld a district court's *refusal* to enforce an IRS summons when the party challenging it had demonstrated that the summons's "sole purpose" was improper. *Id.* at 970. Showing that a subpoena's sole purpose is illegitimate is of course sufficient to quash the subpoena. But that does not imply—and *Gertner* did not hold—that a subpoena may be quashed *only* if it has no legitimate purpose whatsoever. To be sure, *Gertner* distinguished *United States v. Tiffany Fine Arts, Inc.*, 718 F.2d 7 (2d Cir. 1983), *aff'd*, 469 U.S. 310 (1985), which enforced a "dual purpose" IRS summons—*i.e.*, one with an authorized and unauthorized purpose. *Gertner*, 65 F.3d at 970-971. But it does not follow from the recognition that a dual-purpose IRS summons sometimes may be enforceable that a subpoena issued *primarily* for an improper purpose must be sustained. That is particularly true given courts' reluctance to limit the IRS's summons power "'absent unambiguous directions from Congress.'" *United States v. Arthur Young & Co.*, 465 U.S. 805, 816 (1983).[33]

[33] The government cites similar dicta from *Donaldson v. United States*, 400 U.S. 517 (1971). But *Donaldson* too was an IRS summons case. And it simply held that because "Congress clearly has authorized the use of the summons in investigating what may prove to be criminal conduct," a civil IRS summons issued for the purpose of determining tax liability may be enforced even when it also may return evidence relevant to a future criminal prosecution. *Id.* at 535-536. That statutory holding, which did not address a subpoena issued primarily for an improper purpose, has no relevance here.

Moreover, the government conflates a policy purpose with a legally authorized purpose. If an agency's policy purpose is not specifically authorized by law, that purpose cannot convert a subpoena animated by improper purpose into a subpoena animated by a dual purpose of the sort that *Gertner* distinguished, that is, a subpoena with an authorized and unauthorized purpose. Rather, as courts across the country confronting similar subpoenas have held, the government must propound "a genuine legitimate investigative purpose, not merely a legal theory" and not just "a policy purpose." *In re Administrative Subpoena to Rhode Island Hospital*,__F.Supp.3d__, 2026 WL 1392565, at *8 (D.R.I. May 14, 2026) (citing cases), *appeal filed*, No.26-1568 (1st Cir.). "To hold otherwise would allow the DOJ to immunize any coercive investigation from the improper purpose doctrine simply by appending an untenable legal theory" or a desired policy outcome to it. *Id.* That is not the law.

In any event, this forfeited argument affects neither the government's substantial rights nor the integrity of these proceedings; it does not even affect the outcome of the case. Even if this Court were to rule that a subpoena can be quashed only if its sole purpose is improper, the Court should still affirm the district court. As the district court held, and as explained above, DOJ has entirely failed to carry its burden of showing that the subpoena serves *any* legally authorized purpose, and

conversely, BCH has established that the subpoena was issued exclusively for an improper purpose, "motivated *only* by bad faith." Add.14 (emphasis added).

As DOJ's investigations have faltered in federal courts, it has pivoted tactics and forums alike. And now, DOJ attempts to warp the law. But no late-breaking legal shifts can overcome BCH's evidence or DOJ's admission that eliminating GAC even where lawful is "exactly what this investigation is about." App.69. Crediting BCH's evidence and the government's word, the district court did not commit a clear error of judgment in holding that "the Government has failed to show proper purpose and, even if it had, that BCH has demonstrated that the subpoena was issued for an improper purpose, motivated only by bad faith." Add.14.

### C. In Any Event, The Subpoena Is Overbroad, Vague, And Unduly Burdensome Such That Enforcing It Would Be Unreasonable

The subpoena can also be quashed on the alternative ground that it is overbroad, vague, and unduly burdensome. While the district court did not reach this issue, this Court may "'affirm on any basis apparent in the record,'" even if that would "'require[] ruling on arguments not reached by the district court.'" *Williams v. United States*, 858 F.3d 708, 714 (1st Cir. 2017). A subpoena must not only be issued for an authorized purpose but also must be "reasonable[]." *Oklahoma Press Publ'g Co. v. Walling*, 327 U.S. 186, 209 (1946). To be reasonable, a subpoena must be "'properly limited in its scope,'" *In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000), with requests that are both "relevant to the authorized purpose"

and "adequately described," *Sturm, Ruger & Co.*, 84 F.3d at 4. A subpoena "will be deemed unreasonable and unenforceable if it is overbroad and disproportionate to the end sought." *Theodore*, 479 F.2d at 754.

