**Nos. 25-2092, 26-1093**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

---

IN RE: ADMINISTRATIVE SUBPOENA NO. 25-1431-019

---

THE CHILDREN'S HOSPITAL CORPORATION, d/b/a Boston Children's Hospital,

Petitioner-Appellee,

v.

UNITED STATES DEPARTMENT OF JUSTICE,

Respondent-Appellant.

---

On Appeal from the United States District Court
for the District of Massachusetts

---

**REPLY BRIEF FOR APPELLANT**

---


BRETT A. SHUMATE
*Assistant Attorney General*

BRAD HINSHELWOOD
BRANTLEY MAYERS
*Attorneys, Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 890-9874*

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 1

ARGUMENT .......... 2

I. The subpoena is valid and was properly issued. .......... 2

A. Congress authorized issuance of the subpoena. .......... 2

B. The subpoena's requests are relevant. .......... 7

II. The subpoena did not issue for an improper purpose. .......... 10

III. Even if the district court's improper purpose finding were correct, it would not justify quashing the subpoena .......... 15

IV. The subpoena is not overbroad, vague, or unduly burdensome. .......... 19

V. The district court should have given the government an opportunity to satisfy its new, heightened standard .......... 23

CONCLUSION .......... 26

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

### Cases

*Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*,
57 F.4th 791 (11th Cir. 2022) .................................................................................... 17

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ................................................................................................. 16

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990) ................................................................................................. 15

*Daury v. Smith*,
842 F.2d 9 (1st Cir. 1988) ......................................................................................... 22

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ................................................................................................. 16

*Doe v. United States*,
253 F.3d 256 (6th Cir. 2001) ............................................................................7, 20, 23

*Donaldson v. United States*,
400 U.S. 517 (1971) ............................................................................................15, 18

*ECB USA, Inc. v. Chubb Ins. Co. of N.J.*,
113 F.4th 1312 (11th Cir. 2024)................................................................................. 17

*EEOC v. Shell Oil Co.*,
466 U.S. 54 (1984) ..................................................................................................... 7

*Eli Lilly & Co. v. Staats*,
574 F.2d 904 (7th Cir. 1978) ..................................................................................... 18

*Endicott Johnson Corp. v. Perkins*,
317 U.S. 501 (1943) ................................................................................................... 8

*F.T.C. v. Swanson*,
560 F.2d 1 (1st Cir. 1977) ...................................................................................5, 6, 11

*F.T.C. v. Texaco, Inc.*,
555 F.2d 862 (D.C. Cir. 1977)...............................................................................7, 10

*I. C. C. v. Bay State Transp. Brokers*,
579 F.2d 113 (1st Cir. 1978) .......... 4

*In re Fidelity/Micron Sec. Litig.*,
167 F.3d 735 (1st Cir. 1999) .......... 24

*In re Gimbel*,
77 F.3d 593 (2d Cir. 1996) .......... 4

*In re Grand Jury Subpoenas*,
No. 26-MC-43 PJS, 2026 WL 1783899 (D. Minn. June 22, 2026) .......... 11

*In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*,
823 F. Supp. 3d 1 (D.D.C. 2026) .......... 11

*In re Sealed Case (Admin. Subpoena)*,
42 F.3d 1412 (D.C. Cir. 1994) .......... 20

*In re Search Warrant (Sealed)*,
810 F.2d 67 (3d Cir. 1987) .......... 9

*In re Subpoena Duces Tecum*,
228 F.3d 341 (4th Cir. 2000) .......... 19, 22, 23

*Krupski v. Costa Crociere S. p. A.*,
560 U.S. 538 (2010) .......... 24

*Lynn v. Biderman*,
536 F.2d 820 (9th Cir. 1976) .......... 15, 18

*McPhaul v. United States*,
364 U.S. 372 (1960) .......... 20

*Mendoza v. Bondi*,
133 F.4th 139 (1st Cir. 2025) .......... 17

*NASA v. Nelson*,
562 U.S. 134 (2011) .......... 22

*Nyer v. Winterthur Int'l*,
290 F.3d 456 (1st Cir. 2002) .......... 15

*Okla. Press Pub. Co. v. Walling*,
327 U.S. 186 (1946) .......... 4, 20

*Reich v. Mont. Sulphur & Chem. Co.*,
32 F.3d 440 (9th Cir. 1994) .......... 4

*Samia v. United States*,
599 U.S. 635 (2023) .......... 22

*Sec. & Exch. Comm'n v. Howatt*,
525 F.2d 226 (1st Cir. 1975) .......... 3

*Sec. & Exch. Comm'n v. Jarkesy*,
603 U.S. 109 (2024) .......... 19

*Soo v. Bone Biologics Corp.*,
No. 19-CV-11520-ADB, 2021 WL 1391458 (D. Mass. Apr. 13, 2021) .......... 24

*Sugarloaf Funding, LLC v. U.S. Dep't of the Treasury*,
584 F.3d 340 (1st Cir. 2009) .......... 20

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 16

*Trump v. United States*,
603 U.S. 593 (2024) .......... 10

*United States v. Armstrong*,
517 U.S. 456 (1996) .......... 16

*United States v. Bacto-Unidisk*,
394 U.S. 784 (1969) .......... 5, 9

*United States v. Comley*,
890 F.2d 539 (1st Cir. 1989) .......... 3, 5, 15, 18

*United States v. Gertner*,
65 F.3d 963 (1st Cir. 1995) .......... 15, 18

*United States v. Gleason*,
No. 1:06-cr-229 (E.D.N.Y. 2006) .......... 8, 9

*United States v. Hillie*,
39 F.4th 674 (D.C. Cir. 2022) .......... 17

*United States v. Morton Salt*,
338 U.S. 632 (1950) .......... 19

*United States v. Norwood*,
420 F.3d 888 (8th Cir. 2005) .......... 19

*United States v. Powell*,
379 U.S. 48 (1964) .......... 16

*United States v. Skrmetti*,
605 U.S. 495 (2025) .......... 10

*United States v. Sturm, Ruger & Co.*,
84 F.3d 1 (1st Cir. 1996) .......... *passim*