The subpoena here does not clear that bar. It imposes a burden that far outweighs any likely relevance of the requested documents to a lawful purpose, which, as explained above (at pp.12-13), is not even present here. Its 15 requests seek documents and information since January 1, 2020, and across all components and operations of BCH, including billing; administrative; patient, physician, and training records; and communications. *See* App.21, 24-26. And at every turn, it assumes maximal scope. Where the subpoena even defines its terms, it defines them broadly. For example, the subpoena's target is BCH as well as "[a]ll of its predecessors, subsidiaries, affiliates, branches, divisions, groups, business units, business segments, operations, units, parent organizations, successors, assigns, plants, and any joint ventures of which they were or are a part." App.20. And the subpoena defines "Employee" to include "any independent contractor or agent, all past and present directors, officers, agents, representatives, attorneys, accountants, advisors, and consultants" who have done work for BCH on a "full-time, part-time, piece-work, commission, volunteer, or other basis, and whether paid or unpaid." *Id.* The subpoena's requests are equally sweeping. They seek "any" and "all" documents within their broadly formulated descriptions. App.20. And as explained

above (at pp.12-13, 30-33), most of the categories of documents this subpoena requests do not plausibly relate to any FDCA offense—the only subject permissible here.

Worse still, the subpoena's sweeping requests are directed at sensitive patient medical records and other highly confidential materials. The subpoena seeks personal health information in the form of billing records, communications among physicians, documents that identify patients (including "by name, date of birth, social security number, address, and parent/guardian information"), documents relating to patients' "clinical indications, diagnoses, or assessments," and all documents relating to "informed consent, patient intake, and parent or guardian authorization" for certain medical treatments. App.24-25.

Across contexts, the law recognizes that such highly sensitive health information warrants heightened protection. For example, a party seeking discovery of records relating to the physical and mental condition of another must satisfy a higher burden than is required for discovery generally. *Compare* Fed. R. Civ. P. 35(a)(2) (requiring "good cause" to obtain medical examination and report), *with* Fed. R. Civ. P. 26(b) (not subjecting ordinary discovery to good-cause standard). Medical records are also subject to an exemption under the Freedom of Information Act. 5 U.S.C. §552(b)(6). And courts have held that "medical records, which may contain intimate facts of a personal nature, are well within the ambit of materials

entitled to privacy protection." *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980).

Health information is afforded additional protection for good reason. The forced disclosure of such private information has a profound impact on patients and doctors alike, intruding on personal decisions and undermining the trust essential to the physician-patient relationship. So it is no surprise that both patients and doctors are sensitive to disclosing it. This "natural sensitivity that people feel about the disclosure of their medical records … is amplified" when opposition to the medical care at issue has "at times erupted into violence," and the subpoenas seeking those records "have generated enormous publicity." *Northwestern Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 928-929 (7th Cir. 2004). And that is unfortunately the case here: Regular threats of violence haunt BCH and other hospitals committed to providing GAC,[34] and DOJ's investigation of these hospitals continues to attract

[34] *See e.g.*, Press Release, U.S. Attorney's Office, D. Mass, Westfield Woman Sentenced for Making Hoax Bomb Threat Against Boston Children's Hospital (July 22, 2024), https://perma.cc/4H7N-M9FE; John Williams (@JohnWillia71018), X (July 28, 2025), https://perma.cc/6EB7-Q6DZ ("Boston Childres[sic] Hospital are mutilating children. You're lucky @AGPamBondi is going to take care of you so i don't you f***ing Godless perverts"); Rachel W (@Raechullgreene), X (July 26, 2025), https://perma.cc/W88F-UC9P (posting "Burn it down" in response to post concerning BCH). BCH received a bomb threat as recently as last month. *See* Bassma, *Boston Children's Hospital Given 'All-Clear' After Police Investigate Bomb Threat*, Boston 25 News (June 11, 2026), https://perma.cc/62R7-PRPD.

national attention,[35] making sensitivities about the private information sought even more acute.