*United States v. Theodore*,
479 F.2d 749 (4th Cir. 1973) .......... 20, 21

*United States v. Tiffany Fine Arts, Inc.*,
718 F.2d 7 (2d Cir. 1983) .......... 18

*United States v. Tivian Lab'ys, Inc.*,
589 F.2d 49 (1st Cir. 1978) .......... 4

*Usery v. Whitin Mach. Works, Inc.*,
554 F.2d 498 (1st Cir. 1977) .......... 19

*Vahlsing v. Com. Union Ins. Co.*,
928 F.2d 486 (1st Cir. 1991) .......... 16

*Whalen v. Roe*,
429 U.S. 589 (1977) .......... 22

*Yee v. City of Escondido*,
503 U.S. 519 (1992) .......... 17

**Statutes**

18 U.S.C. § 3486 .......... 21

18 U.S.C. § 3486(a)(1) .......... 21

18 U.S.C. § 3486(e) .......... 21

18 U.S.C. § 3486(e)(1) .......... 23

21 U.S.C. § 321(m) .......... 10

21 U.S.C. § 333(a)(2) .......... 9

21 U.S.C. § 352.......... 11

**Other Authorities**

Justice Manual § 1-7.400.......... 13

Restatement (Second) of Torts § 682 cmt. b (A.L.I. 1977).......... 16

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Department of Justice is investigating potential violations of the Food, Drug, and Cosmetic Act (FDCA). As part of this investigation, the Department issued a subpoena to Boston Children's Hospital (BCH). By every metric, the Department's subpoena is enforceable. Congress authorized the Department to issue subpoenas to investigate potential violations of the FDCA, and the subpoena, in an appropriately tailored manner, seeks documents relevant to that investigation. Indeed, even while distorting the legal standard applicable to a court's review of an administrative subpoena, BCH concedes that at least some of the subpoena's requests seek evidence relevant to a legitimate FDCA theory. Still, the district court concluded that the subpoena to BCH is void in its entirety. This extraordinary remedy is entirely unjustified. An administration's policy positions cannot immunize industry actors from investigations into potential violations of federal law. And requiring DOJ to proffer evidence of such wrongdoing before obtaining evidence through a subpoena inverts the entire purpose of a subpoena.

BCH's contrary arguments largely repeat the district court's errors and fail on their own terms. BCH misconstrues the standard for determining whether a subpoena is authorized by Congress, ignoring repeated admonitions from this Court that a subpoena proceeding is not a trial run to test potential theories of liability. BCH similarly contorts the standard for relevance in a subpoena proceeding, in defiance of the precedents of the Supreme Court and this Court. And BCH presses for an

"improper purpose" analysis not only inconsistent with this Court's precedent, but that would provide politically controversial industries of all varieties a free pass from scrutiny whenever an administration seeks both policy change and to enforce existing federal law. That cannot be the rule. BCH may oppose the current administration's policies. It may challenge any eventual enforcement action on whatever grounds the law permits. But it may not convert policy disagreement into immunity from a validly issued subpoena. By allowing BCH to do just that, the district court abused its discretion. This Court should reverse.

## ARGUMENT

### I. The subpoena is valid and was properly issued.

BCH agrees that an administrative subpoena is enforceable if "(1) the subpoena is issued for a congressionally authorized purpose, the information sought is (2) relevant to the authorized purpose and (3) adequately described, and (4) proper procedures have been employed in issuing the subpoena." *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 4 (1st Cir. 1996). That standard, which is "not onerous," is met here. *Id.*; *see* Govt.Br.19-24. BCH's arguments to the contrary—which focus on the first two elements of this Court's test—fail to convince.

#### A. Congress authorized issuance of the subpoena.

The first element of this Court's test considers whether "Congress has vested the [agency] with the authority to issue subpoenas in conjunction" with investigations within the agency's statutory authority and whether the agency has invoked an

authorized purpose "as one of the purposes underlying its subpoena." *United States v. Comley*, 890 F.2d 539, 542 (1st Cir. 1989). Contrary to BCH's suggestion otherwise, BCH.Br.31, the Department's Civil Division has been clear that it issued the subpoena to BCH as part of an investigation into potential violations of the FDCA, *see* Dkt. 21 at 4. And BCH agrees, as did the district court, that the Civil Division can issue subpoenas under 18 U.S.C. § 3486 to investigate FDCA offenses. BCH.Br.28-29; *see* Add.11-12. Even so, BCH argues, and the district court concluded, that this subpoena is not authorized. The district court was wrong, and BCH is too.

BCH devotes much of its brief to arguing that the Department lacks a valid FDCA theory under which BCH could be liable. BCH.Br.32-38. But this Court has "repeatedly admonished that questions concerning the scope of an agency's substantive authority to regulate are not to be resolved in subpoena enforcement proceedings." *Sturm, Ruger & Co.*, 84 F.3d at 5 (citing cases). Instead, so long as the agency's "assertion of authority is not obviously apocryphal," *id.*, the agency must be allowed to "adequately develop a factual basis for a determination as to whether particular activities come within [its] regulatory authority," *Sec. & Exch. Comm'n v. Howatt*, 525 F.2d 226, 230 (1st Cir. 1975).