Under these circumstances, the government can compel production of medical records only after demonstrating "that the societal interest in disclosure outweighs the privacy interest on the specific facts of the case." *Westinghouse*, 638 F.2d at 578. Courts around the country have held that identical subpoenas issued to other hospitals should be quashed in whole or part considering their overbroad requests for sensitive patient information. *See, e.g.*, *QueerDoc*, 807 F.Supp.3d at 1304 (the subpoena "seeks to rifle through thousands of patient records hoping to find something—*anything*—to justify its predetermined goal of ending gender-affirming care"); *In re Subpoena No.25-1431-014*, 810 F.Supp.3d at 599-600 (subpoena requests "would strip patients of control over their most personal information, expose intimate details about their bodies and lives, and risk public outing and lasting stigma"); *In re DOJ Subpoena No.25-1431-030*, 2026 WL 33398, at *4 (requests are "'facially overbroad'" and "a dragnet designed to sweep in all patient data related to any prescription of puberty blockers or hormone therapy"); *In re*

---

[35] *See, e.g.*, Ghorayshi & Thrush, *Justice Dept. Demands Patient Details From Trans Medicine Providers*, The New York Times (July 10, 2025), https://perma.cc/A7RE-2KUN; Casiano, *Trump's Justice Department Targets Doctors, Clinics Who Provide Sex Change Procedures To Minors*, Fox News (July 9, 2025), https://perma.cc/UBX6-PBLN.

*Children's Nat'l*, 2026 WL 160792, at *8 & n.17 (subpoena was "oppressive in its breadth"). Here, likewise, the government has not begun to make the required showing, where it has not even tied its subpoena to an authorized investigative purpose. As a result, the subpoena plainly imposes an undue burden and should be quashed on that alternative basis.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING THE GOVERNMENT'S BELATED MOTION TO ALTER OR AMEND THE JUDGMENT

Relief under either Rule 59(e) or Rule 60(b) is "extraordinary" and should be granted only "sparingly." *Fisher*, 589 F.3d at 512; *Palmer*, 465 F.3d at 30. The standard of appellate review is "correspondingly deferential," and the district court's decision on a motion under either rule is reviewed for abuse of discretion. *Palmer*, 465 F.3d at 30; *see also Fisher*, 589 F.3d at 512.

### A. The Government's Appeal Divested The District Court Of Jurisdiction To Consider The Untimely Post-Judgment Motion

The district court's disposition of the government's motion to alter or amend the judgment is entirely the result of the government's own errors. Under Federal Rule of Appellate Procedure 4(a)(4)(A), a Rule 59 or Rule 60 motion generally tolls the period for filing a notice of appeal, but only when the motion is filed "within the time allowed for filing a motion under Rule 59." The government's motion was not. Rule 59(e) sets a 28-day deadline. Rule 6(a)(4) then specifies that the deadline to make a timely filing on the "last day" may be set by local rule. District of

Massachusetts Local Rule 5.4(d), in turn, states that "[a]ll electronic transmissions of documents must be completed prior to 6:00 p.m. to be considered timely filed that day." The government missed that deadline by filing its motion electronically at 10:31 p.m. on October 7, 2025, the 28th day after the district court's September 9 decision. *See* App.96. The government does not dispute that its motion was untimely, nor did it ever seek leave from the district court to file after the deadline or explain its failure to adhere to the court's rules.

Because the government's motion was untimely, it did not toll the period for taking an appeal. As a result, the government was compelled to file a notice of appeal of the court's decision quashing the subpoena before the court could rule on the motion to reconsider. App.115. That preserved the government's appellate rights, but it came at a cost. Filing an appeal has "jurisdictional significance": where the notice does not fall within Rule 4's tolling rule for timely reconsideration motions, the notice of appeal "confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Colón-Torres v. Negrón-Fernández*, 997 F.3d 63, 74 (1st Cir. 2021) (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam)). The government's filing therefore divested the district court of jurisdiction to decide the government's motion to alter or amend its prior order, as the district court held. *See*

*id.* The district court's recognition of the limits of its jurisdiction was not an abuse of discretion, and this Court should affirm on that basis.

### B. The Government's Untimely Motion Is Meritless

Even if this Court were to look past the jurisdictional obstacle, the government's motion to alter or amend fails on the merits. The motion sought reconsideration on the ground that the district court "fail[ed] to afford" the government an "opportunity to respond to the novel burden and standard that the court articulated." Br.46. But that argument rests on a false premise, because the district court did not apply a "new, heightened standard." Br.18. Rather, it applied well-established Supreme Court law. *See supra* pp.21-28. Since the government has not shown that the district court applied the wrong legal standard, the government's "heightened standard" argument offers no basis for the "extraordinary" relief the government sought in its post-judgment motion. *Fisher*, 589 F.3d at 512; *Palmer*, 465 F.3d at 30.