BCH does not grapple with this Court's repeated admonishments about the narrow scope of review in subpoena proceedings. It instead seeks to fundamentally invert the entire subpoena process. The Department, BCH argues, may investigate only if it already knows enough to identify BCH's specific violations or it can first convince

a court that particular FDCA offenses would be "legitimate." BCH.Br.29; BCH.Br.29-30, 39-41 (demanding "factual predicate"). But that approach asks the court to pre-determine the scope of the Department's authority—and to do so without the benefit of any information that would be relevant to that determination. This Court has long rejected that backwards approach to subpoena proceedings. The question at this point is simply whether "enforcement of the [law at issue] is a purpose properly authorized by Congress," *Sturm, Ruger & Co.*, 84 F.3d at 5, and "[a] subpoena . . . may be judicially enforced without a showing that probable, or even reasonable, cause exists to believe that a violation of law has occurred," *United States v. Tivian Lab'ys, Inc.*, 589 F.2d 49, 54 (1st Cir. 1978). This Court's approach tracks that of the Supreme Court and other courts of appeals, which have regularly rejected similar efforts. *See, e.g.*, *Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 208-09 (1946) ("It is not necessary … that a specific charge or complaint of violation of law be pending or that the order be made pursuant to one. It is enough that the investigation be for a lawfully authorized purpose, within the power of Congress to command."); *In re Gimbel*, 77 F.3d 593, 600 (2d Cir. 1996) ("[T]he FDIC need not articulate an individualized suspicion of wrongdoing to obtain enforcement of its administrative subpoena *duces tecum*."); *Reich v. Mont. Sulphur & Chem. Co.*, 32 F.3d 440, 444 (9th Cir. 1994) (rejecting argument that subpoena should be quashed based on agency's failure to "identify any regulations which might be being violated").

Here, BCH has already acknowledged that the Department "is empowered" by Congress to determine whether BCH or others have violated the FDCA. *I. C. C. v. Bay*

*State Transp. Brokers*, 579 F.2d 113, 115 (1st Cir. 1978). And as the foregoing illustrates, for purposes of demonstrating that a subpoena is within an agency's statutory authority, it is sufficient that the subpoena seeks to investigate potential offenses within the scope of Congress's authorization—in other words, that the assertion of authority is not "obviously apocryphal," *Sturm, Ruger & Co.*, 84 F.3d at 5, or "plainly spurious," *F.T.C. v. Swanson*, 560 F.2d 1, 2 (1st Cir. 1977). If the rule were otherwise—if the Department had to *prove* a case before it could *investigate* it—it would defeat the very purpose of the investigation. And the Department would be impeded from fulfilling its mandate to "protect the public health" by ensuring compliance with the FDCA. *United States v. Bacto-Unidisk*, 394 U.S. 784, 798 (1969).

BCH's reference to declarations offered in other cases (BCH.Br.39) likewise misses the point. As we explained, the government can offer "affidavits of government officials" to substantiate the purpose of an investigation, *Comley*, 890 F.2d at 541, and such an affidavit is hardly "superfluous," BCH.Br.39, for example, when "there is no public information about the existence or scope of [an] investigation," Govt.Br.28. But BCH cannot point to any precedent requiring an affidavit in every case and does not grapple with the reasons such an affidavit is not required here, given that the existence and scope of the investigation is a matter of public record. *See Sturm, Ruger & Co.*, 84 F.3d at 5 (rejecting challenge to administrative subpoena based on government's assertion of investigative purpose and citation to statutory authority); *Comley*, 890 F.2d at 541-42.

BCH in any event fails to engage directly with the explanations the Department offered for the subpoena. BCH admits that drug manufacturers can violate the FDCA and recognizes that the subpoena seeks "documents related to the relationship between BCH and drug manufacturers." BCH.Br.32. BCH thus could well be a witness to misbranding by others, and has no basis to suggest otherwise. Moreover, BCH nowhere responds to the Department's argument that a medical provider can violate the FDCA by, for example, conspiring to misbrand, *see* Gov't.Br.42, let alone explain why such a theory is "plainly spurious," *Swanson*, 560 F.2d at 2. Instead, BCH builds a strawman—by arguing that the Department considers off-label prescribing itself to be an FDCA violation—and devotes over five pages to tearing it down. BCH.Br.33-38. The Department has made clear that this is *not* its FDCA theory. Gov't.Br.36 ("The Department does not contend that the act of writing a prescription for an off-label use would, in and of itself, give rise to FDCA liability."). Therefore, BCH's argument on this point is irrelevant to any issue before the Court. The Department has, quite simply, not "wander[ed] unconscionably far afield" of its FDCA authority. *Swanson*, 560 F.2d at 2.

Finally, BCH's claim of "shifting theories" (BCH.Br.32) is refuted by the record—the Department has consistently explained the basic nature and purpose of the subpoena across the various memoranda and filings here. *See, e.g.*, Govt.Br.12-13; Dkt. 21 at 4. The fact that other statutes may be relevant or under investigation, *see, e.g.*, Dkt. 21 at 5, does not affect the fact that this subpoena is tied to the FDCA piece of the

investigation. In any event, shifting theories, or uncertainty about BCH's status in the investigation, BCH.Br.32n.28, is not evidence of an improper investigation. It is unsurprising that the Department would not reveal every aspect of its investigative plans or the theories it is pursuing at the outset, especially before it receives documents responsive to a subpoena, and it would not be unusual or improper for an investigation to change or develop as it unfolds.