The district court likewise did not abuse its discretion in declining to consider the procedurally improper Hsiao Declaration, and this Court should not consider it either. Because the government filed the Hsiao Declaration with its belated post-judgment motion, the district court had no obligation to consider it. And even if the Hsiao Declaration had been appended to a timely post-judgment motion, it would have been improper. The government was on notice throughout the motion-to-quash

proceedings that it could have submitted a declaration. Instead, it submitted no evidence, arguing then, as it does again now (Br.25-28), that it did not need to. That strategic calculation does not create the "exceptional circumstances" warranting post-judgment relief. *See Fisher*, 589 F.3d at 512.

A post-judgment motion "'does not provide a vehicle for a party to undo its own procedural failures' or to 'introduce new evidence or advance arguments that could and should have been presented to the district court prior to judgment.'" *Quality Cleaning Prods. R.C., Inc. v. SCA Tissue N. Am., LLC*, 794 F.3d 200, 208 (1st Cir. 2015). Here, the government had every opportunity to present evidence supporting an authorized purpose; it simply chose not to. As the district court observed when quashing the subpoena, "[t]he Government ha[d] not submitted any affidavits or other evidence to show proper purpose." Add.11.

Any complaint from the government would be particularly unwarranted here, because the district court specifically prompted it for supporting evidence or allegations at oral argument. App.70-71. Among other things, the court stated that "it would be helpful, if, for example, the government had proffered something along the lines of, look, we've looked at our data and there appears to be X amount of numbers of billing codes under this code for this particular drug and that is raising an eyebrow." App.72. Yet the government stuck to its position that it did not "need an affidavit here because the movant put in the basis for the investigation as evidence

… .” App.67. Moreover, the government admitted that it was “not aware of [allegations] specific” to BCH or even Massachusetts. App.81. After repeatedly refusing invitations to meet its burden, the government cannot ask for the extraordinary relief of a do-over.

Finally, even if considered, the Hsiao Declaration does not establish an authorized purpose for the subpoena. The declaration is predicated on the same novel and unsupported theories of FDCA liability discussed above. *See supra* pp.28-38. It asserts that “prescribing for unapproved uses can itself involve FDCA violations” and that “implants or injectables that require administration by a physician or nurse … plac[e] healthcare providers in the chain of distribution of that drug,” suggesting they could be criminally liable for off-label administration. App.102, 105-106. As explained, these theories of FDCA liability contradict settled law, jettison decades of executive branch practice, and trample States’ traditional authority over the practice of medicine. So they cannot imbue the subpoena with a congressionally authorized purpose. And even if somehow they could, the overwhelming evidence of improper purpose (discussed *supra* pp.23-28) would still furnish a basis to quash the subpoena.

## CONCLUSION

The district court did not abuse its discretion in quashing the subpoena and denying the government’s post-judgment motion. This Court should affirm.

Respectfully submitted,

*/s/ Alan Schoenfeld*

ALAN SCHOENFELD
BOYD JOHNSON
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
alan.schoenfeld@wilmerhale.com
boyd.johnson@wilmerhale.com

AMANDA MASSELAM STRACHAN
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
amanda.masselamstrachan@wilmerhale.com

BRIAN M. BOYNTON
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000

*Attorneys for Petitioner-Appellee The Children's Hospital Corporation, d/b/a Boston Children's Hospital*

JOSHUA S. LEVY
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02119
(617) 951-7000
joshua.levy@ropesgray.com

DOUGLAS HALLWARD-DRIEMEIER
ROPES & GRAY LLP
2099 Pennsylvania Avenue
Washington, DC 20006
(202) 508-4600
douglas.hallward-driemeier@ropesgray.com

BRIAN R. BLAIS
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9090
brian.blais@ropesgray.com

July 14, 2026

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 12,970 words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ *Alan Schoenfeld*
ALAN SCHOENFELD
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
alan.schoenfeld@wilmerhale.com

July 14, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of July, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *Alan Schoenfeld*
ALAN SCHOENFELD
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
alan.schoenfeld@wilmerhale.com

July 14, 2026