For the above reasons, the district court erred in concluding that the Department "has failed to show proper purpose." Add.14.

**B. The subpoena's requests are relevant.**

BCH also defends the district court's decision by arguing that the subpoena's requests are irrelevant to any "legally valid theory of FDCA liability." *E.g.*, BCH.Br.30-33. BCH again misses the mark.

First, BCH misstates the law. The test for relevance in this context is not whether the evidence is relevant to an element of an investigated offense, but instead "whether the documents requested pursuant to the subpoena are relevant to the . . . investigation being undertaken." *Doe v. United States*, 253 F.3d 256, 266 (6th Cir. 2001); *see F.T.C. v. Texaco, Inc.*, 555 F.2d 862, 874 (D.C. Cir. 1977) (en banc) ("[I]n the pre-complaint stage, ... the relevance of the agency's subpoena requests may be measured only against the general purposes of its investigation."). This standard is "generously construed" and is "not especially constraining," as to afford "the [government] access to virtually any material that might cast light" on its investigation. *EEOC v. Shell Oil Co.*, 466 U.S. 54,

68-69 (1984). Indeed, judicial intervention is warranted only when a request is "plainly incompetent or irrelevant to any lawful purpose of" the Department under the relevant statutory scheme. *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943).

BCH ignores this standard, which is easily met. The investigation at issue is two-pronged: it seeks to determine whether (1) drug manufacturers violated the FDCA by misbranding drugs and (2) BCH violated the FDCA by, for example, conspiring with drug manufacturers to misbrand drugs or by issuing false or misleading labeling. Such a conspiracy could involve, for example, a drug manufacturer paying a doctor to promote and prescribe for an off-label use and then the doctor concealing this arrangement by listing a false diagnosis code. *See, e.g.*, Indictment, *United States v. Gleason*, No. 1:06-cr-229 (E.D.N.Y. Apr. 5, 2006), Dkt. 8 (*Gleason* Indictment).

All fifteen requests are relevant to the general purposes of this investigation. BCH concedes as much with respect to Requests 7-10, which seek documents related to the relationship between BCH and drug manufacturers and can provide evidence of off-label promotion and a conspiracy. BCH.Br.30-31; *see* App.25. And the rest of the requests are relevant too. Request 1 seeks personnel files to identify who at BCH may be involved in violations of the FDCA and who may have information relevant to such violations. App.24. Requests 2 through 6 seek documents that would shed light on the existence of false billing. Govt.Br.22. BCH argues that these requests do not seek relevant information because "submitting false claims and committing billing fraud are not violations of the FDCA," but violations of other federal laws. BCH.Br.31-32. But

evidence of fraud is relevant to the Department's investigation because fraudulent or misleading intent enhances the criminal penalties under the FDCA. *See* 21 U.S.C. § 333(a)(2). And BCH's rhetorical follow-up—"Fraudulent intent as to what?" (BCH.Br.37)—fails to account for the possibility that false billing can serve to conceal a conspiracy to misbrand. *See, e.g.*, *Gleason* Indictment ¶ 14.

Requests 11 through 15 are also relevant. App.25-26. In an investigation aimed at "protect[ing] the public health," *Bacto-Unidisk*, 394 U.S. at 798, evidence as to who received potentially misbranded drugs (Request 11) and what happened to those patients (Request 15), is obviously relevant, especially under the low standard in this context.

Patient records (Request 12) are relevant in determining whether BCH conspired to violate the FDCA. Most importantly, with the patient records, the Department will be able to determine why the drugs were used. *Cf. In re Search Warrant (Sealed)*, 810 F.2d 67, 73 (3d Cir. 1987). If for an off-label purpose, the records may reveal patterns suggestive of off-label promotion, such as a shift toward a preference for a particular company's drug following a meeting with a pharmaceutical company representative. And they also could reveal evidence suggestive of fraud, for example, a shift in diagnostic or billing codes across multiple patients following a meeting with a pharmaceutical company representative. This explanation—fully keyed to misbranding—rebuts the claim that the Department is merely focused on false billing for its own sake.

Disclosures about off-label uses (Request 13) can provide evidence of drug labeling—which includes any "written, printed, or graphic matter . . . accompanying" the drug, 21 U.S.C. § 321(m)—and are thus relevant to the Department's investigation into whether BCH disseminated false or misleading labeling. And BCH's communications related to the safety of puberty blockers or hormones used in the treatment of minor patients (Request 14) can provide evidence into whether, if BCH added labeling, it did so knowing the new labeling was false and misleading.

For these reasons, all fifteen requests are relevant to "the general purposes" of the investigation. *Texaco*, 555 F.2d at 874.

## II. The subpoena did not issue for an improper purpose.

As the Department explained in its opening brief (Govt.Br.32-38), the district court fundamentally erred when it concluded that the administration's policy views meant that the Department issued the subpoena to BCH for an improper purpose. No precedent supports such a limit on the Executive Branch's "conclusive and preclusive" enforcement authority, *Trump v. United States*, 603 U.S. 593, 620 (2024), and nothing in BCH's response demonstrates otherwise. The federal government can simultaneously advocate for "rational" policy positions, *United States v. Skrmetti*, 605 U.S. 495, 523 (2025), and enforce existing law.

BCH's response largely rehashes the district court's erroneous reasoning. First, BCH asserts that the administration is engaged in a "campaign to end" so-called gender-affirming care (GAC). BCH.Br.23. BCH next claims that the Department issued the

subpoena to "harass[] hospitals and doctors" and in service of the administration's campaign to "criminalize[] GAC." BCH.Br.24. And then, BCH claims that this campaign is an affront to federalism and cause for quashal because the subpoena constitutes a "tactic" to settle a "collateral dispute." BCH.Br.25.

What this narrative misses is the obviously legitimate "basis in federal law" for the subpoena's issuance. BCH.Br.24.[1] Although "providing GAC to minors" is "not a [federal] crime," BCH.Br.23-24, misbranding drugs is, *see* 21 U.S.C. § 352. And the Department is investigating potential instances of misbranding. *See supra* at 2-7. In other words, the subpoena to BCH *is* "for investigating crimes" and is not predicated on "spurious theories of criminal liability." BCH.Br.28. And the enforcement of existing law—the facial legitimacy of which BCH does not question—presents no disruption of the "usual constitutional balance between the States and the Federal Government." BCH.Br.24 (quotation omitted). Put simply, the Executive Branch does not have to choose between taking steps to enforce policies already codified and advocating for new ones.

[1] The investigatory justification for the subpoena distinguishes this case from those on which BCH relies. *See In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 823 F. Supp. 3d 1, 13 (D.D.C. 2026) ("[T]he Government counters with only a tenuous assertion of a legitimate purpose."); *In re Grand Jury Subpoenas*, No. 26-MC-43 PJS, 2026 WL 1783899, at *6 (D. Minn. June 22, 2026) ("[T]he Department has struggled—without success—to identify a single plausible investigatory justification for the subpoenas.").

As the Department previously explained, accepting that premise would have "startling consequences" and "preclude government investigations into anything touching" on issues in which an administration has expressed policy preferences. Govt.Br.34. BCH denies that any "slippery slope" exists, BCH.Br.28, but offers no limiting principle. An administration that advocated for a ban on sports gambling, or for limits on cryptocurrency, would be equally subject to objections that its steps to enforce existing law in those areas were premised on "spurious theories of criminal liability" that subpoena recipients would ask courts to pre-adjudicate, and recipients could equally point to public statements expressing policy views as evidence that the subpoenas were designed "to intimidate organizations into ceasing lawful conduct." BCH.Br.28. This Court should not open the door to such wide-ranging consequences.

BCH also seems to think that the intensity of the administration's interest in enforcing federal law and altering federal policy—based on actions taken after the subpoena's issuance—somehow retroactively taints this subpoena's issuance. BCH.Br.27. But additional and legitimate federal actions—including actions at the core of the Executive Branch's powers and aimed at ending violations of federal law—provide no evidence of bad faith for the same reason that the issuance of this subpoena

does not.[2] BCH's argument on this front is just another unavailing attack on "core executive power." Govt.Br.35.[3]

More generally, BCH's arguments on improper purpose repackage its objections to the Department's statutory authority and the relevance of the requests. BCH asserts, for example, that the "scope of the subpoena" is evidence of improper purpose. BCH.Br.25-26; Add.12. But this subpoena is of equal breadth to the subpoenas previously issued and enforced in this space. *See* Govt.Br.40-44; *infra* at 19-23. This is yet more evidence that here, like in the past, the Department is motivated by the manifestly proper purpose of discerning and prosecuting violations of federal law. And BCH's argument that improper purpose is evident from the "disconnect" between the subpoena's requests and "any plausible theory of FDCA liability" is similarly unavailing. BCH.Br.26. That simply repeats BCH's relevance arguments, and as already explained, all fifteen of the subpoena's requests are relevant to the investigation, including to FDCA theories that BCH does not challenge. *See supra* at 7-10.

---

[2] Pursuant to Federal Rule of Criminal Procedure 6(e), the Department is not presently permitted to confirm or deny BCH's assertions (BCH.Br.27) concerning the issuance of grand jury subpoenas.

[3] BCH also claims that a press release concerning the issuance of the administrative subpoena to BCH (among others) is evidence of improper purpose. BCH.Br.10-11. But announcing the existence of investigations, as appropriate, is contemplated by longstanding Department regulations. *See* Justice Manual § 1-7.400; Press Release, U.S. Dep't of Justice, *Attorney General Merrick B. Garland Announces Investigation of the City of Minneapolis, Minnesota, and the Minneapolis Police Department*, https://perma.cc/LG8R-YSZQ (Apr. 21, 2021).

Last, BCH turns to distorting the record. BCH claims that, at oral argument in front of the district court, the Department admitted that "this investigation is about" "reduc[ing] or elimin[ating] gender-related care to minors." BCH.Br.26 (quoting App.69). A review of the transcript proves otherwise. In arguing that the administration's policy views do not justify quashal, the attorney stated twice within the same sentence that the "investigation is about" the medical treatments at issue here: "medicalized gender-related care to minors" or "medicalized gender-affirming care of minors." App.69. These statements plainly go to the investigation's *scope*—not the investigation's *intent*. And the other language BCH quotes merely expresses the executive branch's "policy" goal—which is "to reduce or eliminate gender-related care for minors"—not the focus of this investigation. *Id.* Again, nothing about this policy goal is inconsistent with, or in any way tarnishes the legitimacy of, the Department's focus on enforcing existing law.

BCH also claims improper purpose based on a remark from a "high-ranking DOJ official" at a Federal Trade Commission event providing that DOJ was "working on it" when "another presenter suggested prosecuting GAC providers would 'stop' GAC 'even in blue States.'" BCH.Br.2; *see* Add.13. But a review of the transcript reveals that BCH's representation is again inaccurate. The quoted statement comes in response to a suggestion that the Department "enforce the law[s]" that "already exist" prohibiting the use of "fraudulent" "diagnosis codes." Federal Trade Commission, *The Dangers of "Gender-Affirming Care" for Minors* at 25 (July 9, 2025), https://perma.cc/Y97Y-668X.

BCH cannot seriously contest that enforcing federal law prohibiting healthcare fraud is a proper purpose.

* * *

This Court requires "firm evidence" of improper purpose to justify quashing a subpoena. *Comley*, 890 F.2d at 542-43. And a subpoena recipient bears a heavy burden in seeking such a relief. Here, all BCH has, and all the district court cited, are policy statements with which it disagrees. But such statements cannot purchase immunity from a valid federal investigation. In concluding otherwise, the district court "based its ruling on an erroneous view of the law" and abused its discretion. *Nyer v. Winterthur Int'l*, 290 F.3d 456, 461 (1st Cir. 2002) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)). This Court should reverse.

### III. Even if the district court's improper purpose finding were correct, it would not justify quashing the subpoena.

As the foregoing illustrates, an administration's policy views and its related enforcement priorities cannot be a basis on which to infer improper purpose. But even if those policy views could be construed as relevant to the improper purpose inquiry, that still would not justify quashal of the subpoena here. This Court has made clear that quashal is unwarranted when a proper purpose is paired with an improper one. *United States v. Gertner*, 65 F.3d 963, 970 (1st Cir. 1995) (affirming quashal because the "sole purpose" was improper); *see Lynn v. Biderman*, 536 F.2d 820, 826 (9th Cir. 1976). And the Supreme Court has said the same. *Donaldson v. United States*, 400 U.S. 517, 533

(1971) ("[W]here the *sole* objective of the investigation is to obtain evidence for use in a criminal prosecution, the purpose is not a legitimate one and enforcement may be denied." (emphasis added)).

This rule makes sense. After all, the Supreme Court in *United States v. Powell*, the case on which BCH places so much reliance, said that the improper purpose inquiry is necessary to ensure a court's "process" is not "abused." 379 U.S. 48, 58 (1964). And a court's process is *not* abused "even though the person using the process may have an improper motive in addition to his lawful intention." *Vahlsing v. Com. Union Ins. Co.*, 928 F.2d 486, 490 (1st Cir. 1991); *see also* Restatement (Second) of Torts § 682 cmt. b (A.L.I. 1977), Westlaw (database updated June 2026). This rule also receives support from basic principles of administrative law—that inquiries "into the mental processes of administrative decisionmakers [are] usually to be avoided," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), and that "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons," including being "prompted by an Administration's priorities." *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019). And any contrary rule would threaten to "unnecessarily impair the performance of a core executive constitutional function," *United States v. Armstrong*, 517 U.S. 456, 465 (1996), choosing "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021).

Recognizing that the above caselaw proves fatal for its quest to avoid investigation, BCH throws the kitchen sink. But none of its arguments persuade.

BCH starts by claiming that the Department's "sole purpose" argument is "forfeited." BCH.Br.41-42. But parties cannot forfeit the application of governing rules of law established by circuit precedent. *See, e.g.*, *ECB USA, Inc. v. Chubb Ins. Co. of N.J.*, 113 F.4th 1312, 1321 (11th Cir. 2024) ("A party can no more waive or forfeit the canons [of construction] for appellate purposes than it can waive or forfeit the existence of a precedent or the words of a statute."); *United States v. Hillie*, 39 F.4th 674, 684 (D.C. Cir. 2022) ("[A] party cannot forfeit or waive recourse to a relevant case just by failing to cite it." (quotation omitted)). Moreover, there is no doubt that the question goes to the issues raised below. *See Yee v. City of Escondido*, 503 U.S. 519, 535 (1992); *Mendoza v. Bondi*, 133 F.4th 139, 145 n.1 (1st Cir. 2025) ("[A] litigant is not limited to the precise arguments made below in support of a claim."). The subpoena's enforceability in light of its purpose was the key issue below, *see, e.g.*, Dkt. 4 at 12-18, Dkt. 21 at 4-13, and the focus of the district court's analysis, *see* Add.9-14. The question in this appeal has been the question throughout—whether the subpoena is enforceable under this Court's precedents despite the administration's policy views—and this Court is "duty bound to apply the correct law" in determining whether quashal is proper, *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 816 n.8 (11th Cir. 2022) (en banc).

BCH's other efforts to avoid this Court's precedents fare no better. BCH.Br.43-44. BCH acknowledges, as it must, that in *Gertner* this Court affirmed quashal of a

subpoena that had "only" an improper purpose and distinguished a case—*United States v. Tiffany Fine Arts, Inc.,* 718 F.2d 7 (2d Cir. 1983)—in which the issuing agency had two purposes, one proper and one improper, 65 F.3d at 970-71. BCH likewise admits that the Supreme Court in *Donaldson* said something "similar." BCH.Br.44n.33; *see* 400 U.S. at 532-33. BCH's attempt to argue these cases are different because they concern "IRS summons[es]" is not compelling. BCH.Br.44&n.33. Such summonses do not have a unique status; the court's role in a subpoena proceeding is "strictly limited" no matter the agency at issue, *Comley*, 890 F.2d at 541, and the same principles that counsel against intervention in IRS subpoena proceedings apply with equal force to other administrative subpoenas Congress has expressly authorized.

The Ninth Circuit's opinion in *Lynn* demonstrates this well. There, the Ninth Circuit opined that the agency administrator—an employee of the Department of Housing and Urban Development—had a "firm intention" to use the customer lists obtained from the subpoena to provide "erroneous" and unauthorized advice to the subpoenaed business's customers, which the court ruled "was not a legitimate purpose." 536 F.2d at 826. Despite finding an improper purpose, the court, relying on *Donaldson*, affirmed an enforcement order after finding a proper purpose too. *Id.* ("It is not . . . a ground to deny enforcement of a subpoena that it is being employed for a wrongful purpose if there is also a legitimate purpose for the subpoena."). As the Seventh Circuit recognized in applying the same rule to a subpoena by the Comptroller General, that simply reflects the application of a "principle of administrative law." *Eli Lilly & Co. v.*

*Staats*, 574 F.2d 904, 910 (7th Cir. 1978). Although the Department cited *Lynn* in its opening brief, Govt.Br.30, BCH offers no response.

Finally, BCH regurgitates its argument that the Department has not identified a "genuine legitimate investigative purpose" and thus, "[e]ven if this Court were to rule that a subpoena can be quashed only if its sole purpose is improper, the Court should still affirm the district court." BCH.Br.45-46. BCH's contention is wrong "no matter how many times it repeats those words." *Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109, 138 (2024); *see supra* at 2-7.

## IV. The subpoena is not overbroad, vague, or unduly burdensome.

BCH also argues that the subpoena can "be quashed on the alternative ground that it is overbroad, vague, and unduly burdensome." BCH.Br.46-51. This argument is wrong for three reasons.

To start, overbreadth is not an alternative ground for affirmance. This Court has specified that overbreadth would at most be a starting point to narrow the subpoena, not quash it entirely. *Usery v. Whitin Mach. Works, Inc.*, 554 F.2d 498, 503 (1st Cir. 1977); *see, e.g.*, *United States v. Norwood*, 420 F.3d 888, 896 (8th Cir. 2005).

Also, BCH failed to make "reasonable efforts . . . to reach accommodation with the government" before moving to quash. *In re Subpoena Duces Tecum*, 228 F.3d 341, 351 (4th Cir. 2000); *see United States v. Morton Salt*, 338 U.S. 632, 653 (1950). This failure comes even though the Department, to advance the investigation, is "willing to negotiate scope" with BCH. App.78.

Those threshold flaws—which were noted in the Department's opening brief, *see* Govt.Br.40-41, but remain unaddressed by BCH—are alone enough to reject BCH's argument. But if more were needed, BCH is wrong on the merits. Whether a subpoena is overbroad turns on "the nature, purposes and scope of the inquiry." *Walling*, 327 U.S. at 209. With § 3486, Congress gave "broad subpoena power" to the Attorney General. *Doe*, 253 F.3d at 265. And the subpoena to BCH, which is like other subpoenas "in this area," Govt.Br.23-24, 41-44, stems from a "broad" investigation, *McPhaul v. United States*, 364 U.S. 372, 382 (1960). Also, as explained, all the subpoena's requests—from those that pertain to "billing" to those concerning "patient[s]" (BCH.Br.47)—relate to potential FDCA offenses. *See supra* at 7-10.

BCH's protestations concerning requests for "any" and "all" documents (BCH.Br.47) are unavailing because the requests are "limited by reference to particular subject matters," and therefore "are not overly broad." *Sugarloaf Funding, LLC v. U.S. Dep't of the Treasury*, 584 F.3d 340, 348 (1st Cir. 2009). So are BCH's claims of a "fishing expedition." BCH.Br.40. The close fit between the requests in the subpoena, the nature of the investigation, and the evidence the Department regularly uses in FDCA misbranding prosecutions refutes such a claim. The Department is not seeking personal financial documents to uncover "other wrongdoing, as yet unknown." *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1418 (D.C. Cir. 1994). Nor is the Department—like in *United States v. Theodore*, 479 F.2d 749 (4th Cir. 1973)—transgressing the limits of the

relevant authorization statute.[4] 18 U.S.C. § 3486 allows the government to require "the production of any records or other things relevant to the investigation." 18 U.S.C. § 3486(a)(1)(B)(i).

BCH's arguments concerning "sensitive patient information" are similarly unconvincing. BCH.Br.48-51.[5] For one, BCH does not explain how the private nature of this information means that production of these documents would be burdensome. Instead, BCH appears to advance another relevance argument in disguise, asserting that a "higher burden" must be met before such materials could be disclosed. Yet HIPAA itself contains no such "higher burden," even as it recognizes that HIPAA subpoenas will be used to obtain patient records. *See* 18 U.S.C. § 3486(e) (prescribing limitations on use of "[h]ealth information about an individual that is disclosed under this section"); *cf.* BCH.Br.48 (citing federal rule creating higher standard for certain information). There is no license for a court to impose different standards of relevance on different

[4] In *Theodore*, the IRS issued a summons to an accounting service requesting the "firm's records relating to tax returns prepared from 1969 through 1971." 479 F.2d at 752. The Fourth Circuit concluded that this open-ended request violated the terms of 26 U.S.C. § 7602, the statute at issue, which authorizes a summons for the purpose of, among other things, "ascertaining the correctness of any return . . . [or] determining the liability of any person." 479 F.2d at 754.

[5] "Regular threats of violence" are unacceptable, BCH.Br.49, and the Department has prosecuted such cases, as BCH recognizes, BCH.Br.49n.34. But one victimizer's behavior cannot immunize from scrutiny the conduct of other potential victimizers. The Department owes to all victims, BCH included, the pursuit of justice.

types of information in the absence of any indication from Congress that the standards should differ from those applicable to all other administrative subpoenas.

To the extent BCH attempts to ground such a standard in a purported substantive due process right to privacy in medical records against a lawful subpoena, the Supreme Court has never endorsed a constitutional right to "informational privacy." Instead, it has merely assumed the right's existence in cases *upholding* the government's access to personal information. *See NASA v. Nelson*, 562 U.S. 134, 138, 146-48 (2011). The Supreme Court has also recognized that "disclosures of private medical information" are "often an essential part of modern medical practice." *Whalen v. Roe*, 429 U.S. 589, 602 (1977). And, for its part, this Court has recognized that any asserted right "must often give way to considerations of public interest." *Daury v. Smith*, 842 F.2d 9, 13 (1st Cir. 1988).

Here, the public's interest in the enforcement of the law clearly outweighs any privacy interest. Regarding the latter, the possibility of disclosure "is not meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with many facets of health care." *In re Subpoena Duces Tecum*, 228 F.3d at 351 (quotation omitted). Regarding the former, the Department has a "compelling interest in finding, convicting, and punishing those who violate the law," *Samia v. United States*, 599 U.S. 635, 655 (2023), and here, Congress has specifically authorized the Department to collect records—including patient records—while investigating potential offenses. That interest "outweighs the privacy rights of those whose records were turned over to

the government, particularly in light of the limitation placed on uses of subpoenaed information by § 3486." *In re Subpoena Duces Tecum*, 228 F.3d at 351; *see* 18 U.S.C. § 3486(e)(1).

Against this backdrop, it is no surprise that no court of appeals has embraced the premise that a HIPAA subpoena that obtains patient records in any respect violates any right to informational privacy, even though such records are regularly obtained through HIPAA subpoenas. *See, e.g.*, *In re Subpoena Duces Tecum*, 228 F.3d at 351; *Doe*, 253 F.3d at 265 (enforcing subpoena that included "requests for the files of patients"). This Court should not be the first.[6]

## V. The district court should have given the government an opportunity to satisfy its new, heightened standard.

Even if the new heightened standard the district court imposed was somehow legally correct, the district court still should have permitted the government an opportunity to satisfy that new standard. Govt.Br.45-47.

BCH primarily responds by ducking the issue, arguing that the Department's appeal divested the district court of jurisdiction to consider the Department's post-judgment motion intended to satisfy the district court's new standard. BCH.Br.51-53; *see* Add.17-18. But BCH does not dispute the basic fairness of permitting a litigant to

[6] Although BCH claims that the subpoena's requests are not "adequately described," BCH.Br.47 (quoting *Sturm, Ruger & Co.*, 84 F.3d at 4), it does not substantiate this argument, which is unavailing in any event, Govt.Br.23.

attempt to satisfy a newly announced standard through *some* procedural mechanism. Nor could it. *Cf., e.g.*, *In re Fidelity/Micron Sec. Litig.*, 167 F.3d 735, 737 n.1 (1st Cir. 1999) (disapproving "of district courts imposing rules of practice without some form of notice that would allow the parties and their counsel to conform their conduct accordingly"); *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 550 (2010) (recognizing "the preference expressed in the Federal Rules of Civil Procedure in general . . . for resolving disputes on their merits"). BCH contends that the district court applied "well-established Supreme Court law," not a "new, heightened standard," BCH.Br.53, but whatever else might be said of BCH's arguments, there can be little doubt that BCH has not pointed to a single case in which a subpoena has been quashed in a similar posture. To the extent BCH argues that the Department should have anticipated such a heightened standard, BCH.Br.53-54, there was no reason to anticipate that this case would become the first of its kind, and there are obvious reasons why the Department, unless required, would not want to publicly disseminate evidence while in the process of an investigation. Regardless of the correctness of the district court's jurisdictional analysis, there can be little debate that some further process was appropriate.[7]

[7] Of course, the district court had the Department's motion before it for a month before the Department, to protect its appellate rights, filed a notice of appeal. At any point in that period the court could have addressed the motion, or at least made clear that it regarded the motion as timely (and thus as tolling the time to appeal), as the district court routinely excuses compliance with the 6pm deadline set by local rules where no prejudice has resulted. *See Soo v. Bone Biologics Corp.*, No. 19-CV-11520-ADB, 2021 WL 1391458, at *4 (D. Mass. Apr. 13, 2021) (collecting such cases).

BCH is also conspicuously silent about the effects of the district court's analysis. BCH does not dispute that the district court's approach—and, indeed, BCH's—would leave the Department unable to pursue *any* subpoena, even a new one supported by the factual information the district court deemed lacking. Nor does BCH grapple with the full factual content of the declaration the Department offered here, which not only identified features of BCH's own practices warranting further investigation, but also described in greater detail the results of the investigation so far. *See* App.110-11. BCH instead takes snippets of the declaration out of context, claiming that the Declaration suggests that "off-label administration" could be a basis for criminal liability. BCH.Br.55. Nowhere in the declaration is there any suggestion that off-label administration alone can provide a basis for FDCA liability. And nowhere in BCH's brief is any refutation of the declaration's information concerning potential misconduct at BCH. App.110-11. The declaration confirms what should have been obvious from the beginning—the Department issued the subpoena for a proper purpose. The district court erred in concluding otherwise.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

*/s/ Brantley Mayers*
BRAD HINSHELWOOD
BRANTLEY MAYERS
*Attorneys, Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 890-9874*
*brantley.t.mayers@usdoj.gov*

August 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,476 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Brantley Mayers*
Brantley Mayers